**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GISELLE HIGUERA Administrator for the Estate of Anthony Alvarez and as mother of A.A., a minor, | ) ) ) | No. 22 C 964 |
| | ) | |
| Plaintiff, | ) | Honorable Judge Seeger |
| | ) | |
| v. | ) | |
| | ) | Honorable Magistrate Judge Cole |
| City of Chicago and City of Chicago Police Officers Evan Solano, Star No. 12874 and Sammy Encarnacion, Star No. 11790, | ) ) ) | |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

**FIRST AMENDED COMPLAINT**

NOW COMES the Plaintiff, GISELLE HIGUERA, as administrator of the Estate of

Anthony Alvarez, deceased and as mother of A.A. a minor (hereinafter referred to as "Plaintiff"),

by and through her attorneys, and for her First Amended Complaint against the Defendants, City

of Chicago and City of Chicago Police Officers Evan Solano, Star No. 12874 and Encarnacion,

Star No. 11790.

**INTRODUCTION**

1.      This action, arising out of the shooting death of Anthony Alvarez ("Plaintiff")

caused by the Defendant Officers, is brought pursuant to 42 U.S.C. Section 1983 to redress the

deprivation under color of law of Decedent's rights as secured by the United States Constitution.

2.      On March 31, 2021, at the age of 22 years old, Anthony Alvarez was killed when

he was shot in the back and his left leg without lawful justification by Defendant Chicago Police

acting under color of law as police for Defendant City of Chicago.

3.      This Court has jurisdiction of the action pursuant to 28 U.S.C. Section 1331 and U.S.C. Section 1367, and venue is proper under 28 U.S.C. Section 1391(b).  On information and belief, all parties reside in the judicial district, and the events giving rise to the claims occurred within the district.

## PARTIES

4.      Anthony Alvarez, until the time of his death, was a resident of Chicago, Cook County, Illinois.

5.      Giselle Higuera is the mother of Anthony Alvarez's minor child A.A. and has been appointed Administrator of his Estate. This action is brought on behalf of Anthony's Estate and on behalf of A.A., a minor, for Anthony's Death, caused by the Defendant Officers and the City of Chicago.

6.      Defendants Solano and Encarnacion, herein referred to as "Defendants" and/or "Defendant Officers", at all times relevant to this complaint, were Chicago Police Officers employed by the City of Chicago Police Department, and agents of the City of Chicago, on duty, acting within the scope of their employment and under color of state law.  The Defendant Officers are sued in their individual capacity.

7.      The City of Chicago is a municipal corporation organized under the laws of the State of Illinois and, at all relevant times, was the employer of the defendant officer.

## BACKGROUND

**I.      The Reckless Shooting of Anthony Alvarez.**

8.      On the evening of March 31, 2021, Anthony Alvarez was walking.

9.      Anthony was holding two plastic grocery bags in one hand and what appears to have been a Styrofoam cup in the other.

2

10.     The Defendant Officers did not witness Anthony breaking any law.

11.     The night prior to the shooting, the Defendants had followed Anthony in their unmarked police vehicle without notifying dispatch or activating their body-worn cameras.

12.     Now, near midnight on March 31, 2021, Defendant Encarnacion said, "there's Alvarez" to his partner Defendant Solano.

13.     The officers agreed to go after him.

14.     There were no warrants for Anthony's arrest, nor was there any investigative alert to notify officers to stop or speak to Anthony.

15.     Anthony had no criminal convictions.

16.     Seeing Anthony holding the grocery bags and Styrofoam cup, they did a sharp u-turn.

17.     The Defendants drove their vehicle straight at any Anthony.

18.     When the officers assaulted Anthony, driving their unmarked SUV at him at a high speed, Anthony became startled.

19.     To avoid being struck, Anthony dropped his grocery bags and cup, and ran.

20.     Defendants did not radio for assistance or notify OEMC of their police action when they were driving at Anthony.

21.     Defendants did not activate their body worn cameras while they were driving at Anthony.

22.     The Officers drove at Anthony through the gas station, making several turns while driving up behind him.

23.     With Defendants' SUV mere feet behind him, Anthony reached the sidewalk and avoided getting hit.

24.     Defendant Officers did not radio for assistance before jumping out of their car and initiating their deadly foot chase.

25.     Defendant Officers did not activate their body-worn cameras before jumping out of their car and initiating their deadly foot chase.

26.     Approaching Anthony as Defendants did—by driving their car at him and initiating a dangerous foot chase without adequate cause—constituted excessive force.

27.     Defendant Encarnacion exited the car first and immediately began chasing Anthony Alvarez.

28.     According to the publicly released investigation file, Defendant Encarnacion told his supervisor Sgt. Haran, that he had fired his gun.

29.     When the magazine of Encarnacion's gun was inspected after the shooting, it had one bullet unaccounted for.

30.     Anthony lost his footing as he ran out of the mouth of the alley onto the lawn of a home located on the 5200 block of West Eddy Street, Chicago, Illinois.

31.     Defendant Officer Solano ran past his partner and turned onto Eddy Street where he saw Anthony.

32.     Defendant Officer Solano immediately fired several shots at Anthony striking him in the back and leg.

33.     Anthony did not threaten Defendant Officers or anyone else.

34.     With his last words, Anthony asked Defendant Solano, "Why did you shoot me?"

35.     Anthony died from his wounds.

36.     The Defendant Officers used inappropriate, unwarranted, and unjustifiable force against Anthony.

4

37.     As a result of Defendant Officers' unlawful use of force, Anthony suffered pain, before the gunshot wounds eventually killed him.

38.     Even after violating Anthony's rights by driving his police vehicle right at him, initiating a reckless foot pursuit, and shooting and killing him; Defendants felt free to act with impunity with regard to the safety of other Chicago citizens in other unjustifiable events.

## II.     Defendants' Lack of Training, a Lack of an Appropriate Foot Chase Policy, and a Lack of Meaningful Discipline Caused Anthony Alvarez's Death.

39.     Defendants have claimed that they received no meaningful training as to how to conduct a foot chase.

40.     Defendants testified to the effect that they need actual field or simulated training, presenting multiple scenarios, to practice how they would react and to ensure that they implement best practices.

41.     Defendants testified that they did not receive such training.

42.     Defendants testified that training bulletins, which do not have the authority of a General Order or other directive, are merely suggestions.

43.     Defendant Solano claimed that his review of the training bulletin regarding foot chase policy caused him to deviate from what he thought was the safest course of action.

44.     Defendant Solano testified that without the bulletin he would have remained in his car and not run to an uncovered position.

45.     According to the publicly available investigation file, Officer Solano stated that deadly force was necessary because he was unable to seek cover.

46.     In an interview following the shooting incident Defendant Encarnacion stated that he has not received any real foot pursuit training, and that he regarded the CPD training bulletin to constitute suggestions and recommendations.

5

47.     Defendant Encarnacion also stated that the bulletin did not provide sufficient guidance.

48.     Defendants' direct supervisor, Sgt. Haran acknowledged during his deposition, that there was no foot pursuit policy that he was aware of.

49.     As described below, Chicago policy makers have known for many years that proper foot pursuit training is essential for protecting both officers and civilians.

50.     Despite knowing for many years before Anthony's death of the importance of having proper foot pursuit training and policy, at the time of his death, no appropriate policy had been adopted.

51.     Chicago police officers had no serious guidance about how to conduct a foot chase, resulting in numerous deaths and injuries.

52.     Despite claiming that the "sanctity of human life" is the highest priority in its use of force documentation, the City played political ping-pong, caring more about appearances that than the lives of its employees and constituents.

## II.     Failure to Discipline the Defendants Allowed them to Believe that they Could Act with Impunity.

53.     Defendant Officers believed that they could stop individuals and/or conduct interviews without reporting or documenting it as a police action—no body camera, no reporting, and no contact with OEMC.

54.     At the time of Defendant Solano's deposition, this was still his belief.

55.     Defendant Officers have previously committed serious misconduct in the area where they killed Anthony Alvarez. *See* Exhibit A.

56.     On September 10, 2020, Defendants were drinking at a bar roughly two miles away from where they eventually killed Anthony Alvarez.

6

57.    Defendants' drinking ended in a fist fight with other Latino individuals.

58.    A woman who lived less than two blocks from the bar called the police after an intoxicated off-duty police officer tried to break into her house claiming that he was the victim of a battery.

59.    This was not an isolated incident.

60.    Defendant Encarnacion has long had a serious drinking problem that caused him to commit crimes; his frequent intoxication has interfered directly with his police duties.

61.    For example, Defendant Encarnacion in 2016 to 2017, often got drunk and became dangerously abusive to his then girlfriend. *See* Exhibit B.

62.    COPA made a finding of "Sustained" to allegations that "On various dates and times between June 2016 and November 2017 at various locations, Officer Encarnacion was intoxicated while armed with a firearm in violation of Rule 6."

63.    The Civilian Office of Police Accountability (COPA) made a finding of "Sustained" to allegations that Defendant Encarnacion struck another vehicle with his car and fled the scene.

64.    The Civilian Office of Police Accountability (COPA) made a finding of "Sustained" to allegations that Defendant Encarnacion pointed a gun at his girlfriend and pushed her to the ground.

65.    The Civilian Office of Police Accountability (COPA) made a finding of "Sustained" to allegations that Defendant Encarnacion put his weapon in his mouth and pulled the trigger.

66.    The Civilian Office of Police Accountability (COPA) made a finding of "Sustained" to allegations that Defendant Encarnacion fired his weapon through his glass front door and failed to notify the police.

67.    COPA and the City of Chicago had video evidence of many of the accusations of Defendant Encarnacion's ex-girlfriend since 2017, but failed to take any disciplinary action or make any findings until the summer of 2022.

68.    It took roughly five years for COPA to make its findings, which might not even be final at this point.

69.    Even after participating in this shooting incident, based on publicly available news sources, on July 29, 2022, Officer Encarnacion fired his gun at two fleeing suspects.

70.    For five years Defendant Encarnacion was untouchable, and he knew it.

71.    His partner, Defendant Solano—and every other officer in the CPD—knew that officers should be protected from responsibility for their actions above all other considerations.

72.    Defendant Solano, Encarnacion's partner for many years, was directly affected by Encarnacion's actions while intoxicated and occasionally implicated in them.

73.    Only in 2022, after another officer told Solano that he needed to refer his partner for help with a dangerous drinking problem, did Solano finally act.

74.    Defendant Solano and Encarnacion had known each other for seven years and worked together regularly for roughly two-years, prior to Anthony Alvarez's death.

75.    Even Defendant Encarnacion's family had brought their concerns about his drinking to Defendant Solano.

76.    After killing Anthony Alvarez, neither officer Solano nor Encarnacion were required to describe the shooting, the number of shots fired, nor whether there were any

8

bystanders or witnesses. CPD is so busy making sure its officer are protected from consequences in a shooting, that they do not even ask questions related to immediate public and police safety.

77.     In this case, when their guns were inspected after the shooting, both Defendants had bullets missing from their weapons that remain unaccounted for. Solano had two unaccounted for bullets, and Encarnacion had one.

78.     Even after the shooting, the Defendants continued to operate above the law.

79.     On May 21, 2021, not two months after killing Anthony, Defendant Solano was involved in a road rage incident captured on video by bystanders.

80.     With his gun drawn, and in police uniform, Defendant Solano screamed obscenities at another driver, while bystanders begged him to holster his weapon.

81.     After witnessing what he and his partner had already gotten away with—and his knowledge of CPD culture, practice, and policy generally—Solano knew that no matter what he did, the consequences of his actions would be comparatively mild.

82.     As explained in the Monell both above and below, the City of Chicago's policy and practice is directly responsible, the but-for cause, of the civil rights violations which caused Anthony Alvarez's death.

83.     The City's failure to implement a foot chase policy until well after Anthony's death and its support of a policing culture of impunity (failure to discipline) were the driving force behind the Defendant Officers' unconstitutional actions in this case.

### Count I
### 42 U.S.C. Section 1983
### Fourth Amendment – *Monell* Against City of Chicago

A.      **The Lack of a Real Foot Chase Policy Guaranteed a Police Culture of Excessive Force, Needless Death, and Injury**

9

84.     The Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

85.     On December 7, 2015, the U.S. Attorney General launched a civil rights investigation into the Chicago Police Department's policing tactics[1].  The investigation examined (among other things):

    a.  whether CPD is engaging in a pattern or practice of unlawful conduct, and if so, what systemic deficiencies or practices within CPD, IPRA, and the City might be facilitating or causing this pattern of practice. (*Id*. at 1);

    b.  to examine CPD's use of force and address CPD policies, training, reporting investigations, and review related to officer use of force. (*Id*.); and

    c.  to determine CPD's handling of incidents involving those in crisis, whether related to addiction, trauma, or mental health. (*Id*.)

86.     On August 26, 2016, the Chicago Tribune published an article tracking 435 police involved shootings over a recent six-year span[2].  The article focused, in part, on the police involved shooting death of 92 people and wounding 170 others. The authors of the article reviewed Chicago Police Department records from a database of details of every time police fired a weapon from 2010 through 2015. A portion of the data revealed why officers were initially at the scene in 185 shootings. The data revealed the following:

    a.  at least 40 shootings began with a traffic or street stop, either because of an alleged violation or after officers stopped and questioned a group congregating in public. (*Id*.)

    b.  in more than a third of the stops, officers gave chase on foot, pursing suspects through residential backyards, alleys or over fences before opening fire. (*Id*.)

    c.  of 74 autopsy reports reviewed by the Tribune, at least 11 showed the shooting victims had been struck only in their back, buttocks or back of the head. (*Id*.)

---

[1] Department of Justice, Civil Rights Division and United States Attorney's Office Northern District of Illinois, Investigation of Chicago Police Department, at 4 (January 13, 2017).
[2] Chicago Tribune, 92 deaths, 2,623 bullets: Tracking every Chicago police shooting over 6 years. (August 26, 2016.)

87.     The Chicago Tribune published a follow-up article addressing police shootings during foot chases.[3]  Tribune reporters reviewed police shootings from 2010 through 2015.  The investigation revealed that foot chases played a role in more than a third of the 235 cases that ended with someone wounded or killed. (*Id*.). The data further showed that about half of the foot pursuits began as police attempted to stop or question people for curfew violations, public drinking, theft, disturbance calls or other minor offenses.  Nearly a quarter of those killed by police during foot chases were struck only in the back. (*Id*.)

88.     On January 13, 2017, the United States Department of Justice announced their investigative findings involving the Chicago Police Department. The investigation concluded that CPD practices unnecessarily endanger officers and result in unnecessary and avoidable uses of force. This results from systemic deficiencies in training and accountability, including the failure to train officers in de-escalation and the failure to conduct meaningful investigations of uses of force.  The Justice Department finding included the following pattern and/or practice of using force, including deadly force, that is unreasonable, in violation of the Fourth Amendment:

a.   Shooting at fleeing suspects who presented no immediate threat;
b.   Shooting at vehicles without justification;
c.   Using less-lethal force, including tasers, against people who pose no threat;
d.   Using force to retaliate against and punish individuals;
e.   Using excessive force against juveniles.

89.     In addition, the Justice Department found the following practices contribute to the pattern or practice of excessive force:

a.   Failing to effectively de-escalate situations or use crisis intervention to reduce the need for force;
b.   Employing tactics that unnecessarily endanger officers and result in avoidable shootings and other uses of force; and
c.   Failing to accurately document and meaningfully review officers' use of force
d.   Inadequate training and supervision.

---

[3] Chicago Tribune, A third of police shootings started with foot chases, Tribune analysis finds. (September 7, 2016)

90.     The Justice Department further found that "CPD has long had detailed policies regarding vehicle pursuits.  It does not have a foot pursuit policy.  It should." (*Id.* p 26.)  The investigators concluded that some of the most problematic shootings occurred when a lone officer closed in on a subject, greatly increasing the risk of serious or deadly force incident. (*Id.*).

91.     The Justice Department found that the CPD's pattern and practice of unreasonable force included shooting at fleeing suspects who presented no immediate threat. The investigation found that in those instances, CPD administrators took the officers' reporting of the events as true, even where there was contrary evidence.

92.     Between 2013 and now there are many instances of Chicago police officers shooting fleeing suspects while unarmed or when not posing a threat to those around them:

    a.  Christen Green was shot in the back while running from Chicago police officers.
    b.  On October 12, 2014, Ronald Johnson was shot in the back and died while running from the police.
    c.  Laquan McDonald was shot 16 times and died while many of those shots being to his back while walking away from and not posing a threat to officers.
    d.  On July 28, 2016, Paul O'Neal was shot in the back and died while running from police.
    e.  An unidentified man was shot in the buttocks while running from the police.
    f.  On June 6, 2018 Maurice Granton was shot and killed while scaling a fence to flee from Chicago police.
    g.  On May 18, 2022, AG, a thirteen-year old minor, was shot in the back and paralyzed from the waist down while running from Chicago police officers as described in Northern District Case 22-cv-5896, Doc. 1.
    h.  On February 16, 2019, Michael Elam, Jr., a young man, was shot and killed as he fled from officers as recounted in the Northern District Case No. 19-cv-4130.
    i.  The DOJ report identified other instances of police involved shootings of fleeing suspects.

93.     Lack of awareness regarding foot chase policy is evident even in chases that do not end with a shooting. In *Kennedy v. Chicago, et. al,* No. 21-cv-877, Chicago Police Officer Abramson testified that his training was told to run fast after and catch suspects that he thought

might have a gun. This statement was made in regard to a foot chase that ended in unconstitutional force on Aust 23, 2020.

94.     On information and belief, most of the Chicago Police officers involved in these shootings, have extremely lengthy histories both of Complaints by civilians and Complaints initiated by the Department or other law enforcement.

95.     Consequences and for officers involved in these shootings are rare—even when they have shot and/or killed multiple people in unjustifiable circumstances.

96.     To date, the price in blood and lawsuits has unquestionably put the City on notice of a problem that it admits it has, but it had not yet persuaded the City to act in a meaningful way.

97.     This constitutes textbook deliberate indifference.

98.     Plaintiff expects that *Monell* discovery will uncover many more such incidents.

99.     In August 2017, the Illinois Attorney General sued the City of Chicago based on CPD's civil rights abuses. The lawsuit ended with a Consent Decree, effective March 2, 2019 [4]. The Consent Decree seeks to ensure that Chicago police officers are provided with training, resources, and support they need.  The Consent Decree requires changes in the areas of community policing as well as the use of force. (Consent Decree ¶2.)

100.     In March of 2021, the Independent Monitor released the third period report for the court's review. (March 1, 2020-December 31,2020). The Monitor found that the City of Chicago failed to comply with the majority of reforms set forth in the Consent Decree.[5] The city missed 26 of 43 agreed-upon deadlines. The City also failed to meet "preliminary compliance," which is simply defined as creating a compliant policy.

---

[4] http://chicagopoliceconsentdecree.org/wp-contents/uploads/2019/02/Final-Consent Decree.

101.     With respect to foot pursuits, the Monitor found that the percentage of foot pursuits ending in some level of force for the third reporting period *actually increased* by 6.1 percent from the second reporting period. (*Id.* at p 280.) Additionally, the City failed to reach full compliance in developing a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. (*Id*. at 286.)

102.     On information and belief, the CPD did not have a foot pursuit policy and/or the training necessary to implement an appropriate policy when Anthony was killed.  On April 5, 2021, Mayor Lightfoot acknowledged that foot pursuits often lead to a "dangerous environment" for all involved, as officers' "adrenaline is pumping," and they could be separated from their partner.  Mayor Lightfoot added that "Foot pursuits present a significant safety issue for officer safety, but also community safety, for the pursued and for bystanders."

103.     Before Mayor Lightfoot was even elected, she spoke about the urgent need for a foot pursuit policy, stating that the department should not wait until the 2021 consent decree deadline to do so.

104.     Despite Mayor Lightfoot being inaugurated in May of 2019, two-years later when Anthony Alverez was killed, no foot-chase policy was in place.

105.     From March of 2020 until the beginning of 2021 there were 1,300 police foot pursuits, with 382 ending with the use of force.

106.     Because there was no foot chase policy in the years preceding Anthony Alvarez's death, the City knew that unconstitutional use of force did and would continue to occur during foot chases.

   **B.  The City's Failure to Supervise and Discipline Has Led to a Police Culture of Impunity.**

107.    The Defendant City of Chicago, through its subsidiary the Chicago Police Department and the Civilian Office of Police Accountability (COPA), has established certain policies and procedures regarding the investigation of police involved shootings.

108.    Defendant City of Chicago, through the Chicago Police Department and COPA, and its predecessor agencies, the Independent Police Review Authority (IPRA) and Office of Professional Standards (OPS), has historically been unwilling to fairly and impartially investigate and/or arrive at arrive at honest, fair, and just conclusions regarding officer involved shootings.

109.    The City has developed a pattern of *de facto* policies and practices that actually impede the investigation of officer involved shootings, which are designed to support the officer's version of events regardless of the other evidence that was developed, or should have been developed, in the investigation.

110.    The historical failure of the City of Chicago to fairly and impartially investigate officer involved shootings and discipline the involved officer has resulted in culture within the CPD where officers know they can shoot a citizen with impunity, with full knowledge that their conduct will not be challenged or subjected to a legitimate investigation.

111.    The City's policies and practices in failing to conduct legitimate and impartial investigations into officer involved shootings has helped create a Code of Silence culture in which officers expect to use force and not be questioned about the need for or propriety of their use of force.

112.    On December 9, 2015, Chicago Mayor Rahm Emanuel acknowledged the existence of this Code of Silence within the Chicago Police Department in a public speech to the City Council.

113.    In April of 2016, Defendant City of Chicago's own Police Accountability Task Force made certain "Overarching Findings" that there was a "racist mentality" within the Chicago Police Department that the "ends justify the means" and that "the collective bargaining agreements between the police unions and the City have essentially turned the Code of Silence into official policy."

114.    On January 13, 2017, the United States Department of Justice Civil Rights Division ("DOJ") issued a report at the conclusion of a 13-month investigation into the policies and practices of the Chicago Police Department.

115.    The 2017 DOJ investigation found "Systemic deficiencies" by the City of Chicago through its subordinate agencies the CPD and IPRA, including "the failure to review and investigate officer use of force [which] has helped create a culture in which officers expect to use force and not be questioned about the need for or propriety of that use."

116.    The 2017 DOJ investigation of the Chicago Police Department also concluded that "CPD has engaged in a pattern or practice of unreasonable force in violation of the 4th Amendment and that the "deficiencies in CPD's training, supervision and accountability and other systems have contributed to that pattern or practice."

117.    The failure and/or refusal by the Defendant City of Chicago, through the Department, to properly investigate or discipline the use of deadly force by officers signals a tolerance by the City of Chicago of the improper use of deadly force by Chicago Police Officers and constitutes a deliberate indifference by the Chicago.

118.    The failure and refusal by the City of Chicago, through the Department, to properly investigate and discipline the use of deadly force by sworn Chicago Police Officers in the same manner and form, and subject to the same standards, as those used by the Department

16

in its investigations of the use of such force by civilians, creates unwarranted and illegal favored treatment for a class of citizens, Chicago Police Officers, as compared with the treatment afforded civilian citizens.

119.    The acts and omissions of the City of Chicago, through the policies and procedures implemented by the Chicago Police Department, were a deliberate and malicious deprivation of Anthony Alvarez's Constitutional Rights as guaranteed by the Fourth Amendment to the Constitution, and made applicable to the states by the Fourteenth Amendment.

120.    Individually and collectively, the above described *de facto* policies and practices of the City of Chicago results in the culture and endemic attitude among members of the Chicago Police Department, including Defendant Officers, that they may engage in excessive force against the citizenry with impunity and without fear of official consequence.

121.    This lack of accountability and discipline is well known among Chicago Police Officers and contributes to a culture where CPD officers, including Defendant Solano, understand that if they resort to using excessive force, they will not be held accountable for their misconduct.

122.    The Defendant City of Chicago's systemic failures and *de facto* policies and procedures outlined above were the moving force and proximate cause to the fatal use of force by Defendant Solano that took the life of Anthony Alvarez.

123.    The Defendants knew that that their reckless and constitutionally unreasonable approach would not be questioned, investigated, or disciplined.

124.    Defendant Solano knew that he could recklessly pursue civilians, putting them in great danger, with little to no repercussions.

17

125.     Defendant Solano knew that he could shoot a fleeing civilian in the back and face little to no repercussions.

126.     The City repeatedly fails to discipline officers involved in shootings and officers who unholster their guns when they should not on dozens and perhaps over a hundred occasions.

127.     Indeed, Officer Solano still had his gun and badge months later, when he pulled his gun on another motorist during a road rage incident.

128.     Defendant Encarnacion has long been knows as dangerous and loose cannon, yet he was still a City employee when Anthony Alvarez was killed.

129.     Through being partners for years, and involved in incidents together, each Defendant was well aware of the other's dangerous proclivities, and knew that they should not be on the streets.

130.     Chicago final policy makers have long been aware of these problems (the City's *de facto* policies and its practices) and were deliberately indifferent or worse to the Constitutional violations that they cause.

131.     The City of Chicago's practices and *de facto* policies described above were the moving force behind Anthony Alvarez's death.

**Count II**
**42 U.S.C. Section 1983**
**Fourth Amendment – Excessive Force Against Both Defendant Officers**

132.     Each of the foregoing Paragraphs is incorporated as if restated fully herein.

133.     The actions of Defendant Officers as detailed above in their unconstitutionally aggressive stop/foot pursuit and in Defendant Solano's use of deadly force, constitutes unreasonable, unjustifiable, and excessive force; and violated Anthony Alvarez's rights under the Fourth Amendment to the United States Constitution.

134.     As a result of the Defendant Officers' misconduct described above, Anthony Alvarez suffered injury including pain and suffering, fear, and death.

## Count III
### 42 U.S.C. § 1983
### Fourth Amendment – Failure to Intervene Against Both Defendant Officers

135.     Each of the foregoing Paragraphs is incorporated as if restated fully herein.

136.     As described more fully in the preceding paragraphs, during the constitutional violations described herein, both Defendants had the opportunity to prevent the unconstitutionally aggressive stop/foot pursuit misconduct, but failed to prevent the misconduct described in this Complaint.

137.     As a result of the Defendant Officers' failure to intervene, Anthony Alvarez suffered injury including pain and suffering, fear, and death.

## Count IV
### State Law Claim
### Wrongful Death—Defendant Solano

138.     The Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

139.     The Plaintiff, GISELLE HIGUERA, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, et seq., the Illinois Wrongful Death Act.

140.     At all relevant times, Defendant Officer Solano, was acting as a duly authorized agent of Defendant City of Chicago, owed Anthony Alvarez a duty to refrain from wanton and willful acts and omissions, which could cause him harm.

141.     Defendant Officer Solano, by and through his acts and/or omissions and as an agent of Defendant City of Chicago, breached his duty to Anthony Alvarez, by acting in an

intentional manner, a willful and wanton manner, and with utter indifference and conscious

disregard for Anthony Alvarez's health and safety in one or more of the following respects:

a. Pursued Anthony Alvarez in vehicle and on foot without justification;
b. Shot Anthony Alvarez in the back without lawful justification;
c. Used force against Anthony Alvarez in a manner that violated CPD policy;
d. Used excessive and inappropriate deadly force against Anthony Alvarez when he shot him without lawful justification;
e. Used excessive and inappropriate deadly force without lawful justification;
f. Failed to warn Anthony Alvarez of the impending use of deadly force;
g. Failed to implement and follow the use of force model used by law enforcement in Illinois;
h. Failed to use less dangerous force before using deadly force;
i. Was otherwise willful and wanton.

142.    As a direct and proximate result of Defendant Officer Solano acts and omissions,

Anthony Alvarez, died on March 31, 2021.

143.    Anthony Alvarez is survived by his minor daughter.

144.    By reason of the death of Anthony Alvarez, A.A. has suffered pecuniary damages,

including loss of support, comfort, love, affection, protections and society of her father.

## Count V
## State Law Claim
## Survival—Defendant Solano

145.    The Plaintiff incorporates all preceding paragraphs as though fully set forth

herein.

146.    The Plaintiff, GISELLE HIGUERA, as administrator of the estate of Anthony

Alvarez brings this cause of action under the provisions of the Survival Act of Illinois, 755 ILCS

5/27-6.

147.    Defendant Officer Solano, acting as a duly authorized agent of Defendant City of

Chicago, owed Anthony Alvarez a duty to refrain from wanton and willful acts and omissions,

which could cause him harm.

148.     Defendant Officer Solano, by and through his acts and/or omissions and as an agent of the Defendant City of Chicago, breached his duty to Anthony Alvarez, by acting in an intentional manner, willful and wanton manner, and/or utter indifference and conscious disregard for Anthony Alvarez's health and safety in one of more of the following acts:

     a.  Pursued Anthony Alvarez in their vehicle and on foot without justification;
     b.  Shot Anthony Alvarez in the back without lawful justification;
     c.  Used force against Anthony Alvarez in a manner that violated CPD;
     d.  Used excessive and inappropriate deadly force on Anthony Alvarez when he shot him in the back without lawful justification;
     e.  Used excessive and inappropriate deadly force without lawful justification;
     f.  Failed to warn Anthony Alvarez of the impending use of deadly force;
     g.  Failed to implement and follow the use of force model used by law enforcement in Illinois;
     h.  Failed to use less dangerous force before using deadly force;
     i.  Was otherwise willful and wanton.

149.     As a direct and proximate result of Defendant Officer Solano's willful and wanton acts and/or omissions, Anthony Alvarez, suffered damages, including physical and emotional injuries, past medical expense, and conscious pain and suffering while still alive on the ground, writhing in pain, after being shot.

150.     As a direct and proximate result of Defendant Officer Solano's acts and omissions, Anthony Alvarez, died on March 31, 2021.

151.     As a direct and proximate result of one or more of the acts and/or omissions, caused Anthony Alvarez, to lose his change of survival.

152.     As a further direct and proximate result of Defendant Officer Solano's willful and wanton acts, Anthony Alvarez suffered injuries, disfigurement, economic loss, pain and suffering, emotional trauma, and loss of chance of survival, for which Anthony Alvarez would have been entitled to compensation from Defendant Officer Solano, had he survived.

**Count VI**
**State Law Claim**
**Wrongful Death—Defendant City of Chicago**

153.     The Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

154.     The Plaintiff, GISELLE HIGUERA, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, et seq., the Illinois Wrongful Death Act.

155.     The Defendant City of Chicago, through its agents, owed Anthony Alvarez, a duty to refrain from wanton and willful acts and omissions, which could cause him harm.

156.     The Defendant City of Chicago, by and through the acts and/or omissions of its agent, employee, and police officer, Defendant Officer Solano, breached its duty to Anthony Alvarez, in Defendant Officer Solano acting in an intentional manner, willful and wanton manner, and/or, with utter indifference and conscious disregard for Anthony Alvarez's health and safety in one or more of the following:

   a.   Pursued Anthony Alvarez in their vehicle and on foot without justification;
   b.   Shot Anthony Alvarez in the back without lawful justification;
   c.   Used force against Anthony Alvarez in a manner that violated CPD policy;
   d.   Used excessive and inappropriate deadly force on Anthony Alvarez when he shot Alvarez in the back without lawful justification;
   e.   Used excessive and inappropriate deadly force without lawful justification;
   f.   Failed to warn Anthony Alvarez of the impending use of deadly force;
   g.   Failed to implement and follow the use of force model used by law enforcement in Illinois;
   h.   Failed to use less dangerous force before using deadly force;
   i.   Was otherwise willful and wanton.

157.     The Defendant City of Chicago, by and through the acts/omissions of its agents, employees, officers, breach its duty of care to Anthony Alvarez in an intentional manner, willful and wanton manner, and/or utter indifference and conscious disregard for citizens' health and safety, which cause the death of Anthony Alvarez in one or more of the following:

     a.   Maintained a custom and practice of using unjustified, deadly force during foot pursuits of individuals;

     b.   Maintained a custom and practice of failing to train officers on the proper use of force on fleeing individuals;

     c.   Ignored that its officers had repeatedly shot fleeing individuals who were engaged for minor offenses, traffic violations, or city ordinance violations;

     d.   Ignored repeated calls from the Department of Justice and other agencies for increased training and new policies related to foot pursuits and fleeing individuals;

     e.   Failed to implement increased training and polices related to the use of force during foot pursuits;

     f.   Was otherwise willful and wanton.

158.    As a direct and proximate result of Defendant Officer Solano's acts and omissions, Anthony Alvarez, died on March 31, 2021.

159.    Anthony Alvarez is survived by his minor daughter.

160.    By reason of the death of Anthony Alvarez, his heir, A.A. a minor has suffered pecuniary damages, including loss of support, comfort, love, affection, protections and society of her father.

## Count VII
### State Law Claim
### Survival—Defendant City of Chicago

161.    The Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

162.    The Plaintiff, GISELLE HIGUERA, as administrator of the estate of Anthony Alvarez brings this cause of action under the provisions of the Survival Act of Illinois, 755 ILCS 5/27-6.

163.    The Defendant City of Chicago, through its officers, owed Anthony Alvarez a duty to refrain from wanton and willful acts and omissions, which could cause him harm.

164.    The Defendant City of Chicago, by and through the acts and/or omissions of its agent, employee, and police officer, Defendant Officer Solano, breached its duty to Anthony

Alvarez, in Defendant Officer Solano acting in an intentional manner, willful and wanton manner, and/or, with utter indifference and conscious disregard for Anthony Alvarez's health and safety in one or more of the following:

    a.    Pursued Anthony Alvarez in their vehicle and on foot without justification;
    b.    Shot Anthony Alvarez in the back without lawful justification;
    c.    Used force against Anthony Alvarez in a manner that violated CPD policy;
    d.    Used excessive and inappropriate deadly force on Anthony Alvarez when he shot him in the back without lawful justification;
    e.    Used excessive and inappropriate deadly force without lawful justification;
    f.    Failed to warn Anthony Alvarez of the impending use of deadly force;
    g.    Failed to implement and follow the use of force model used by law enforcement in Illinois;
    h.    Failed to use less dangerous force before using deadly force;
    i.    Was otherwise willful and wanton.

165.    The Defendant City of Chicago, by and through the acts/omissions of its agents, employees, officers, breach its duty of care to Anthony Alvarez in an intentional manner, willful and wanton manner, and/or utter indifference and conscious disregard for citizens' health and safety, which caused the death of Anthony Alvarez in one or more of the following:

    a.    Maintained a custom and practice of using unjustified, deadly force during foot pursuits of individuals;
    b.    Maintained a custom and practice of failing to train officers on the proper use of force on fleeing individuals;
    c.    Ignored that its officers had repeatedly shot fleeing individuals who were engaged for minor offenses, traffic violations, or city ordinance violations;
    d.    Ignored repeated calls from the Department of Justice and other agencies for increased training and new policies related to foot pursuits and fleeing individuals;
    e.    Failed to implement increased training and polices related to the use of force during foot pursuits;
    f.    Was otherwise willful and wanton.

166.    As a direct and proximate result of the Defendant City of Chicago's willful and wanton acts and/or omissions Anthony Alvarez suffered damages, including physical and emotional injuries, past medical expenses, and conscious pain and suffering while still alive and on the ground, writhing in pain, after being shot.

167.    As a direct and proximate result of Defendant City of Chicago's acts and omissions, Anthony Alvarez, died on March 31, 2021.

168.    As a direct and proximate result of said willful and wanton acts and/or omissions Anthony Alvarez lost his chance of survival.

169.    As a direct and proximate result of Defendant City of Chicago's willful and wanton acts, Anthony Alvarez suffered injuries of a personal and economic nature, including disability, pain and suffering, emotional trauma, loss of chance of survival, for which Anthony Alvarez would have been entitled to receive compensation from Defendant City of Chicago, had he survived.

**Count VIII**
**State Law Claim**
***Respondeat Superior*—Defendant City of Chicago**

170.    The Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

171.    At all relevant times, Defendant Officers were members and employees of the City of Chicago Police Department acting within the scope and authority of their employment

172.    The Defendant City of Chicago, as principal, is liable for the actions of its agents under the doctrine of *respondeat superior*.

173.    Should the Defendant Officers be found liable for the acts alleged above, the Defendant Officers and City of Chicago would be liable to pay the Plaintiff any judgment obtained against the Defendants.

**<u>Count IX</u>**
**State Law Claim**
**Indemnification—Defendant City of Chicago**

174.     The Plaintiff incorporates all preceding paragraphs as though fully set forth

herein.

175.     Illinois law provides that public entities are directed to pay any compensatory tort

judgment for damages for which employees are liable within the scope of their employment

activities.

176.     All of the Defendant Officers are employees of the City of Chicago Department

who acted within the scope of their employment in committing the misconduct described herein.

177.     Should the Defendant Officers be found liable for the acts alleged above, the

Defendant Officers and City of Chicago would be liable to pay the Plaintiff any judgment

obtained against the Defendants.

WHEREFORE, Plaintiff demands judgment against the Defendants: Solano,

Encarnacion, and the City of Chicago; jointly and severally, for compensatory damages and

because the Defendant Officers acted maliciously, wantonly, or oppressively, punitive damages

against the individual Defendants in their individual capacities plus the costs of this action and

attorney's fees, and for such other and additional relief as this court deems equitable and just.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Christopher R. Smith
One of Plaintiff's Attorneys

Christopher R. Smith
CRS Trial Group, LLC

26

The Monadnock Building
53 West Jackson Boulevard, Suite 856
Chicago, IL 60604
312.432.0400
chris@crstrialgroup.com

# Exhibit B

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

## SUMMARY REPORT OF INVESTIGATION

### I.    EXECUTIVE SUMMARY

| | |
|---|---|
| Date of Incident: | June 2016 – November 2017 |
| Time of Incident: | Various |
| Location of Incident: | ████████████████ ███████, /Various Locations |
| Date of COPA Notification: | November 12, 2017 |
| Time of COPA Notification: | 10:11PM |

████████ and PO Encarnacion were involved in a dating relationship for approximately a year and a half. ████████ related that throughout their relationship, PO Encarnacion drank to the point of intoxication, physically and verbally abused her, and pointed a gun at her. ████████ submitted videos and photographs to support her allegations. The allegations are Sustained in part.

### II.    INVOLVED PARTIES

| | |
|---|---|
| Involved Officer #1: | Sammy Encarnacion, Star 11790, Employee #█████████ DOA June 29, 2015, Police Officer, Unit 016, DOB ██████ ████, Male, Hispanic |
| Involved Officer #2: | ████████ Star 3085, Employee ID#███████, DOA March 15, 2013, Police Officer, Unit 015/166, DOB ██████ █████, Male, Hispanic |
| Involved Individual #1: | ████████ ████████, Female, White |

### III.    ALLEGATIONS

| Officer | Allegation | Finding / Recommendation |
|---|---|---|
| Officer Encarnacion | 1.  On various dates and times between June 2016 and November 2017 at various locations, Officer Encarnacion was intoxicated in violation of Rule 15. | Sustained |
| | 2.  On various dates and times between June 2016 and November 2017 at various locations, | Sustained |

HIGUERA_CITY 14588

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG#1087474**

| | |
|---|---|
| Officer Encarnacion was intoxicated while armed with a firearm in violation of Rule 6. | |
| 3.  On or about November 12, 2017, at approximately 0630 at or near ███████, Officer Encarnacion engaged in an unjustified physical altercation with ██████ to wit: pushed her about the body, and/or dragged her body, and/or slapped her about face, and/or placed his knee on her chest, and/or knocked her phone from her hands, and/or kicked her about the body in violation of Rule 9. | Not Sustained |
| 4.  On or about November 12, 2017, at approximately 0630 at or near ██████████ Encarnacion verbally abused ██████ in that he stated words to the effect of, "Bitch, cunt, whore" in violation of Rule 8. | Not Sustained |
| 5.  On or about November 12, 2017, at approximately 0630 at or near ████████ Officer Encarnacion placed his hand around ████ throat in violation of Rule 8. | Not Sustained |
| 6.  On or about November 12, 2017, at approximately 0630 at or near ██████████ Officer Encarnacion harassed ██████ by calling her repeatedly in violation of Rules 2 and 8. | Not Sustained |
| 7.  On or about October 18, 2017, at approximately 11:00 AM at or near ██████ ██████, Officer Encarnacion pointed a firearm at ████ in violation of Rule 38. | Sustained |
| 8.  On or about October 18, 2017, at approximately 11:00 AM at or near ██████████ Officer Encarnacion pushed ██████ to the ground in violation of Rule 9. | Sustained |

HIGUERA_CITY 14589

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

| | |
|---|---|
| 9. On or about October 18, 2017, at approximately 11:00 AM at or near ███████ ███ Officer Encarnacion struck a vehicle with his vehicle in violation of Rule 2. | Sustained |
| 10. On or about October 18, 2017, at approximately 11:00 AM at or near ███████ ██████████████ Officer Encarnacion left the scene of a vehicle accident in violation of Rule 2. | Sustained |
| 11. On or about October 18, 2017, at approximately 11:00 AM at or near █████ Officer Encarnacion drove a vehicle while intoxicated in violation of Rule 2 and 15. | Sustained |
| 12. On or about October 18, 2017, at approximately 11:00 AM at or near ██████ ██████████ Officer Encarnacion placed his weapon in his mouth, racked it and pulled the trigger without due regard for the safety of himself or others in violation of Rule 38. | Sustained |
| 13. On or about October 18, 2017, at approximately 11:00 AM at or near ████████████ Officer Encarnacion lost control of his weapon in that ██████████ had the opportunity to remove the ammunition in violation of Rule 6. | Sustained |
| 14. On or about June 19, 2016, at approximately 1:00 PM at or near ████ █████████ Officer Encarnacion discharged his weapon without justification in violation of Rule 38. | Sustained |
| 15. On or about June 19, 2016, at approximately 1:00 PM at or near ████ ██████████ Officer Encarnacion failed to notify the Chicago Police Department that he discharged his weapon in violation of Rule 6. | Sustained |

HIGUERA_CITY 14590

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**            **LOG#1087474**

| | |
|---|---|
| 16. On or about June 19, 2016, at approximately 1:00 PM at or near █████████████ ████████████████████ Officer Encarnacion pointed a firearm at ████████████ in violation of Rule 38. | Sustained |
| 17. On or about June 19, 2016, at approximately 1:00 PM at or near █████████ ████████████████████████████ Officer Encarnacion endangered the safety of ██████ ██████ in that he discharged his weapon in her direction in violation of Rule 38. | Sustained |
| 18. On or about an unknown date and time in May 2017 at or near ████████████ ████████████████ Officer Encarnacion engaged in an unjustified physical altercation with ████████████, to wit: pulled a blanket off of her causing her nails to break and/or slapped her about the face in violation of Rule 9. | Sustained |
| 19. On or about an unknown date and time in May 2017 at or near ██████████████ ██████████████, Officer Encarnacion verbally abused █████████████, stating words to the effect of "Fuck you. You're a bitch," violation of Rule 8. | Sustained |
| 20. On or about July 7, 2016, at an unknown time at or near ██████████████ ██████████, Officer Encarnacion engaged in an unjustified physical altercation with ███████ ██████, to wit: pushed her to the ground and/or dragged her body in violation of Rule 9. | Sustained |
| 21. On or about October 31, 2017, at an unknown time at an unknown location Officer Encarnacion failed to secure his weapon in that he allowed █████████████ to possess it in violation of Rule 6. | Sustained |

4

HIGUERA_CITY 14591

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

IV.    **APPLICABLE RULES AND LAWS**

| Rules |
| --- |

1.  Rule 2 –Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

2. Rule 6- Disobedience of an order or directive, whether written or oral.

3. Rule 8 - Disrespect to or maltreatment of any person, while on or off duty.

4.  Rule 9 - Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

5.  Rule 15 - Intoxication on or off duty.

6.  Rule 38 - Unlawful or unnecessary use or display of a weapon.

7. Rule 39 - Failure to immediately make an oral report to the desk sergeant at the District of occurrence and to follow such oral report with a written report on the prescribed form, whenever a firearm is discharged by a member.

| General Orders |
| --- |

1. U04-02 – Department Approved Weapons and Ammunition

V.    **INVESTIGATION** [1]

This log number includes allegations of misconduct spanning various dates, times, and locations.[2] Therefore, to assist the reader, under each subheading below, COPA will summarize the evidence below as it relates to each specific date.

### a.  Various Dates and Times

In her interviews at COPA, the complainant, ████████,[3] related that she met PO Encarnacion in January 2016 and the two immediately began a dating relationship. Although she lived near PO Encarnacion, she temporarily moved in with him in May 2016 and moved out upon his request in September 2016. ████████ explained that her relationship with PO Encarnacion

---

[1] COPA conducted a thorough and complete investigation.  The following is a summary of the material evidence gathered and relied upon in our analysis.
[2] The victim, ████████ made other allegations that lacked specific dates and/or corroborating evidence. Thus, COPA opted not to serve the allegations.
[3] Att. 11, 21, 45, 46

HIGUERA_CITY 14592

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

was great until they moved in together. She stated that she began to notice his "Dr. Jekyll and Mr. Hyde"[4] personality, in that when he was nice and kind when he was sober but would become verbally and physically abusive when he drank alcohol. ████████ stated that she shared minimum information with family and friends about her relationship, and even though she confided in her friend ███████████████[5] she didn't tell her how she sustained her injuries. ████████ stated that her landlord, ███████████[6] who also resided in the building, could have heard altercations between the two.

████████ related that on the days PO Encarnacion worked, he would have a drink or two before he came home and would continue to drink at home. ████████ stated that he drinks more than the average person. ████████ related that when PO Encarnacion would drink excessively, he would pull his gun out, wave it around, and sometimes, point it at her and/or himself. ████████ related that PO Encarnacion would always leave his gun on the table, so she started hiding the guns from him.

████████ submitted several photos and videos she recorded in which she alleged that PO Encarnacion was intoxicated. ████████ stated that PO Encarnacion was aware that he was being recorded. ████████ started recording and taking photos of PO Encarnacion to document his behavior and to remind herself of how toxic their relationship was.

July 7, 2016 – PO Encarnacion's apartment[7]       October 28, 2016 – ████████ apartment[8]





---

[4] Att. 46, page 13, line 15
[5] COPA's attempts to interview her were unsuccessful. See Att. 80
[6] COPA's attempts to interview him were unsuccessful. See Att. 34
[7] Att. 47
[8] Att. 48

HIGUERA_CITY 14593

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

February 2, 2017 – ▮▮▮▮▮▮ apartment[9]          June 10, 2017 – PO Encarnacion's apartment[10]




July 1, 2017 – PO Encarnacion's apartment[11]



---

[9] Att. 49
[10] Att. 51
[11] Att. 47

HIGUERA_CITY 14594

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

████████ also submitted a **video**[12] that was recorded at her apartment on an unknown date. PO Encarnacion, who appeared to be intoxicated, is seen walking around wearing black pants and no shirt. PO Encarnacion is heard in the background yelling and stating words to the effect of, "You think this is a fucking game." As he walked past ████████ he stated "Yeah, record me." ████████ told him that he was too drunk to go anywhere, and he needed to lay down and stop hitting her door and furnace. She also accused him of throwing a chair on her foot and pushing her against the wall. Chairs and clothing were strewn on the floor.

In his statement at COPA on July 16, 2021, **PO Encarnacion**[13] related that he dated ████████ ████ off and on, from 2015 to 2017, and she briefly lived with him. He stated that he ended the relationship because they were arguing too much. Sometimes, he would come home from work, and she would be intoxicated and ready to start an argument. He stated that she did not drink alcohol daily and neither did he. He estimated that he drinks approximately twice a week. PO Encarnacion stated that he mostly drinks beer, but sometimes, he would have a few shots of Jameson Whiskey. When asked if he has ever drunk alcohol to the point of intoxication, he stated words to the effect of, "I mean, I'm sure I have. Yeah."[14] PO Encarnacion explained that when he was intoxicated, he was normally in the house. There were times that both he and ████████ would be intoxicated together, but he does not recall the arguments escalating to a volatile situation. He stated that he is sure there were probably moments, but he does not recall the specific details.

After being provided the opportunity to review the photos[15] that ████████ submitted, PO Encarnacion acknowledged that it was, in fact, him in the photos and he appeared to be sleeping at the time. In all the photos, except for the photo[16] of him sleeping on the floor while wearing his CPD vest, PO Encarnacion stated that it was possible that he was intoxicated. PO Encarnacion denied being intoxicated while wearing his CPD vest and added that his gun was not in the holster at the time. PO Encarnacion also stated that he had no knowledge that photos were being taken of him inside of his residence. PO Encarnacion related that he has never lost consciousness or experienced memory loss because of intoxication. ████████████████████████ ████████████████████████████████████████████████████████

After being provided the opportunity to view the videos that ████████ submitted to COPA, PO Encarnacion acknowledged that he was the male in the videos and the female voice was that of ████████. He stated that he did not remember any of the recorded incidents. PO Encarnacion admitted that on various dates and times he was intoxicated and possibly while in possession of his firearm.[17]



---

[12] Att. 22, Video 5
[13] Att. 62, 63
[14] Att. 63, Page 30, Line 23
[15] Att. 22, pages 47 - 52
[16] Att. 52
[17] Att. 63 , pg 75

HIGUERA_CITY 14595

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**           **LOG#1087474**

b. **November 12, 2017**

In her statement at COPA, ▉▉▉▉▉[18] related that on November 11, 2017, PO Encarnacion came to her house, stayed for approximately 10 minutes, and told her that he was going to his brother's house and would return in an hour. PO Encarnacion did not return to ▉▉▉ residence but kept in contact with her via text and continued to tell her that he was on his way. The following morning and after PO Encarnacion failed to return, ▉▉▉▉ decided to use her key and enter PO Encarnacion's residence, because it seemed suspicious that he was no longer answering her calls or replying to her text messages. When she entered the residence with his keys, she heard a female voice making noises. She proceeded to one of PO Encarnacion's bedrooms and turned on the lights. PO Encarnacion jumped up and said, "Is this a dream? Is this really happening?" ▉▉▉▉ stated that she could tell that he was drunk because of the manner in which he was speaking and the smell of alcohol on his person. ▉▉▉▉ related that PO Encarnacion pushed her to the floor and stated, "Get the fuck out of here. What are you doing here?" He then started dragging her across the floor. Every time she tried to stand up, he would push her back down. When ▉▉▉▉ was finally able to stand, PO Encarnacion slapped her on the face. As ▉▉▉ walked toward the female (now known as ▉▉▉▉▉▉), PO Encarnacion pushed ▉▉ on the floor and placed his knee on her chest. ▉▉▉▉ headed to the living room and said she was leaving. ▉▉▉▉ followed her and confronted her regarding her relationship with PO Encarnacion. ▉▉▉▉ grabbed ▉▉▉▉▉ bag that was on the floor, but PO Encarnacion snatched the bag from her grasp and pushed her down on the floor.

When PO Encarnacion walked back to his bedroom, ▉▉▉▉ followed him. PO Encarnacion began calling ▉▉▉▉ a bitch, cunt, and whore. He told ▉▉▉▉ that he and ▉▉▉▉ were no longer together. ▉▉▉▉ refuted the information and showed ▉▉▉▉ a recent text message he sent her. PO Encarnacion then snatched the phone from her hand and continued pushing her to the floor and onto the bed as she tried to get answers from him. At some point, PO Encarnacion pushed her against a table, which caused her to sustain a bruise on her hip. As they headed to the living room, PO Encarnacion pushed ▉▉▉▉ again, causing her to trip and strike her head against the wall. PO Encarnacion then started kicking her on the ribs as she laid on the floor. Eventually, ▉▉▉▉ got up and continued to follow PO Encarnacion around the house. ▉▉▉▉ grabbed PO Encarnacion's keys and placed them in her pocket in an attempt to make PO Encarnacion talk to her and to prevent him from driving drunk. Once again, PO Encarnacion pushed ▉▉▉▉ to the floor, placed his knee on her chest and retrieved his keys from ▉▉▉▉ pockets. When PO Encarnacion got up, ▉▉▉▉ jumped up and immediately began questioning PO Encarnacion about their relationship. At that point, PO Encarnacion placed his hand around ▉▉▉▉ throat and slammed her head against the door. PO Encarnacion then left through the door followed by ▉▉▉▉.

▉▉▉▉ immediately drove to the police station to report the incident. ▉▉▉▉ sought medical treatment at ▉▉▉▉▉▉▉▉▉ ▉▉▉▉ sustained swelling and a bump on the back of her head, a bruise on her left hip, and a scratch on her neck. ▉▉▉▉ stated that PO Encarnacion called and texted her over 56 times following the incident to apologize and showed up at her residence on two separate occasions.

---

[18] Att. 11, 21 ,45, 46

9

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**  **LOG#1087474**

**Evidence Technician Photographs**[19] of ▇▇▇▇ depict what appears to be a bruise on her right cheek, a scratch on her neck, a bruise on her upper left arm, and redness on her knees.

COPA obtained ▇▇▇▇ **medical records**[20] from ▇▇▇▇▇▇▇▇▇▇. According to the medical records, ▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇

On November 12, 2017, ▇▇▇▇ went to the District Station and filed a Battery Report (**RD# JA-508753**[21] ) against PO Encarnacion. She related essentially the same information as she reported to COPA. According to the **Supplemental Report**,[22] PO Encarnacion related that he had been dating ▇▇▇▇ off and on for approximately two years. He stated that when ▇▇▇▇ lived with him, she had a key. When the two of them broke up during the summer, she returned the key. The two of them reconciled, but as far as he knew, she did not have keys to his apartment. PO Encarnacion related that the night before the incident, he and ▇▇▇▇ were texting back and forth. ▇▇▇▇ wanted to go out with him, but he had already made plans with ▇▇▇▇, a female that he had been casually dating for approximately four months.

After the date, PO Encarnacion and ▇▇▇▇ returned to his apartment. While the two of them were engaged in sexual activities in PO Encarnacion's bedroom, he heard a clicking sound at his front entry door. ▇▇▇▇ entered the bedroom and turned on the lights. ▇▇▇▇ jumped on the bed while flailing her arms at him and ▇▇▇▇. ▇▇▇▇ grabbed ▇▇▇▇ by the hair and dragged her off the bed, slapped her, and called her names. ▇▇▇▇ then chased ▇▇▇▇ down the hall to the bathroom. PO Encarnacion related that he attempted to stand in between ▇▇▇▇ and ▇▇▇▇. PO Encarnacion explained that ▇▇▇▇ did not try to defend herself and she only tried to keep her distance from ▇▇▇▇. After ▇▇▇▇ closed the bathroom door, ▇▇▇▇ redirected her attention to PO Encarnacion in that she slapped him. ▇▇▇▇ exited the bathroom and ▇▇▇▇ followed her. ▇▇▇▇ then picked up ▇▇▇▇ purse, but PO Encarnacion snatched it from her and gave it back to ▇▇▇▇. ▇▇▇▇ left the apartment and proceeded down the stairs, and PO Encarnacion escorted her part of the way, while blocking ▇▇▇▇ from making contact with her.

PO Encarnacion returned to his apartment to put on clothes and then went back downstairs, but ▇▇▇▇ and ▇▇▇▇ were no longer there. PO Encarnacion called ▇▇▇▇ who related that she was safe in her Lyft ride. PO Encarnacion related that he had bruises on his inner left arm and scratches on his right arm, stomach, torso, left forearm and right hand. When asked why he did not call the police, PO Encarnacion stated that he had a negative experience with the 017th District and referred to two prior domestic incidents when he called the police.

---

[19] Att. 38
[20] Att. 23
[21] Att. 5
[22] Att. 43

HIGUERA_CITY 14597

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                **LOG#1087474**

███████████told detectives that she had known PO Encarnacion for a year and had been dating him for approximately three months. She stated that she met PO Encarnacion when he responded to a hit and run in which she was the victim. He and his partner would often eat at Dog Stop where she worked. ████████ had met ██████ on two previous occasions.

████████████ stated that on November 12, 2017, she and PO Encarnacion had returned to his home after celebrating her birthday. She related that the two of them were having sex when ████████ entered the bedroom and turned on the lights. ██████████ began screaming at ██████████ and calling her a bitch, whore, and a cunt. ████████ then pulled PO Encarnacion out the bed, shoved him and slapped him. ████████ stated that she could tell that ████████ had been drinking because she smelled of alcohol and was stumbling. ████████ then struck ███████ on the head and repeatedly slapped PO Encarnacion every time he got near her.

████████ then grabbed ████████ who was naked, by the leg and hair and pulled her out of the bed and onto the floor. ██████████ continued to slap and strike ████████ on the head and face. ████████ stated that she tried to defend herself by blocking ████████ blows. PO Encarnacion pulled ███████ off ████████ told ███████ that she should not be there and told her to leave. ████████████ related that she picked up her clothes and went to the bathroom. ████████ followed her and continued to slap her while PO Encarnacion tried to place himself between them.

When ████████ exited the bathroom, she walked past ██████ and PO Encarnacion in the living room. ████████ tried to attack ████████ again as PO Encarnacion tried to block her. ██████ grabbed ████████ and pulled her to floor. PO Encarnacion threatened to call the police and repeatedly asked her why she had his keys. ████████ grabbed ██████ purse and started rummaging through it. PO Encarnacion retrieved ████████ purse and returned it to her. ████████ ordered a Lyft and left PO Encarnacion's house. She stated when she left, ███████ and PO Encarnacion were in the bedroom arguing. ████████ related that she blocked most of ████████ blows. She stated that it's possible that she scratched ████████ on the neck and arm in self-defense. ████████ further related that she did not choke ████████ and did not observe PO Encarnacion choke her. ████████████ sustained rug burns on her knees and bruises on her inner left knee and her arms.

**RD# JA-508753** was exceptionally cleared close after the involved parties refused to pursue criminal charges. Both PO Encarnacion and ████████ submitted photos of their injuries to the assigned detective, who in turn, inventoried the photos. Inventoried photos of PO Encarnacion[23] depict what appears to be a bruise on his arm, a scratch near his stomach, and a scratch on his arm and right hand. Photographs of ████████[24] depicted what appears to be bruises on both knees and her arm.

During his statement at COPA, **PO Encarnacion**[25] related that on November 12, 2017, he and his date, ████████ went out to celebrate her birthday and returned to his house. Shortly after the two became intimate, ████████ walked inside of the room. PO Encarnacion stated that

---

[23] Att. 54
[24] Att. 55
[25] Att. 62, 63

11

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

he had given her a key to his apartment when they were together, but she returned the key when they broke up. PO Encarnacion did not know she was in possession of a spare key and did not invite her over. PO Encarnacion related that when ██████████ saw them in the bed, ██████, immediately began striking and punching both him and ██████████ about the body. PO Encarnacion stated that he separated them by getting between them. He stated that ██████████ was balled up and trying to protect herself. PO Encarnacion stated that neither he nor ██████ struck ██████████ PO Encarnacion stated that he did attempt to separate ██████ from ██████ by standing between them and extending his arm towards ██████████ to prevent her from attacking ██████████.

PO Encarnacion related that he did not call the police because ██████████ just wanted to go home. PO Encarnacion sustained scratches on his body. PO Encarnacion did not recall if photos were taken of his injuries, but when he was given the opportunity to review photos, he confirmed that he sustained bruises on his arm and ribcage. PO Encarnacion did not know what injuries ██████████ sustained. PO Encarnacion denied being in an unjustified physical altercation with ██████████ and stated that he did not call her a bitch, cunt and/or whore. He further denied placing his hand around ██████████ neck and repeatedly calling her after the incident.

c. **October 18, 2017**

In her COPA statement, ██████████[26] explained that even after she moved out of PO Encarnacion's apartment, she still had personal belongings at his house and spent every night there. On October 18, 2017, at approximately 5:00 AM, ██████████ returned to PO Encarnacion's house and entered the apartment with her key. Once inside, she observed ██████████ inside of the home with PO Encarnacion. PO Encarnacion began to explain that the two of them were just friends. ██████████ announced that she was leaving, and PO Encarnacion followed her outside prompting ██████████ to follow him. Ms. Wood stated that she was trying to approach ██████████ to ask her about her relationship with PO Encarnacion, but PO Encarnacion kept intervening by pushing ██████████ to the ground. When ██████████ left in an Uber, PO Encarnacion began screaming at her. ██████████ stated that she believes that PO Encarnacion called the police on her. When the police officer arrived, PO Encarnacion reported that ██████████ was drunk, on drugs, and had attacked him. The officer then spoke with ██████████ who reported that it was PO Encarnacion who was drunk and not her. The officer told them both to go inside unless they wanted a report to be generated.

Later that day, PO Encarnacion, who ██████████ stated was drunk and had side-swiped a vehicle when he pulled off, drove to his parents' house in Waukegan. ██████████ stated that she wanted to continue the conversation with him regarding ██████████, so she followed him. When she arrived, she observed PO Encarnacion's vehicle in the driveway. PO Encarnacion was in his vehicle drinking beers and motioned for her to come to his car. The couple talked calmly for a few minutes, but then, PO Encarnacion got upset. At some point, PO Encarnacion went in the garage and returned with a hammer. ██████████ immediately began recording PO Encarnacion with her cell phone. ██████████ related that PO Encarnacion threatened to strike her windshield with the hammer. ██████████ also believed that PO Encarnacion called the police on her. ██████████ submitted a recording of the incident which was captured in three videos.

---

[26] Att. 21, 46

HIGUERA_CITY 14599

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                     **LOG#1087474**



    **Video 2**[27] depicts what appears to be PO Encarnacion standing at ▮▮▮▮ car and screaming at her. ▮▮▮▮ told him not to touch her car and PO Encarnacion stated, "Get the fuck out of my car." PO Encarnacion leans into the camera and states, "Yeah, I'm crying cuz I'm a fucking alcoholic." PO Encarnacion, who is dressed in civilian attire, is seen with a hammer in his hand and appears to be under the influence of alcohol in that he had slurred speech. ▮▮▮▮ is seen outside of the vehicle and holding her phone in his direction as if she is recording him. He then states to her, "Yeah, record me. Zoom in on my face." The couple briefly argued over who broke up with whom and PO Encarnacion accused ▮▮▮▮ of following him out to Waukegan.

    **Video 1**[28] is a continuation of Video 2. PO Encarnacion is seen holding a hammer and arguing with ▮▮▮▮. PO Encarnacion confirmed in the video that they were at his parents' house in Waukegan. ▮▮▮▮ stated that PO Encarnacion had been driving drunk all night and he had a case of beer in the car that he had been drinking. During her narration, ▮▮▮▮ related that the video is evidence in case he damaged her car and proof that he drives drunk. ▮▮▮▮ accused PO Encarnacion of damaging his parents' garage door. PO Encarnacion appears to have slurred speech.

    **Video #3**[29] is a continuation of Videos 1&2. PO Encarnacion is now seen with a star (badge) hanging on a silver in color chain from around his neck that depicts, "Chicago Police Officer 11790." PO Encarnacion explains to ▮▮▮▮ that she is on private property, he and his parents own. PO Encarnacion physically showed her the badge and verbally stated his badge number, which correlates to the numbers observed on the badge. ▮▮▮▮ asked him if he was intoxicated, he responded, "I may or may not be." She then asked him if he a had a case of beer in his car that he had been drinking, PO Encarnacion pointed to a silver car parked next to ▮▮▮▮ vehicle and responded, "Yeah, go ahead, go ahead, look, look, look in there, I don't care." He then stuck his badge through an opening of the top portion of her car door and asked her if she had heroin. PO Encarnacion commented that he had pictures. ▮▮▮▮ said she has never touched heroin in her life and told him he could drug test her. PO Encarnacion told her he was going to give her 5 seconds to remove herself from his private property and would call the police if she did not. PO Encarnacion then raised the hammer that was in his hand and said, "I have a legal right to smash your car right now." When ▮▮▮▮ asked if it was his property, PO Encarnacion responded, "I have legal right, I will do it right now."

    ▮▮▮▮ related the reason for being there was a response to him driving erratically from Chicago while clearly intoxicated, and she was worried about him. PO Encarnacion said he was going to call the police. He retrieved a cell phone from the silver vehicle and returned to ▮▮▮▮ car. He proceeded to talk on the cell phone and reported that his ex-girlfriend refused to leave his property. When PO Encarnacion tried to explain the address of where to send the police, he said, "The address is um…," and removed the phone from his ear and held it down to his side and looked away from ▮▮▮▮. For approximately 22 seconds he stood relatively silent, although he did say something to the effect of, "I don't want to do—but this is gonna happen," before placing the phone back up to his mouth, and relayed he was at ▮▮▮▮ in the alley.

---

[27] Att. 22, Video 2
[28] Id, Video 1
[29] Id, Video 3

HIGUERA_CITY 14600

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG#1087474

He provided their names and gave a description of the vehicle she was driving. The video recording ended abruptly while PO Encarnacion was still on the telephone.

████████ also submitted a **video**[30] recorded on October 18, 2017, that depicts PO Encarnacion wearing his Chicago Police Star around his neck while holding an open bottle of wine in his left hand and a gun in his right hand. He placed the barrel of the gun in his mouth, placed the wine bottle on the table, used his left hand to rack the gun and then pulled the trigger. PO Encarnacion then stated words to the effect of, "I wish there was a fucking bullet in here." PO Encarnacion continues drinking from the wine bottle as he waved his gun around. Towards the end of the video clip, he displayed his CPD name tag in front of the camera. PO Encarnacion appeared to be intoxicated in that his speech was slurred, he was swaying from side-to-side, and drinking from a wine bottle.

According to a **911 call (Event #1729102009),**[31] on October 18, 2017, at approximately 5:14 AM, a male caller, who identified himself as Sam, requested police service to ████████ ████████. He reported that his ex-girlfriend entered his home with keys that she was not supposed to be in possession of. He also reported that she had been drinking.

According to **Waukegan Police Department Records,**[32] on Oct 18, 2017, at approximately 8:41AM, a male caller, who identified himself as off-duty Chicago Police Officer Sam Encarnacion, requested police service to his parents' house located at ████████ He reported that his ex-girlfriend, who is in a black Mercedes, refused to leave his property and was sitting in the car recording him. He then reported that police service was no longer needed because she was leaving.

In his statement to COPA, **PO Encarnacion**[33] did not recall the events that transpired on October 18, 2017. PO Encarnacion stated that in 2017, he owned a silver Lexus IS250 sedan. He stated that he no longer has the vehicle and gave it to a family member a few months prior to his statement. PO Encarnacion related that to the best of his knowledge, he never had a car accident in the vehicle and never told ████████ that he did. He denied being involved in a vehicular accident, leaving the scene of an accident, or driving while intoxicated.

PO Encarnacion admitted that it was him in the videos ████████ submitted to COPA. He stated that it was possible that he was intoxicated and in possession of his weapon. He admitted that he placed his weapon in his mouth, racked it, and pulled the trigger. PO Encarnacion denied pointing a firearm at ████████, pushing her to the ground, and being involved in a motor vehicle accident. He also denied losing control of his weapon and stated that ████████ has never been in possession of his weapon. Furthermore, PO Encarnacion did not recall calling the Waukegan Police on ████████[34]

---

[30] Id, Video 4
[31] Att. 65
[32] Att. 24, 71
[33] Att. 62, 63
[34] It should be noted that when ████████ spoke to CPD regarding the November 12, 2017 incident, she related that on October 18, 2017, at PO Encarnacion's residence. She stated that ████████ burst through PO Encarnacion's door and pushed and shoved her. PO Encarnacion called the police, but ████████ left prior to the officers' arrival. See Att. 5

HIGUERA_CITY 14601

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG#1087474**

     d. **June 19, 2016**

        ██████[35] related that on June 19, 2016, she and PO Encarnacion were headed to his parent's house in Waukegan, when PO Encarnacion decided that he did not want to go because he was too drunk. When the two of them returned to PO Encarnacion's apartment, they had an argument over his drinking habits. ██████ was sitting beside PO Encarnacion on the bed. She told him that she could not deal with it anymore, at which time, PO Encarnacion pulled his gun out and pointed it at her. ██████ told PO Encarnacion that the gun was loaded, and he insisted that it was not. PO Encarnacion pointed the gun towards the window and pulled the trigger. ██████ ██████ reported that the bullet went through the window. ██████ took a picture of the damaged window and submitted it to COPA. ██████ stated that PO Encarnacion never reported the incident and did not tell his landlord, PO ██████ PO Encarnacion had his uncle replace the window.



June 19, 2016 – PO Encarnacion's apartment[36]

     In his statement, **PO Encarnacion**[37] denied all allegations. When shown Attachment #40, PO Encarnacion stated that the window could be either his bedroom or dining room window. He stated that initially he stayed on the second floor but had been living on the main floor for the past two years. PO Encarnacion denied discharging his weapon but added that it is possible that ██████ ██████ discharged the weapon, though he did not provide any factual account to support this. PO Encarnacion stated that while he does not know if ██████ owns a gun, he stated that she is familiar with guns. He explained that her father owns a lot of firearms, and when they visited him in Indiana, both he and ██████ would shoot.

---

[35] Att. 45, 46
[36] Att. 40
[37] Att. 63

HIGUERA_CITY 14602

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

e. **May 25, 2017**

██████████[38] stated that on May 25, 2017, she recalled that she was laying in the bed when PO Encarnacion came home drunk. PO Encarnacion began yelling profanities at her and calling her a "bitch." He snatched the covers off her, causing her nails to break and bleed, and slapped her on the face. PO Encarnacion called the police and reported that she was refusing to leave the house. ██████████ left the house and as she was driving away, an officer curbed her vehicle and asked her to return to the scene. When she went back to PO Encarnacion's house, the officers interviewed them separately and then let her go. ██████████ stated that an evidence technician came to her home to take pictures of her injuries, but she did not seek medical attention. ██████████ stated that PO Encarnacion was not injured during the incident.

**OEMC 911 Recordings**[39] obtained indicate that on May 25, 2017, at approximately 6:46AM, a male caller, who identified himself as an off-duty police officer with star 11790, called 911 and requested police service at ██████████ He related that he was trying to get his girlfriend out of his house and that he would meet the responding units outside. At approximately 6:51AM, a male caller, who identified himself as off-duty officer Sammy Encarnacion, star 11790, told the call taker that he had just called a few minutes prior and was requesting a slow-down because. his ex-girlfriend was leaving.

On May 25, 2017, **Domestic Battery Case Report RD# JA-278214**[40] was generated after PO Encarnacion called 911 and reported that ██████████ refused to leave his residence. He related that when he relocated to a different room, she followed him, pulled the cover off him, and broke her nail in the process. ██████████ then began flailing her arms near PO Encarnacion. PO Encarnacion blocked and redirected ██████████ arms, sustaining a scratch in the process. When PO Encarnacion called the police, ██████████ left the residence. As officers arrived on the scene, they stopped ██████████ and relocated her back to PO Encarnacion's residence. Both PO Encarnacion and ██████████ refused to pursue criminal complaints or make allegations against one another. While both parties refused medical treatment, an evidence technician was ordered to photograph their injuries.[41]

**Evidence Technician Photographs**[42] were taken of PO Encarnacion and ██████████ on May 25, 2017 and recorded under RD# JA-278214. No obvious or visible injuries were observed on PO Encarnacion. Photographs depicted what appeared to be ██████████ artificial nail partially detached from her natural nail and a chipped natural nail.

In his statement, **PO Encarnacion**[43] recalled only one incident in which he had to call the police on ██████████ While he did not recall when the incident occurred or the circumstances surrounding it, he stated that he just remembered ██████████ hitting him on the chest and leaving

---

[38] Att. 21, 46, 79
[39] Att. 67
[40] Att. 28
[41] At the time of the incident, Log #1085353 was initiated. However, ██████████ ailed to cooperate with LOG# 1085353 at the time of initiation. She provided an account of the incident during the investigation of LOG# 1087474. Thus, the allegations are addressed under this Log Number. See Att. 29.
[42] Att. 38
[43] Att. 63

HIGUERA_CITY 14603

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG#1087474**

the house. The police came and evidence technicians[44] took pictures of him. He stated that he sustained a scratch on his chest and face. PO Encarnacion stated that he did not recall much of the incident, because it took place a long time ago. He categorically denied all allegations.

    f. **July 7, 2016**[45]

        ██████ alleged that on July 7, 2016 while PO Encarnacion was drunk, he pushed her to the ground and drug her across the kitchen floor. While ██████ stated that she rarely documented her injuries, she submitted a photo[46] of herself with a bruise on her left thigh. She explained that she sustained the bruise during this physical altercation with PO Encarnacion. ██████ ██████ did not report the incident and did not seek medical attention.



    In his COPA statement, **PO Encarnacion**[47] stated that he did not recall the incident and he denied the allegations.

    g. **October 31, 2017**

        ██████ submitted a **photo[48]** of herself dressed as a Police Officer for Halloween and holding a gun. ██████ stated that it was PO Encarnacion's gun, and he allowed her to pose with it. During her statement, ██████ had no knowledge that her possession of his weapon was a violation of Department Rules and Regulations. When COPA asked her several questions about the photo and incident, she stated words to the effect of, "Uh, is that wrong to do that stuff? Like is that illegal?"[49]

---

[44] While PO Encarnacion did not remember the date of the incident, COPA determined that the incident occurred on May 25, 2017.
[45] COPA determined that the incident occurred on July 13, 2016, and ██████ took the picture on July 14, 2016.
[46] Att. 22, 74
[47] Att. 63, 63
[48] Att. 53
[49] Att. 46, Page 127, line7-18

HIGUERA_CITY 14604

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

In his statement, **PO Encarnacion**[50] stated that he has two weapons, a 9mm Glock 19 and a .38 LCP. While PO Encarnacion recalled ████████ dressing up as police officer for Halloween, he denied allowing her to pose with his weapon and stated that ████████ has never been in possession of his weapons.

### h. Additional Information

In his statement at COPA on Jan 24, 2018, **PO ████████**[51], related that he normally works the midnight shift, but he was at home on IOD[52] between May 13, 2016, through February 26, 2017. PO ████ owns a two-flat with additional rooms in the basement. He rented PO Encarnacion the basement apartment in May or June 2015, and PO Encarnacion later moved upstairs to the second floor once it was finished. PO ████ and his wife lived on the first floor. PO ████ stated that he does not consider PO Encarnacion a friend and had not met him prior to renting him an apartment. PO Encarnacion was a former coworker of PO ████ wife. PO ████ stated that he rarely had any interactions and conversations with ████ and PO Encarnacion. He related that he normally used the back door to enter and exit the building while they used the front door.

PO ████ relayed that initially PO Encarnacion lived there alone, but later, ████████ moved in with him and she was on the lease as well. Approximately eight months into the lease, ████████ approached him and informed him that she was leaving and breaking the lease. ████ did not provide details regarding why she was leaving. PO ████ recalled hearing raised voices in PO Encarnacion's apartment at times and knew that they were not getting along. However, PO ████ did not speak to ████ or PO Encarnacion about the matter. PO ████ stated that if he had heard any screaming or sounds indicating a physical altercation was taking place, he would have called the police. On one occasion, PO ████ heard a loud thump and asked PO Encarnacion about it. PO Encarnacion explained that he and ████████ were drinking, and the bottle dropped on the floor. PO ████ stated that he did speak with PO Encarnacion regarding the noise they made in the apartment. PO ████ threatened to call the police on PO Encarnacion if they continued to be loud. He explained that PO Encarnacion and ████████ would be loud when they argued, played music, or had company. PO ████ stated he has texted PO Encarnacion three or four times regarding the noise that stemmed from his apartment. PO ████ stated that he had no knowledge of officers ever responding to his building. PO ████ also related that while he has never observed PO Encarnacion intoxicated, he recalled, on different occasions, beer bottles and alcohol bottles being in the building's recycle bin.

When shown Attachments 40-42, the pictures that ████████ submitted with a bullet hole in the window, PO ████ related that the awning in the picture could possibly be his neighbor's and he did recall, at one point, there were white work vans on his block. PO ████ stated that he had no knowledge of a weapon being discharged inside of his building and has never repaired a window with a bullet hole.

---

[50] Att. 65
[51] Att. 33, 64
[52] Injured on Duty

HIGUERA_CITY 14605

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**             **LOG#1087474**

COPA conducted a **canvass**.[53] As documented in an **Investigatory Report**[54] during the canvass, a neighbor of ████████ who identified herself as ███████████ , described a domestic related disturbance between a Hispanic female and a male, who she believed was a police officer or security officer because she had seen him in uniforms on prior occasions. She observed the female trying to get in the car as the male was driving away in an older black luxury vehicle. ████ ██████████ stated that during another incident in the summer of 2017, she observed the male "passed out" on the front lawn while the female was yelling for him to get up. The female eventually went inside the building and the male slept on the lawn the entire night. ████████████ ████████ stated she believed she called the police on at least one occasion. No other witnesses were located.

## VI.    LEGAL STANDARD

For each Allegation COPA must make one of the following findings:

1. <u>Sustained</u> - where it is determined the allegation is supported by a preponderance of the evidence;

2. <u>Not Sustained</u> - where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence;

3. <u>Unfounded</u> - where it is determined by clear and convincing evidence that an allegation is false or not factual; or

4. <u>Exonerated</u> - where it is determined by clear and convincing evidence that the conduct descried in the allegation occurred, but it is lawful and proper.

A **preponderance of evidence** can be described as evidence indicating that it is **more likely than not** that the conduct reviewed complied with Department policy. *See Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005), (a proposition is proved by a preponderance of the evidence when it has found to be more probably true than not). If the evidence gathered in an investigation establishes that it is more likely that the conduct complied with Department policy than that it did not, even if by a narrow margin, then the preponderance of the evidence standard is met.

**Clear and convincing evidence** is a higher standard than a preponderance of the evidence but lower than the "beyond-a-reasonable doubt" standard required to convict a person of a criminal offense. See *e.g.*, *People v. Coan*, 2016 IL App (2d) 151036 (2016). Clear and Convincing can be defined as a "degree of proof, which, considering all the evidence in the case, produces the firm and abiding belief that it is highly probable that the proposition . . . is true." *Id.* at ¶ 28.

## VII.    ANALYSIS

---

[53] Att. 34
[54] Att. 37

HIGUERA_CITY 14606

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**           **LOG#1087474**

### A. Credibility Assessment

The credibility of an individual relies primarily on two factors: 1) the individual's truthfulness and 2) the reliability of the individual's account. The first factor addresses the honesty of the individual making the statement, while the second factor speaks to the individual's ability to accurately perceive the event at the time of the incident and then accurately recall the event from memory. While some facts are consistent among the accounts of ████████ and PO Encarnacion (i.e., that they were involved in an off and on relationship, and that they have been involved in physical altercations), other material facts are entirely divergent. Overall, COPA finds ██████ more credible than PO Encarnacion.

Specifically, ████████ reported a thorough account of the incidents and provided evidence to corroborate her accounts for nearly all the allegations mentioned. For example, ████████ provided numerous photographs corroborating various physical injuries, as well as photographs and videos documenting PO Encarnacion's frequent intoxication. On the other hand, PO Encarnacion's lack of memory and inability to recall incidents diminishes his credibility. In fact, ████████████████████████████████████████████████████████████████. Furthermore, although PO Encarnacion denied several incidents, he generally failed to provide plausible explanations that might contradict ████████ account.

For example, ████████ related that PO Encarnacion called the police on her in Waukegan. PO Encarnacion stated that he did not recall calling 911 however, digital evidence submitted by ████████ shows that PO Encarnacion appeared to be intoxicated and carrying a hammer in his hand. In addition to this, the Waukegan Police Department's digital evidence corroborates ████ ████ account.

Moreover, PO Encarnacion lack of memory regarding an intimate relationship with ████ ████ is not reasonable. He vaguely remembered arguments between them that caused him to separate himself from the incidents. Nevertheless, PO Encarnacion did recall one incident that occurred on May 25, 2017, in which he called the police because ████████ got physical with him, though he cannot recollect why the situation escalated, but he knew he had scratches on his face and chest. COPA's investigation revealed that PO Encarnacion called the police on multiple occasions requesting the police during incidents with ████████ and identified himself by name and star number.

When PO Encarnacion was asked how many weapons, he possessed during the time he and ████████ were in a relationship, he said one. But when it was brought to his attention that he in fact won a gun from the Department, PO Encarnacion said, "Oh yes, yes, I did, yeah." He added, "I think it was a .38, if I recall." The question here leans towards the truthfulness of PO Encarnacion's response. PO Encarnacion did not have a cache' of weapons to recall, he had only two. The plausibility of a gun owner/police officer not remembering how many weapons they own is diminutive and borders on negligence.

Additionally, PO Encarnacion was asked if he ever allowed ████████ to use his weapon to take photos when she dressed as a police officer around Halloween, or any other time. He said

HIGUERA_CITY 14607

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                **LOG#1087474**

he only recalled ▮▮▮▮▮▮ dressing as a police officer, but he "did not recall" or said, "no, not to the best of my knowledge" that ▮▮▮▮▮▮ was ever in possession of one of his weapons. A reasonable gun owner, and particularly a police officer should be responsible enough to answer the question with an unequivocal yes or no answer and not, "I do not recall" or "not to the best of my knowledge." Therefore, reliance on PO Encarnacion's recall is questionable at best.

In this case, PO Encarnacion's inability to recall most of the incidents limits his ability to dispute ▮▮▮▮▮▮ account.

COPA finds that a preponderance of the evidence demonstrates that ▮▮▮▮▮▮ account of the incident is more credible than PO Encarnacion. COPA must question if PO Encarnacion's level of intoxication impacted his ability to accurately recall his relationship with ▮▮▮▮▮▮ or the incidents in question.

**B. Allegations**

COPA finds that **Allegations 1 and 2** that on various dates and times between June 2016 and November 2017 PO Encarnacion was intoxicated and was intoxicated while armed with his handgun are **Sustained**. ▮▮▮▮▮▮ reported that when PO Encarnacion was intoxicated, he would often wave his gun around and point it at her and himself. ▮▮▮▮▮▮ submitted several photos of PO Encarnacion apparently intoxicated and laying on the floor. She also submitted several videos she recorded in which she alleged that PO Encarnacion was intoxicated. In his statement, PO Encarnacion confirmed that he was the subject in the videos and pictures and was probably intoxicated at the time. Based on a preponderance of the evidence, the allegations are Sustained as alleged.

COPA finds that **Allegations #3-6** that on November 12, 2017 PO Encarnacion engaged in an unjustified physical altercation with ▮▮▮▮▮▮ verbally abused her, placed his hands around her throat, and repeatedly called her after the incident are **Not Sustained**. Although witness ▮▮ ▮▮▮▮▮▮ did not cooperate with the COPA investigation, she provided her account of the incident to detectives. She related that ▮▮▮▮▮▮ entered PO Encarnacion's and began attacking them when she saw them in the bed together. She stated that ▮▮▮▮▮▮ pulled PO Encarnacion out of the bed and slapped him and repeatedly struck him when he tried to separate her an ▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮ stated that ▮▮▮▮▮▮ grabbed her by the leg and hair and pulled her out of the bed, and repeatedly slapped her. ▮▮▮▮▮▮ stated that she tied to block her strikes and could have possibly scratched ▮▮▮▮▮▮ neck. ▮▮▮▮▮▮ stated that she sustained rug burns to the knees and bruises on her left leg. ▮▮▮▮▮▮ told detectives that she did not observe PO Encarnacion place his hands around ▮▮▮▮▮▮ throat. PO Encarnacion provided a similar account of the incident. Both identified ▮▮▮▮▮▮ as the aggressor and not the victim. However, COPA is unable to ascertain ▮▮▮▮▮▮ credibility without being able to interview her. Additionally, all involved parties sustained injuries during the incident. Thus, there is insufficient evidence to prove or disprove the allegations and the allegations are Not Sustained .

COPA finds that **Allegations #7-13** are **Sustained**. ▮▮▮▮▮▮ alleged that on October 18, 2017, PO Encarnacion pointed a firearm at her, pushed her to the ground, struck a vehicle, left the scene of a vehicle accident, drove a vehicle while intoxicated, put a gun in his mouth and pulled the trigger, and lost control of his weapon.

21

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG#1087474**

While PO Encarnacion was not able to recall the details of the events that transpired on October 18, 2017. Ms. Wood was able to give a thorough account, which was credible. Additionally, ██████████account was corroborated, in part, by video. ██████████provided videos of her interaction with Officer Encarnacion. Officer Encarnacion, who appeared to be intoxicated in the videos, called the Waukegan Police on ██████████ and stated that she refused to leave his property. Later that day, ██████████ alleged that PO Encarnacion placed his weapon in his mouth. ██████████ provided a video to support her allegations. The video depicted PO Encarnacion, drinking wine with his gun in his hand. He placed his gun in his mouth, racked it, and pulled the trigger. PO Encarnacion admitted to COPA that it was him in all four videos that ██████████ presented. PO Encarnacion also admitted that he was intoxicated while in possession of his weapon which is in violation of the CPD Uniform and Property Order 04-02, which states, "While sworn members are permitted to carry firearms during non-duty hours, they are instructed to refrain from doing so when there is a likelihood that they will be consuming alcoholic beverages or medications which may impair their physical and/or mental abilities." While PO Encarnacion did not recall the events and denied striking a vehicle and pushing ██████████ to the ground, ██████████ account is more credible. PO Encarnacion's lack of memory regarding the incidents does not diminish ██████████credibility or combat her account. Based on a preponderance of the evidence, the allegations are Sustained.

COPA finds that A**llegations #14-17** are **Sustained**. ██████████ alleged that on June 19, 2016, PO Encarnacion pointed a firearm at her, discharged his weapon in her direction, and failed to notify the Department. ██████████ submitted photos of the window that the bullet struck. PO Encarnacion's landlord, PO ██████ stated that he had no knowledge of a weapon being discharged in his building and has never repaired or replaced a window with a bullet hole. PO ████viewed the photo that ██████████ provided and related that the awning that is captured in the picture could possibly be his neighbor's. PO Encarnacion denied the allegations but admitted the window in the photo could be either his bedroom or dining room window. PO Encarnacion suggested that it is possible that ██████████discharged the weapon. However, he did not recall or allege any specific details in support of that possibility nor claim that he witnessed her fire the weapon. PO Encarnacion's suggestion is unsupported by any evidence. Based on the preponderance of the evidence and ██████████credibility, these allegations are Sustained.

COPA finds that **Allegations #18 and 19** that on or about an unknown date and time in May 2017, PO Encarnacion pulled a blanket off ██████ causing her nails to break and/or slapped her about the face, and stated words to the effect of "Fuck you. You're a bitch," to her are **Sustained**. ██████████told COPA that PO Encarnacion pulled the cover off her, causing the injury to her nail, and slapped her. In his statement at COPA, PO Encarnacion stated that he did not recall much about the incident due to the amount of time that elapsed. He recalled that ██████████ struck him on the chest, and he sustained a scratch on his chest and face. No visible injuries were observed to PO Encarnacion's in the ET photos. ET photos of ██████████depict what appears to be a broken artificial nail partially detached from her natural nail. ██████████account of the incident remained consistent. Even after COPA contacted her approximately a year and a half later, her account was the same. Based on ██████████consistency and credibility, the allegations are Sustained.

COPA finds that **Allegation #20** that on or about July 7, 2016 PO Encarnacion pushed ██████ to the ground and/or dragged her body is **Sustained**. ██████████submitted photographs of

HIGUERA_CITY 14609

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG#1087474

her bruise on her thigh that she sustained when PO Encarnacion pushed her to the ground and drug her across the floor. PO Encarnacion denied the allegation and stated that he did not recall the incident. COPA finds ████████ more credible, and her allegations are supported by the photograph, which depicts bruising to her thigh. Thus, COPA finds this allegation is Sustained.

COPA finds that **Allegation #21** that PO Encarnacion failed to secure his weapon in that he allowed ████████ to possess his weapon is **Sustained**. ████████ told COPA that PO Encarnacion allowed her to pose with his weapon when she was dressed as a police officer for Halloween. PO Encarnacion denied the allegation and stated that ████████ has never been in possession of his weapon. In her interview to COPA, ████████ had no knowledge that her possession of his weapon was a violation of Department policy, further demonstrating her credibility. While PO Encarnacion denied the allegation, based on ████████ credibility and the photograph, it is more likely than not that PO Encarnacion allowed her to pose with his weapon. Thus, the allegation is Sustained.

## VIII.   RECOMMENDED DISCIPLINE FOR SUSTAINED ALLEGATIONS

### a. Officer Sammy Encarnacion

#### i. Complimentary and Disciplinary History

As of March 25, 2022, Officer Encarnacion's complimentary history consists of the following: (1) 2019 Crime Reduction Award, (5) Complimentary Letters), (2) Department Commendation, and (26) Honorable Mentions.

**SPAR History**: Log# 562886 August 5, 2021, Reprimand-Court Appearance Violation, Log# 562887 August 8, 2021, 1 Day Off-Court Appearance Violation and Log# 562965, August 30, 2021, Reprimand-Tardiness.

**Sustained Complaints History:** Case# C 1092579 February 4, 2019, 1 Day Suspension-05B Arrestee, After Arrest, Prior to Lock up.

#### ii. Recommended Penalty, by Allegation

1. **Allegation No. 1:** Separation

2. **Allegation No. 2:** Separation

3. **Allegation No. 7:** Separation

4. **Allegation No. 8:** Separation

5. **Allegation No. 9:** Separation

6. **Allegation No. 10:** Separation

7. **Allegation No. 11:** Separation

HIGUERA_CITY 14610

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                              **LOG#1087474**

8. **Allegation No. 12:** Separation

9. **Allegation No. 13:** Separation

10. **Allegation No. 14:** Separation

11. **Allegation No. 15:** Separation

12. **Allegation No. 16:** Separation

13. **Allegation No. 17:** Separation

14. **Allegation No. 18:** Separation

15. **Allegation No. 19:** Separation

16. **Allegation No. 20:** Separation

17. **Allegation No. 21:** Separation


     Officer Encarnacion's misconduct is severe in nature. He physically and verbally abused an intimate partner on multiple occasions and caused bodily harm to her during several of those instances. Additionally, Officer Encarnacion was in possession of his firearm and intoxicated on multiple occasions. Most concerning, is Officer Encarnacion's discharge of his firearm, which went unreported and endangered the safety of himself and others. Such misconduct, both individually and collectively, demonstrates a lack of judgement and self-control that cannot be tolerated. An officer who behaves in such a manner not only brings discredit upon the Department, but also is a risk to public safety. Thus, COPA recommends he be separated from the Department.


Approved:


_____          May 31, 2022
Sharday Jackson                                          Date
Deputy Chief Investigator


_____          May 31, 2022
Andrea Kersten                                          Date
Chief Administrator

HIGUERA_CITY 14611

# Exhibit A



# Quick View Report

## INFORMATION/COMPLAINT DETAILS

| | |
|---|---|
| **Log No** | 2020-0004240 |
| **Primary Category** | Alcohol/Drug Abuse Possession/Drinking Alcohol/Drug Use  02E |

| **Incident Type** | Complaint Register | **Affidavit Received** | No |
|---|---|---|---|
| **Incident Origin** | Phone | **Date of Incident** | 10-September-2020 00:04 |
| **Status** | Under BIA Investigation | **Date of Incident To** | |
| **Investigator** | MARK A LAMBERG | **Supervisor** | JAMES M FIEDLER |
| **Incident Description** | CPD initiated complaint: R/Sgt allegedly detected odor of alcohol on breath of accused officers who were said to be involved in an off duty physical altercation with unknown subjects.  See attached. | | |

## SPECIAL CONSIDERATIONS

| | |
|---|---|
| CIVIL SUIT :No | JUVENILE :No |
| CRIMINAL :No | PCRIA : No |
| CONFIDENTIAL :No | PURSUIT RELATED :No |
| EEOC :No | POLICE SHOOTING (U) :No |
| EXTRAORDINARY OCCURRENCE :No | PPO :No |
| FATAL:No | REPRESENTED :No |
| MAJOR CASE :No | SELF INFLICTED INJURY :No |
| MEDIATION :No | SERIOUS BODILY INJURY :No |
| MOTOR VEHICLE (V) :No | SUICIDE ATTEMPT :No |
| INCARCERATED :No | WARD OF THE STATE :No |

## RELATED CPD

| Role | Name | Star No. | Employee No. | Position | On Duty |
|---|---|---|---|---|---|
| Accused | EVAN SOLANO | 12874 | | POLICE OFFICER | Off Duty |
| Accused | SAMMY ENCARNACION | 11790 | | POLICE OFFICER | Off Duty |
| Reporting Party: Third Party | MARK GOLOSINSKI | 1611 | | SERGEANT OF POLICE | Off Duty |

## RELATED NON CPD

| Role | Name | DOB | Address | Mobile Phone | Email |
|---|---|---|---|---|---|
| Witness | Unknown Unknown | | CHICAGO, | | |



# Quick View Report

## RELATED LOCATIONS

| Role | Address | Beat | District | Location |
|------|---------|------|----------|----------|
| Location of Occurrence | 5800 W MONTROSE AVE    CHICAGO, 60630 | 1622 | 016 | |

## ATTACHMENTS

| Final Attachments | Internal Attachments | Total Attachments | Total Number of Pages |
|------|------|------|------|
| 11 | 0 | 11 | 0 |



**Notes Report**

**Log No : 2020-0004240**

| | | | |
|---|---|---|---|
| **Incident Type** | Complaint Register | **Case Status** | Under BIA Investigation |
| **Team** | GENERAL INVESTIGATIONS | **Date of Incident** | 09/10/2020 |
| **Investigator** | MARK A LAMBERG | **Time of Incident** | 12:04 AM |
| **Confidential?*** | No | **Criminal?** | No |
| **Non-Disciplinary Intervention** | No | | |
| **Manner Received?** | Phone | | |
| **Pursuit Related?*** | No | | |
| **Initial Assignment** | COPA | | |
| **Agency** | BIA | | |

## Notes - Count: 4

| | |
|---|---|
| Note Type | Note |
| Create Date | 9/11/20 11:29 AM |
| Created By | JAMES FIEDLER |
| Details | Cancelled Tasks: ID-0100788, |
| Note Type | Note |
| Create Date | 9/10/20 2:59 PM |
| Created By | RANITA MITCHELL |
| Details | Review for BIA |
| Note Type | Note |
| Create Date | 9/10/20 1:18 PM |
| Created By | ADAM PFEIFER |
| Details | initiation report received and uploaded |
| Note Type | Note |
| Create Date | 9/10/20 12:59 PM |
| Created By | MORGAN RICHARDSON |
| Details | IA Richardson called 016th District for initiation report, Sgt unavailable. IA Richardson then sent email to RP Sgt. |

Bureau of Patrol                                            10 September, 2020
016th Dist.

TO:          Biggane, Maureen
             Commander 016th Dist

FROM:        Golosinski, Mark G. *1611


SUBJECT:     `CR/LOG Initiation: 2020- 0004240


**DATE / TIME OF INCIDENT**: 10 September, 2020 (0300-0500 Approx)

**RD#:** JD-362332 / Agg Battery

**LOCATION:** 5800 W Montrose, Chicago, Il. (Sixpenny Tavern)

**ACCUSED**:

#1) Encarnacion, Sammy (NMI) Employee          * 11790 DOA: 29 Jun 2015 UofA: 016

#2) Solano, Evan G. Employee#          * 12874 DOA: 29 Jun 2015 UofA: 016

**COMPLAINANT:** Golosinski, Mark G. Employee#          * 1611 DOA: 16 Jan 1994 UofA: 016

**VICTIM:**

**#1)** Encarnacion, Sammy Employee#          * 11790 DOA: 29 Jun2015 UofA: 016

#2) Solano, Evan G. Employee#          * 12874 DOA: 29 Jun 2015 UofA: 016

**WITNESS:**

**#1)** Brit, Daniel T. Employee#          * 4181 DOA: 16 Jan 2018 UofA: 016

**#2)**          F/2/Unk LKA:          Phone:

#3) Noncz, Gregory E. Employee#          * 1586 DOA: 27 Feb 1991 UofA: 016

**OFFENDER(s):** Unknown

**NOTIFICATIONS:** 1699 Lt Isakson *378, CPIC Morehead * 6612 @ 0632hrs, Zone 1, CPIC Zacar * 12363 @ 0653 Intoxication Notification

**HIGUERA_CITY 14615**

R/Sgt, while assigned to 016th dist desk duties had an occasion to observe Accused# 1 NKA Encarnacion, Sammy enter the district lobby and state he and his partner NKA: Victim #2 Solano, Evan were the victims of an aggravated battery reported under RD# JD 362332.R/Sgt summoned ███ to the 016th dsit station who relocated Encarnacion, Sammy to ███████████ for treatment by ER staff. While in the station R/Sgt was able to detect the odor of alcohol on the breath of Encarnacion, Sammy necessitating this report and notifications.

Accused #2 NKA: Solano, Evan eventually appeared at ███████████ for treatment and it was detected by Sgt Noncz, Gregory *1586 the slight odor of alcohol on his breath and he in turn related this observation to this R/Sgt.

It should be noted that Encarnacion, Sammy had significant facial and heard trauma and it was related to the R/Sgt that Solano, Evan also had significant facial and head trauma as well.

Above notifications made as noted date / time, initiation report faxed / emailed to IAD, COPA and A/5 detective Division who will conduct a follow up investigation

Sgt. Mark G. Golosinski *1611

APPROVED:

_____

_____

HIGUERA_CITY 14616

**Bureau of Patrol**                                                                10 September 2020

**To:**     Commander Biggane # 710

**From:**  Police Officer Gregory Sobieraj  # 16479

            016th District

**Subject:** Rd JD 362332

            CL # 2020-0004240

        Reporting Officer Sobieraj 16479 responded to the location of Montrose and Menard in an attempt to locate a possible injured police officer wearing a denim shirt. Upon touring the area reporting Officer Sobieraj 16479 was able to gain entry to the establishment located at Montrose and Menard, speak with an older white male approximately 60yrs of age, who informed Officer Sobieraj that there was an altercation inside the establishment between two males and immediately after the altercation both males went outside and left in an unknown direction.  The male also informed Officer Sobieraj that his video surveillance was in operable. Officer Sobieraj was not able to determine a crime scene inside the establishment.

Police Officer  Gregory Sobieraj

016th District

# CHICAGO POLICE DEPARTMENT

## ORIGINAL CASE INCIDENT REPORT

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.388(6/03)-C)

**RD #:** JD362332

**EVENT #:** 2025402292

Case ID: 12161490 CASR229

---

**INCIDENT**

### ASSIGNED TO FIELD

**IUCR:** 0462 - Battery - Agg. Protected Employee - Hands, Fists, Feet, Serious Injury

| | | |
|---|---|---|
| **Occurrence Location:** 5800 W Montrose Ave<br>Chicago, Illinois 60634<br>103 - Bar Or Tavern | **Beat:** 1622 | **Unit Assigned:** 1612<br>**RO Arrival Date:** 10 September 2020 05:30<br>**# Offenders:** 1 |
| **Occurrence Date:** 10 September 2020 04:00 - 10 September 2020 04:30 | | |

---

**NON OFFENDER**

### VICTIM - Individual

**Name:** ENCARNACION, Sammy

**Res:** ███████████ **Beat:** 1722

**Beat:** 5100

Police Officer - Chicago

**Sobriety:** Unknown

**Demographics**

Male
5'08,
170 lbs
Brown Eyes
Brown Hair
Medium Hair Style
Medium Complexion

**DOB:** ████████
**Age:** 31 Years
**Birth Place:** Illinois

---

### VICTIM - Individual

**Name:** SOLANO, Evan

**Res:** ███████████ **Beat:** 1733

**Beat:** 5100

**Sobriety:** Unknown

**Demographics**

Male
White Hispanic
5'08,
160 lbs
Brown Eyes
Brown Hair
Short Hair Style
Medium Complexion

**DOB:** ████████
**Age:** 28 Years
**Birth Place:** Illinois

---

### WITNESS - Individual

**Name:** BIRT, Daniel

**Res:** ███████████ **Beat:** 1624

**Beat:** 5100

Police Officer - Chicago

**Demographics**

Male
White

**DOB:** ████████
**Age:** 25 Years
**Birth Place:** Illinois

---

### WITNESS - Individual

**Name:** ████████

**Res:** ███████████ **Beat:** 1733

**Beat:** 5100

**Demographics**

Female
White Hispanic

**DOB:** ████████
**Age:** 21 Years
**Birth Place:** Illinois

---

### Other Communications and Availability

**Phone - Cellular:** ███████████

---

RD #: JD362332

powered by CLEAR Technology

**HIGUERA_CITY 14618**

## INJURIES

**Injury Info (ENCARNACION,Sammy   - Victim )**

**Responding Unit:**

**Injury Info (SOLANO,Evan   - Victim )**

Injured by offender

**Responding Unit:**

**Injury Info (BIRT,Daniel   - Witness )**

**Responding Unit:**

**Injury Info (             - Witness )**

**Responding Unit:**

## SUSPECTS

**Suspect # 1**

**Name:  UNKNOWN**

Unknown Ave          **Beat:** 3100
Chicago IL

**Demographics**

Male          **Age:**   25 years
White Hispanic
5'06,
120 lbs
Unknown Eyes
Brown Hair
Short Hair Style
Medium Complexion

**Other Communications and Availability**

**Injury Info**

**Responding Unit:**

## RELATIONSHIP

| | RELATIONSHIP | |
|---|---|---|
| (Victim) **ENCARNACION, Sammy** | is a  No Relationship of | ( Offender ) **UNKNOWN** |
| (Victim) **SOLANO, Evan** | is a  No Relationship of | ( Offender ) **UNKNOWN** |

## DOMESTIC INFO

powered by CLEAR Technology          HIGUERA_CITY 14619

## NOTIFICATIONS

| Request Type | Unit | Agency Name | Date | Star # | Name |
|---|---|---|---|---|---|
| Notification | 116 | Deployment Operations Center (Doc) | 10 September 2020 07:58 | 12363 | ,ZACHAR |

## NARRATIVE

EVENT# 02292 IN SUMMARY, SAMMY ENCARNACION (VICTIM) RELATED TO R/O'S THAT WHILE LEAVING THE ESTABLISHMENT AT THE ABOVE LOCATION  UNKNOWN(OFFENDER) YELLED AT THE VICTIM "FUCK YOU I KNOW YOU'RE 12 !".THE  UNKNOWN(OFFENDER) THEN PUNCHED SAMMY ENCARNACION (VICTIM) ON THE LEFT SIDE OF THE FACE WITH A CLOSED FIST. SAMMY ENCARNACION (VICTIM) WENT ON TO RELATE THAT A GROUP OF 8-10 M/4'S BEGAN STRIKING BOTH SAMMY ENCARNACION (VICTIM)SAMMY ENCARNACION (VICTIM) AND EVAN SOLANO (VICTIM) ABOUT THE HEAD AND BODY WITH CLOSED FISTS . THE VICTIMS FOUGHT BACK AND WERE ABLE TO FLEE THE AREA. SAMMY ENCARNACION (VICTIM) SUSTAINED A CUT ABOVE THE LEFT EYE AS WELL UNDETERMINED INJURIES TO THE UPPER LEFT ARM,WRIST,HAND AND LOWER LEFT LEG. EVAN SOLANO (VICTIM) SUSTAINED SWELLING ABOVE AND BELOW BOTH EYES AS WELL AS HIS NOSE. BOTH VICTIMS WERE TRANSPORTED TO [                    ] FOR TREATMENT.R/O WAS UNABLE CONDUCT A LICENSE INVESTIGATION DUE TO THE ESTABLISHMENT BEING CLOSED. ON SCENE, ET,BT5836 , HEIN #14225.A5V/C JABLON#20646 BT.5523A.BT 1620 NOTIFIED THE ZONE THAT BWC WERE TURNED OFF WHEN ENTERING THE EMERGENCY ROOM.
NOTIFICATION: VIOLENT CRIMES  DEMBSKI Beat#:  Star#: 20395 Emp#:  Date: 10-SEP-2020 Time: 0745 NOT
- STAR#: 1566 NAME: GREGORY NONCZ BEAT: 1620
- STAR#: 5080 NAME: WILLIAM SKEHAN BEAT: 1612

## PERSONNEL

| | Star No | Emp No | Name | User | Date | Unit | Beat |
|---|---|---|---|---|---|---|---|
| Approving Supervisor | 1566 | | NONCZ, Gregory, E | | 10 Sep 2020 09:46 | 716 | |
| Detective / Investigator | 20646 | | JABLON, Jeffery, R | | 10 Sep 2020 10:56 | 650 | |
| Reporting Officer | 5080 | | SKEHAN, William, S | | 10 Sep 2020 09:43 | 016 | 1612 |

HIGUERA_CITY 14620

# IICAGO POLICE DEPARTMENT
# ASE SUPPLEMENTARY REPORT

0 S. Michigan Avenue, Chicago, Illinois 60653
use by Chicago Police - Bureau of Investigative Services Personnel Only)

**JD362332**

Case id : 12161490
Sup ID : 13891589 CASR301

## ETHOD/CAU CODE

**DETECTIVE SUP. APPROVAL COMPLETE**

| st Offense Classification/Re-Classification | IUCR Code | Original Offense Classification | | | IUCR Code |
|---|---|---|---|---|---|
| ATTERY / Agg. Protected Employee - ands, Fists, Feet, Serious Injury | 0462 | BATTERY / Agg. Protected Employee - Hands, Fists, Feet, Serious Injury | | | 0462 |

| ldress of Occurrence | Beat of Occur | No of Victims | No of Offenders | No of Arrested | SCR No |
|---|---|---|---|---|---|
| 800 W MONTROSE AVE | 1622 | 2 | 1 | 0 | |

| cation Type | Location Code | Secondary Location | | | Hate Crime? |
|---|---|---|---|---|---|
| ar Or Tavern | 103 | | | | NO |

| te of Occurrence | Unit Assigned | Date RO Arrived | Fire Related? | Gang Related? | Domestic Related? |
|---|---|---|---|---|---|
| 0-SEP-2020 04:00 - 10-SEP-2020 04:30 | 1612 | *********************** | NO | NO | NO |

| porting Officer | Star No | Approving Supervisor | Star No | Primary Detective Assigned | Star No |
|---|---|---|---|---|---|
| EMPAS, Ron | 21509 | REMPAS, Ron | 21509 | JABLON, Jeffery | 20646 |

| te Submitted | Date Approved | Assignment Type |
|---|---|---|
| 0-SEP-2020 10:56 | 10-SEP-2020 10:57 | FIELD |

## IIS IS A FIELD INVESTIGATION METHOD/CAU CODE REPORT

**ICTIM(S) :**

**ENCARNACION, Sammy**   **TYPE:  Individual**

Male / 31  Years

**DOB:**

**RES:**

**BIRTH PL:**  Illinois

**DESCRIPTION:**  5'08,170,Brown Hair,  Medium  Hair Style,  Brown Eyes, Medium  Complexion

**EMPLOYMENT:**  Police Officer - Chicago

**SOBRIETY:**  Unknown

**SOLANO, Evan**   **TYPE:  Individual**

Male / White Hispanic / 28  Years

**DOB:**

**RES:**

**BIRTH PL:**  Illinois

**DESCRIPTION:**  5'08,160,Brown Hair,  Short  Hair Style,  Brown Eyes, Medium  Complexion

**SOBRIETY:**  Unknown

**USPECT(S):**

**UNKNOWN**

Male / White Hispanic / 25 Years

**RES:**    Unknown Ave
Chicago IL

**DESCRIPTION:**  5'06,120,Brown Hair, Short Hair Style, Unknown Eyes, Medium Complexion

JD362332

**RELATIONSHIP OF VICTIM TO OFFENDER:**

ENCARNACION, Sammy   No Relationship
SOLANO, Evan   No Relationship

**ICTIM INJURIES**          **ENCARNACION, Sammy**
Injury attempted by Offender

**CFD RESPONDING UNIT:**

**SOLANO, Evan**
Injured by Offender

**CFD RESPONDING UNIT:**

**OCATION OF INCIDENT:**       5800 W Montrose Ave
Chicago IL 60634
103 - Bar Or Tavern

**ATE & TIME OF INCIDENT:**    10-SEP-2020 04:00 - 10-SEP-2020 04:30

**ETHOD CODE(S):**             DNA

**AU CODE(S):**                Police Related Not Con

**ERSONNEL ASSIGNED:**         **Detective / Investigator**

JABLON, Jeffery R          # 20646
**Reporting Officer**

SKEHAN, William S          # 5080          BEAT: 1612

**ITNESS(ES) :**               **BIRT, Daniel**
Male / White / 25 Years
**DOB:**
**BIRTH PL:** Illinois
**RES:**

**EMPLOYMENT:** Police Officer - Chicago

Female / White Hispanic / 21 Years
**DOB:**
**BIRTH PL:** Illinois
**RES:**

**OTHER COMMUNICATIONS:**
Phone -
Cellular :

**ITNESS INJURIES**            **BIRT, Daniel**
**CFD RESPONDING UNIT:**

**CFD RESPONDING UNIT:**

**RIME CODE SUMMARY:**    0462 - Battery - Agg. Protected Employee - Hands, Fists, Feet, Serious Inj

**ICR ASSOCIATIONS:**    0462 - Battery - Agg. Protected Employee - Hands, Fists, Feet, Serious Inj

| | |
|---|---|
| ENCARNACION, Sammy | ( Victim ) |
| UNKNOWN | ( Suspect ) |
| SOLANO, Evan | ( Victim ) |
| UNKNOWN | ( Suspect ) |
| UNKNOWN | ( Suspect ) |
| | ( Witness ) |
| UNKNOWN | ( Suspect ) |
| BIRT, Daniel | ( Witness ) |

**ICIDENT NOTIFICATIONS:**    **NOTIFICATION DATE & TIME:** 09/10/2020:075800

    **REQUEST TYPE:** Notification

    **PERSON NAME:** ,Zachar

    **STAR #:** 12363

    **EMP #:**

**EPORT DISTRIBUTIONS:**    No Distribution

**IVESTIGATION:**

This is a Method/CAU code Supplementary Report.

# CONSENT TO AUDIO RECORD STATEMENT- NON-DEPARTMENT MEMBERS
BUREAU OF INTERNAL AFFAIRS
CHICAGO POLICE DEPARTMENT

| NAME OF INTERVIEWEE | LOG NUMBER | |
| --- | --- | --- |
| | 2020-0004240 | |
| LOCATION OF STATEMENT | DATE | TIME |
| 3510 S. Michigan Ave. Chicago, IL (Offices of BIA) | 08 Oct 2020 | |

**TO BE COMPLETED BY INTERVIEWEE**

I, ▓▓▓▓▓▓▓▓▓▓ have been advised and fully understand that I have the option to have my statement audio recorded by the Bureau of Internal Affairs, Chicago Police Department, freely, voluntarily, without duress, coercion, or promises of any kind. I understand that I can terminate the audio recording of my statement at any time.

**CHECK ONE:**

[X] I hereby authorize Sgt. Mark Lamberg #1847

PRINT NAME(S) OF INVESTIGATOR(S)

of the Bureau of Internal Affairs, Chicago Police Department to audio record my statement on:

10 8 2020 at 0915 (AM)/ PM.

DATE          TIME

[ ] I hereby decline to have my statement audio recorded.

PRINT NAME OF INTERVIEWEE

SIGNATURE OF INTERVIEWEE

10 8 2020

DATE

Sgt. Mark Lamberg
PRINT NAME OF WITNESS

Sgt. ▓▓▓▓▓
SIGNATURE OF WITNESS

8 OCT 2020

DATE

**CPD-44.260 (5/17)**

| LOG NO. 2020-0004240 |
| --- |
| ATTACHMENT NO. HIGUERA_CITY 14624 |

# SWORN AFFIDAVIT FOR LOG NUMBER INVESTIGATION (ELECTRONICALLY RECORDED STATEMENT)
CHICAGO POLICE DEPARTMENT

STATE OF ILLINOIS )
) CC
COUNTY OF COOK )

| Location of Incident ███████ | Date 10 Sep 2020 | Time 0400 hours |
|---|---|---|

Summary of Statement(s):

The complainant alleged the following: An unknown off-duty Chicago Police Officer appeared to be intoxicated while he continously rang her doorbell and pounded on the front door to her residence. This individual related to the complainant that he was the victim of a battery and needed assistance. The accused then attempted to break into her residence by using his shoulder to push the front door in. The accused eventually fled on foot after approximately five minutes.

The complainant called for police assistance and the responding 016th District Officer refused to provide her with a report of the incident, refused to identify himself, had his badge covered with a black band and did not have a name tag affixed to his uniform.

I, ███████ hereby state as follows:

1. I provided an electronically recorded statement.

2. Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the information set forth in the statement(s) above and/or attached summary are true and correct, except as to any matters therein stated to be on information and belief as to such matters, I certify as aforesaid that I verily believe the same to be true.

Print Affiant's Name

Affiant's Signature

Date 10 8 2020

Print Witness' Name Sgt. Mark Lamberg

Witness' Signature

Date 8 oct 2020

INVESTIGATOR USE ONLY

COMPLETE THIS SECTION ONLY WHEN THE SWORN AFFIDAVIT HAS NOT BEEN SIGNED.

A Sworn Affidavit has not been signed for this investigation under the following circumstances:

☐ NO AFFIDAVIT - NO CONTACT   ☐ NO AFFIDAVIT - REFUSED   ☐ NO AFFIDAVIT - NO COOPERATION   ☐ NO AFFIDAVIT REQUIRED

CPD-44.127 (REV. 8/16) English

Attachment No. 3

Log No. 2020-4240   **HIGUERA_CITY 14625**

Bureau of Internal Affairs
Special Investigations Section

08 OCT 2020

TO:              Karen Konow
                     Chief
                     Bureau of Internal Affairs

FROM:          Sgt. Majed Assaf #1440
                     Bureau of Internal Affairs
                     Special Investigations Section

SUBJECT:     Administering of Photo Array
                     Re: Log No. 2020-0004240

DATE:          08 OCT 2020
TIME:          0915 Hours
LOCATION:    Bureau of Internal Affairs-5th Floor, Main Conference Room

ADMINISTRATOR: Sgt. Majed Assaf #1440

WITNESS:         █████████████████

VIEWED:        Two separate Photo Arrays each containing six (6) Hispanic male
                     members (past and/or current) of the Chicago Police Department

SOURCE:        Chicago I-CLEAR Digital Mugshot System,
                     provided by P.O. Genelle Wherfel #13234, Unit 121-Records

PHOTO LOG NO:   202010716:21:18; 202010715:59:54

INVENTORY NO. :  Returned to Bureau of Internal Affairs Records Division

NARRATIVE:

       At the request of Sergeant Mark Lamberg, Unit 121, the Undersigned acted as an Independent Administrator to a Photo Lineup on 08 OCT 2020, at 0915 hrs. This photo lineup was conducted to assist in the identification of an accused Department member in reference to CL #2020-0004240. The Reporting Sergeant was given a manila folder by Officer Wherfel and informed that the folder contained two photo arrays, each of similarly featured subjects that may or may not have been involved in this investigation. The undersigned had no knowledge of the contents, the demographics of the subjects, or the identity of any possible accused. One demographic page was also included with each of the photo arrays for this procedure. Said page contained the demographics of each subject, which corresponded to each photo in said arrays. Said pictures and demographic information were set in corresponding order, by row and specific location. The included demographic pages were removed from the file prior to the presentation of the photos.

HIGUERA_CITY 14626

Bureau of Internal Affairs                                    08 OCT 2020
Special Investigations Section

    Upon being notified that the viewing witness was available, the undersigned relocated to the main conference room located in the offices of the Bureau of Internal Affairs. The subject viewing the photo array, ██████████, was then presented with a Lineup/Photo Spread Advisory Form, CPD-44.264 Rev. 7/17). The undersigned read the advisory form out loud to ████████ who stated she fully understood the instructions. ████████ when given the option of having the lineup procedure audio recorded, consented to be audio recorded. ████████ proceeded to sign and date the advisory form.

    The undersigned proceeded to open the folder and retrieved the documents that each contained the six photos, arranged in two rows of three. The undersigned then presented ████████ with the first document. ████████ after viewing the photo array, related that she could not identify the subject she encountered on the date in question. ████████ proceeded to sign her name on the bottom of the document. The undersigned repeated the same steps with the second photo array, which also resulted in a negative identification. ████████ was thanked by the undersigned at which time the photo lineup procedure was ended.

    The original file, containing the subject photos, the accompanying demographic sheets, and the original advisory forms, was then returned back to Officer Wherfel for retention in the BIA Records Section. A signed copy of this Synoptic Report and signed Advisory Forms will be forwarded to Sgt. Lamberg for inclusion into his original investigative file.

                                  #1440

                                  Sgt. Majed Assaf #1440
                                  Bureau of Internal affairs
                                  Special Investigations Section

HIGUERA_CITY 14627

# BIA PHOTO LINE-UP ADVISORY FORM - (ADMINISTRATIVE)
**BUREAU OF INTERNAL AFFAIRS**
**CHICAGO POLICE DEPARTMENT**

LOG NO.

2020-0004240

I, _____, agree to view a photo/live line-up at
(Print Name)

3510 S. Michigan Ave. Chicago, IL (Offices of BIA) _____ on 08 Oct 2020 .
(Location)                                                    (Date)

## INSTRUCTIONS TO WITNESS VIEWING PHOTO LINE-UP

I understand that I am not required to be recorded and may refuse to do so:

* If recording the line-up is practical, an audio recording of myself
  and the persons conducting the line-up will be made for the purpose of accurately
  documenting all statements made by myself.

* The accused may or may not be presented in the line-up.

* If an Independent Administrator is conducting the line-up, they do not know the
  accused's identity; if an Independent Administrator is not being used, I should not
  assume the line-up Administrator knows which person in the line-up is the accused.

* I should not feel compelled to make an identification.

* It is as important to exclude innocent persons as it is to identify an accused.

* The investigation will continue whether or not an identification is made.

The photo line-up Administrator has explained the above instructions, I have also read them and/or they
have been read to me and I understand them.

_____    10|8|2020        0915
Signature of Witness Viewing Photo Line-up    Date    Time

## AUDIO RECORDING CONSENT

No BIA member has suggested in any way that I should consent or refuse to have this line-up audio
recorded. The decision to have this line-up audio recorded is my personal preference.

*Circle the word(s) "consent" or "do not consent" in the following questions:*

I (consent)/do not consent to being audio recorded.

Signature of Witness _____    Date    10|8|2020

## PHOTO LINE-UP RESULTS

The Witness identified the following photo number: D N A
The Witness made the following statements during the photo line-up as to the identity of the involved
member:

Had longer hair and face was bloody and beat up.

_____

_____

_____

## SIGNATURES

Signature of Witness viewing photo line-up        Date        Time

Signature of photo line-up Administrator _____

Star No.
1440

CPD-44.264 (7/17)

HIGUERA_CITY 14628

# BIA PHOTO LINE-UP ADVISORY FORM - (ADMINISTRATIVE)
**BUREAU OF INTERNAL AFFAIRS**
**CHICAGO POLICE DEPARTMENT**

LOG NO.

2020-0004240

I, _____, agree to view a photo/live line-up at
(Print Name)

3510 S. Michigan Ave. Chicago, IL (Offices of BIA) _____ on 08 Oct 2020 .
(Location)                                                    (Date)

## INSTRUCTIONS TO WITNESS VIEWING PHOTO LINE-UP

I understand that I am not required to be recorded and may refuse to do so:

* If recording the line-up is practical, an audio recording of myself and the persons conducting the line-up will be made for the purpose of accurately documenting all statements made by myself.

* The accused may or may not be presented in the line-up.

* If an Independent Administrator is conducting the line-up, they do not know the accused's identity; if an Independent Administrator is not being used, I should not assume the line-up Administrator knows which person in the line-up is the accused.

* I should not feel compelled to make an identification.

* It is as important to exclude innocent persons as it is to identify an accused.

* The investigation will continue whether or not an identification is made.

The photo line-up Administrator has explained the above instructions, I have also read them and/or they have been read to me and I understand them.

10 | 8 | 2020                    29 | 15

Signature of Witness Viewing Photo Line-up          Date          Time

## AUDIO RECORDING CONSENT

No BIA member has suggested in any way that I should consent or refuse to have this line-up audio recorded. The decision to have this line-up audio recorded is my personal preference.

*Circle the word(s) "consent" or "do not consent" in the following questions:*

I consent/do not consent to being audio recorded.
Signature of Witness_____          Date 10 | 8 | 2020

## PHOTO LINE-UP RESULTS

The Witness identified the following photo number: D N A
The Witness made the following statements during the photo line-up as to the identity of the involved member:
Had longer hair and face was bloody and beat up.

## SIGNATURES

Signature of Witness viewing photo line-up          Date          Time

Signature of photo line-up Administrator          Star No. 1440

CPD-44.264 (7/17)                    **HIGUERA_CITY 14629**