**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GISELLE HIGUERA, Administrator for the Estate of Anthony Alvarez and as mother of A.A., a minor, | )<br>)<br>)<br>)    Case No. 22 C 964 |
| Plaintiff, | )<br>)    Honorable Judge Seeger |
| v. | )<br>)    Magistrate Judge Cole |
| CITY OF CHICAGO, et al. | )<br>)    JURY DEMAND |
| Defendants. | )<br>) |

**DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS
PLAINTIFF'S POLICY CLAIMS IN HER FIRST AMENDED COMPLAINT**

Defendant City of Chicago, by its attorneys, moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all federal and state law "policy" claims against it in Plaintiff's First Amended Complaint ("FAC"),[1] and states:

**INTRODUCTION**

Giselle Higuera ("Plaintiff"), as Administrator for the Estate of Anthony Alvarez ("Alvarez") and as mother of A.A., a minor, has sued City of Chicago Police Officers Evan Solano and Sammy Encarcion, and the City of Chicago, pursuant to 42 U.S.C. § 1983 and Illinois law, for the March 31, 2021 fatal shooting of Alvarez during a foot pursuit. (*See* Dkt. 80 ("FAC").) Plaintiff brings federal claims against both Defendant Officers for excessive force (Count II) and failure to intervene (Count III), and state law claims against Defendant Solano

---

[1] Plaintiff has titled the complaint she filed on March 3, 2023, as her "First Amended Complaint," despite this Court's February 21, 2023 Order directing her to file a "second amended complaint" (*see* Dkt. 75) and the fact that she previously filed a First Amended Complaint on January 26, 2023. (*See* Dkt. 69.)

1

under the Illinois Wrongful Death Act (Count IV) and the Survival Act of Illinois (Count V).[2] Plaintiff brings *Monell*[3] claims against the City in Count I alleging that (1) its lack of "a real foot chase policy" caused a practice of using excessive force (FAC at ¶¶ 84-106), and (2) its failure to investigate and discipline has spawned a police culture of impunity. (*See id.* at ¶¶ 107-131.) She further pleads Illinois Wrongful Death and Survival Acts claims in Counts VI and VII, alleging that various City customs and practices caused Alvarez's death (*see id.* at ¶¶ 157, 165) and that the City is liable for Solano's acts. (*See id.* at ¶¶ 156, 164.) Finally, Plaintiff brings *respondeat superior* and indemnification claims against the City in Counts VIII and IX, respectively.

Plaintiff's first *Monell* theory relies on (1) the Consent Decree ("Decree") voluntarily negotiated and entered into by the City and the State of Illinois, and (2) the reports of the Independent Monitor ("IM"), whose role is to assess the City's compliance with the Decree.[4] (*See* FAC at ¶¶ 99-101.) Plaintiff also selectively quotes the Chicago Police Department's ("CPD") general order governing the use of force (*see* G03-02, attached as Ex. A) and refers generally to the City's "use of force documentation." (*See id.* at ¶ 52.) In doing so, however, Plaintiff has pled herself out of court because the IM reports, the Decree, and CPD's use of force directive establish that she cannot plausibly plead an essential element of her *Monell* claim— deliberate indifference—which requires her to show that "it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded

---

[2] Defendant Officers have filed a partial motion to dismiss the FAC. (*See* Dkt. 84.) The City hereby adopts and joins the Officers' motion.

[3] *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).

[4] *See State of Illinois v. City of Chicago*, Case No.17 C 6260 (N.D. Ill.), Dkt. 703-1 for the Decree. The IM reports are available on that docket also. *See* Appendix to Motion for hyperlinks to the docket entries for the Decree and the individual IM reports.

those consequences." *See First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986-87 (7th Cir. 2021).[5] Those documents collectively demonstrate that the City has taken affirmative steps to (1) issue a policy to govern foot pursuits, and (2) improve its policies and training related to use of force. Plaintiff, therefore, cannot plausibly contend that the City has "consciously disregarded the consequences" of such policing activity. Thus, Plaintiff's first *Monell* theory fails.

Plaintiff's second *Monell* theory alleges that the City "has historically been unwilling to fairly and impartially investigate and/or arrive at honest, fair, and just conclusions regarding officer involved shootings." (*See* FAC at ¶ 108.) However, Plaintiff fails to plausibly plead this theory because (1) her *Monell* allegations, particularly the existence of a widespread practice, are entirely conclusory, and (2) the citizen complaints against Defendant Officers that Plaintiff relies upon do not permit an inference that the alleged practice at issue exists. Accordingly, Plaintiff's second *Monell* theory also fails, and this Court should dismiss Count I.

This Court should also dismiss Plaintiff's state law "policy" claims because the City is immune from liability pursuant to the Illinois Tort Immunity Act ("TIA"), and the *respondeat superior* allegations in Counts VI and VII (*see* FAC at ¶¶ 156, 164) are duplicative of Plaintiff's *respondeat superior* claim in Count VIII and therefore unnecessary. *See* Fed. R Civ. P. 12(f).

**BACKGROUND: THE CONSENT DECREE AND THE INDEPENDENT MONITOR**

In January 2019, Judge Dow entered the Decree, which became effective on March 1, 2019, with the appointment of the IM. (*See* 17 C 6260 at Dkt. 702 ("Order"), Dkt. 703-1 ("Decree"), and Dkt. 713 (appointment of Monitor).) The Decree was negotiated by the Office of the Illinois Attorney General ("OAG") and the City after the OAG sued the City for alleged CPD

---

[5] "It is well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2021) (same).

civil rights violations. (*See* Order at 8.) The Decree requires the City to make changes in ten areas of policing, including "use of force." (*See* Decree at ¶ 2.) Issues related to foot pursuits are subsumed under the broader use of force category. (*See id.* at ¶¶ 166-172.)

The Decree initially was overseen by Judge Dow, with the assistance of the IM, who assesses and reports on the City's compliance with the Decree.[6] (*See* Decree at ¶ 610.) As part of the evaluation process, the IM updates the Court and the public about the City's compliance efforts and files semi-annual written reports. (*See id.* at ¶¶ 661-665.). Prior to the shooting in this case, the IM had issued three reports, which among other things, included "a summary of the principal achievements and challenges facing the City's ability to comply with the consent decree." (IM Report 3 at 1.)[7] The analyses and assessments in each IM report correspond to the paragraphs in the Decree that identify the specific requirements it imposes on the City.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive dismissal, the complaint must give a defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A

---

[6] The case was reassigned to Chief Judge Rebecca R. Pallmeyer on October 11, 2022. (*See* Dkt. 1049.)

[7] The reporting periods for the pre-incident IM reports are March 1 through August 31, 2019 (Report 1); September 1, 2019, through February 29, 2020 (Report 2); and March 1 through December 31, 2020 (Report 3). *See* Appendix for hyperlinks to case 17 C 6260's docket entries for the relevant IM Reports.

complaint need not contain detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations omitted). A plaintiff "plead[s] himself out of court by pleading facts that show that he has no legal claim." *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016) *(*quoting *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011)).

The "incorporation-by-reference" doctrine "provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Brownmark Films*, 682 F.3d 687, 690 (7th Cir. 2021). That prevents a plaintiff from "evad[ing] dismissal…simply by failing to attach to his complaint a document that proved that his claim had no merit." *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (citation omitted).

## ARGUMENT

I. **Plaintiff's *Monell* Claim That "the Lack of a Real Foot Chase Policy Guaranteed a Police Culture of Excessive Force, Needless Death, and Injury" Should Be Dismissed Because Her Allegations of Deliberate Indifference are Implausible**

To state a cause of action, a *Monell* Plaintiff must sufficiently allege "deliberate indifference"—specifically that "it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *See First Midwest Bank*, 988 F.3d at 986-87. Here, the IM reports and CPD's use of force directive establish not only that the City did not "consciously disregard" any unconstitutional outcomes of the CPD practices that Plaintiff challenges, but also that it has taken positive measures to avoid such consequences. Thus, Plaintiff has not plausibly pleaded deliberate indifference.

A.  **The City's efforts leading to the issuance of a foot pursuit policy demonstrate that Plaintiff's allegations of deliberate indifference are not plausible.**

All of the IM reports for the reporting periods before the Alvarez shooting demonstrate that CPD made important positive strides toward the issuance and implementation of a foot pursuit policy. With reference to Paragraph 168 of the Decree (*see* Decree at 51), the IM commended CPD for making "considerable progress toward tracking and analyzing the frequency of foot pursuits." (IM Report 3 at 282.) The IM pointed specifically to CPD's capturing foot pursuit data from both the Office of Emergency and Management and Communications' ("OEMC") Computer Aided Dispatch ("CAD") system and the Tactical Response Report ("TRR") Application. (*See* IM Report 1 at 58.) The IM also highlighted CPD's development of a "Foot Pursuit and Use of Force" Tableau dashboard that tracked and analyzed the frequency of foot pursuits reported by CPD and OEMC. (*See id.* at 59.)

Regarding training, the City issued a supplemental Foot Pursuits Training Bulletin ("FPTB") in compliance with ¶ 170 of the Decree, on February 28, 2020—over one year before the Alvarez shooting. (*See* IM Report 2 at 163.) Paragraph 170 states:

> The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.

(*See* Decree at 151-52.) The IM reviewed and approved the FPTB, acknowledging that requirements (a)-(e) had been addressed in prior drafts submitted to it for review (*see* IM Report 2 at 163) and emphasizing that CPD "significantly enhanced the final bulletin by including information on weapon retention during a pursuit and strengthening language on partner

6

separation. The latter included noting that each partner is responsible for the safety of the other." (*Id.*) The IM also noted that the FPTB incorporated best practices from foot pursuit policies in other jurisdictions, as ¶ 170 requires. (*See id.*)

In reviewing CPD's training on the FPTB, the IM noted that CPD distributed the FPTB via eLearning to all Department members, and as of December 31, 2020, 99% of Department members had completed that training. (*See* IM Report at 286-87.) Further, CPD's 2020 Use of Force in-service training provided additional training on foot pursuits, which 70% of CPD officers completed as of that same date. (*See id*. at 164.)

CPD's efforts—in particular as to the FPTB—undeniably demonstrate that the City did not turn a blind eye to how CPD should conduct foot pursuits. The mere fact that these efforts did not culminate in an official policy before March 31, 2021, is beside the point. "Conduct may be a determination of policy even if it does not occur at the planning level or involve the formulation of principles to achieve a common public benefit." *LaPorta v. City of Chicago,* 277 F.Supp.3d 969, 997 (N.D. Ill. 2017). The IM reports document the affirmative steps taken by the City prior to this shooting that provide a foundation for the enactment of a formal policy. Hence, Plaintiff cannot plausibly allege that the City was deliberately indifferent to developing and implementing "a real foot chase policy," and the Court should dismiss this claim.[8]

### B. The City's policies and training on use of force demonstrate that Plaintiff's allegations of deliberate indifference are not plausible.

Paragraph 153 of the Decree states:

CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-

---

[8] The allegation that the foot pursuit itself "constituted excessive force" (FAC at ¶ 26) reflects an attempt to circumvent the import of CPD's policy and training regarding the use of force. But this Court has already explained that "Alvarez wasn't seized when he was running away. Flight is not a seizure. And without a seizure there can be no excessive force claim." (Dkt. 61 ("Order") at 4.)

7

>escalation techniques to prevent or reduce the need for force wherever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

(*See* Decree at 46-47.) As the IM reports and G03-02 show, CPD's policies and training on the use of force throughout reporting periods one through three—the periods preceding the Alvarez shooting—demonstrate that the City not only affirmatively addressed, but also successfully met, these objectives.

CPD adopted de-escalation as a core principle (even before the Decree was entered) when it revised its use of force policy in October 2017. (*See* IM Report 1 at 84.) De-escalation strategies are closely related to the force mitigation techniques that CPD members must use during all use of force incidents (e.g., continual communication, tactical positioning, and using time as a tactic). (*See* Decree at ¶ 161 (a)-(e); *see also* G03-02-01, attached as Ex. B, at III.A-C ("Principles of Force Mitigation")[9].) In December 2020, CPD changed the title of G03-02 from *Use of Force* to *De-Escalation, Response to Resistance, and Use of Force* "to further emphasize the importance of de-escalation within the policy." (IM Report 3 at 264.) According to the IM, "[t]he emphasis on the need for de-escalation is reflected in every policy related to the use of force, whether it be a policy regarding firearms, Tasers, batons, or oleoresin capsicum (OC) spray." (IM Report 1 at 84.)

The IM also acknowledged that Section III.B of G03-02 addresses the principle that force may be used only when it is objectively reasonable, necessary, and proportional under the totality of the circumstances. (*See* IM Report 2 at 214.) The IM added that "[t]his standard is repeated

---

[9] As an addendum to G03-02, G03-02-01 is included in the "use of force documentation" that Plaintiff criticizes in her FAC.

throughout CPD's use of force policy suite usually under the heading 'When Force is Authorized.' This is a standard set by the U.S. Supreme Court and is in place for all of the CPD's use of force policies." (*Id.* at 215.) And the IM recognized that Section V of G03-02 codifies the duty to intervene and report any use of excessive force by another officer.[10] (*See id.* at 220.)

According to the IM, G03-02 sets out the use of force training that ¶243 of the Decree requires. (*See* IM Report 3 at 392; *see also* Decree at 69-70.) Section X of G03-02 ("Use of Force Training") states that "[a]t a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability." CPD has required mandatory use of force training since 2018. (*See id.* at 387.) The IM found that CPD's 2020 in-service use of force training curriculum addressed all of the requirements of Paragraph 153 of the Decree. (*See id.* at 388.) According to the IM, 96% of CPD officers completed sixteen-hour mandatory use of force training in 2019, and as of December 31, 2020, 70% of Department members had completed the 2020 use of force in-service training. (*See* IM Report 3 at 387.)

As evidenced by the IM reports and G03-02, it is not arguably plausible that the City was deliberately indifferent to the pattern or practice of using excessive force that Plaintiff alleges. Instead, CPD enacted policies and provided training designed to *prevent* unlawful or excessive use of force—the antithesis of deliberate indifference. In the absence of a plausible allegation of the City's deliberate indifference, the Court should dismiss this claim.

---

[10] Regarding its use of force policies in their entirety, the IM observed that "the CPD has attained and maintains an Advanced Law Enforcement Accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), indicating compliance with national policy standards, including the use of force." (IM Report 3 at 253.)

## II. Plaintiff's *Monell* Claim That the City's Failure to Investigate and Discipline Has Led to a Culture in Which Police Shoot with Impunity Should Be Dismissed Because Plaintiff Fails to Plausibly Allege a Widespread Practice

Plaintiff alleges that Defendant Officers' misconduct was caused by a citywide practice of failing to investigate and discipline police-involved shootings, which led to "a police culture of impunity." (*See* FAC at ¶¶ 107-131.) To prevail, Plaintiff must prove that the alleged constitutional violations were caused by "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice." *First Midwest Bank*, 988 F.3d at 986. But Plaintiff has not plausibly pled such a widespread practice under *Iqbal* and *Twombly*. "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to [the] presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (citations omitted)).

Plaintiff's FAC broadly pronounces that the City "developed a pattern of *de facto* policies and practices that actually impede the investigation of officer involved shootings" (FAC at ¶ 109) and "which constituted the moving force and proximate cause to the fatal use of force by Defendant Solano…." (*Id.* at ¶ 122). Plaintiff also contends that "Chicago's final policymakers have long been aware of…the City's *de facto* policies and its practices and were deliberately indifferent or worse to the Constitutional violations that they cause." (*Id.* at ¶ 130.) But such general legal conclusions are not sufficient to state a *Monell* claim. *See Falk v. Perez*, 973 F.Supp.2d 850, 864 (N.D. Ill. 2013) (finding that "bare allegations of a policy or custom" were insufficient); *see also Elsayed v. Village of Schaumburg*, No. 14 C 8387, 2015 WL 1433071, at *5 (N.D. Ill. March 26, 2015) ("Although [plaintiff] hits on all of the elements of a *Monell* claim, she again fails to allege sufficient factual matter, taken as true, to state a plausible claim for

10

relief."). Instead, Plaintiff's "[f]actual allegations must be enough to raise [her] right to relief above the speculative level." *Twombly*, 550 U.S. 544 at 555.

Plaintiff attempts to bolster her claim solely by referencing other instances of misconduct allegedly committed by Defendant Officers. These allegations include an off-duty incident in which both Defendants were drinking and fighting at a bar shortly before an intoxicated off-duty police officer (presumably one of the Defendant Officers) tried to break into a woman's house claiming that he was the victim of a battery.[11] (FAC at ¶¶ 56-58.) Further, and specifically as to Encarnacion, Plaintiff identifies multiple allegations made by his ex-girlfriend concerning off-duty incidents in 2016 and 2017 in which he was armed with a gun while intoxicated, pointed a gun at and pushed her, put a gun in his own mouth and pulled the trigger, and fired a gun through his own front door. (*Id.* at ¶¶ 62-66.)[12] Plaintiff also identifies a May 21, 2021 off-duty "road rage incident" that occurred after the Alvarez shooting in which Solano drew his gun and screamed obscenities at a driver. (*See* FAC at ¶¶ 79-80.)

These other incidents do not plausibly demonstrate a widespread practice because (1) they are limited to Defendant Officers; and (2) they involve off-duty incidents completely dissimilar to the incident giving rise to this lawsuit. Initially, "[e]vidence regarding one police officer is too sparse to establish 'a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Cooper ex rel. Cooper v. Dailey*, No. 07 C 2144, 2010 WL 3824112, at *7 (N.D. Ill. Sept. 23, 2010); *see also Montano v. City of Chicago*,

---

[11] CPD's investigation of Log No. 2020-4240 indicates a complaint against Defendant Officers was initiated when a sergeant detected alcohol on Encarnacion's breath when he reported that he and Solano were battered at a bar. (*See* FAC Ex. A at Higuera_City 14616.) The investigation further detailed a citizen's report that a person identifying himself as a police officer tried to break into her home, but she could not identify either officer after viewing photo arrays. (*See id.* at Higuera_City 14626-14627.)

[12] These incidents were investigated collectively under Log No. 1087474 (attached as Ex. B to the FAC).

11

535 F.3d 558, 570-71 (7th Cir. 2008) ("The plaintiffs' evidence of deliberate indifference to 'problem officers' is limited to [Defendant Officer]; this cannot establish a 'widespread practice'…."). Here, incidents from only two officers fail to make it plausible that the failure to discipline "permeated a *critical mass* of [the] institutional body." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (emphasis added); *cf. Spalding v. City of Chicago*, 186 F.Supp.3d 884, 917 (N.D. Ill. 2016) ("The fact that the defendant officers are not clustered in a single unit or precinct, range widely in seniority and supervisory authority, and engaged in retaliatory acts against Plaintiffs over a lengthy period suggests that retaliation against those who report misconduct 'permeates a critical mass of' the CPD.") (internal citation omitted)). Absent allegations regarding any officers other than the partner Defendants, Plaintiff has not plausibly pleaded that an alleged practice of failing to investigate and discipline officer-involved shootings is widespread.

But even if reference to incidents involving only the Defendant Officers was sufficient to plausibly plead a widespread practice, Plaintiff's claim still fails as these incidents are completely dissimilar to this case. *See Thomas v. City of Markham*, 2017 WL 4340182, at \*4 (N.D. Ill. Sept. 29, 2017) ("[a]llegations of general past misconduct or *allegations of dissimilar incidents* are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences.") (emphasis added). All of the incidents set forth above do not involve officer-involved shootings or the use of excessive force but instead relate solely to off-duty interactions. Accordingly, they are not relevant to an alleged failure to discipline in regard to the use of force, engaging in foot pursuits, or any conduct in Defendant Officers' official capacities. "The greater the dissimilarity [of events], the greater the skepticism that there is a single actionable municipal practice or custom." *Black v. City of Chicago*, No. 18 C 6518, 2022

WL 425586, at *5 (N.D. Ill. Feb. 11, 2022) (Seeger, J.). As a result, Plaintiff fails to plausibly plead the existence of a widespread practice.

The FAC mentions just one arguably similar on-duty incident involving Encarcion—the non-shooter Defendant here—in which he allegedly fired his gun at two fleeing suspects in July 2022, over a year after the Alvarez shooting. (*See* FAC at ¶ 69.) But this isolated matter does not move the needle an inch, first because Plaintiff says nothing else about the incident, and critically, she does not even allege that the shooting was unjustified or that CPD failed to properly investigate or otherwise address the shooting. In any event, the Seventh Circuit has pronounced that although "there is no clear consensus as to how frequently [harmful] conduct must occur to impose *Monell* liability," a plaintiff must show that "there is a policy at issue *rather than a random event.*" *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (emphasis added) (holding that "it must be more than one instance or even three") (citations omitted); *see also Petropoulos v. City of Chicago*, No. 19 C 3206, 2021 WL 1103480, at *5 (N.D. Ill. March 23, 2021) (Seeger, J.) ("A plaintiff must present 'a series of violations' to state a claim under *Monell*.") (Citations omitted).[13]

Plaintiff's second *Monell* claim thus fails to plausibly allege a widespread practice theory of *Monell* liability and should be dismissed.

### III. Plaintiff's State Law "Policy" Claims Should be Dismissed Under the Illinois Tort Immunity Act

Plaintiff brings the same claims against the City under the Illinois Wrongful Death Act (Count VI) and the Illinois Survival Act (Count VII) as she did in her original Complaint,

---

[13] Plaintiff's "failure to investigate and discipline" claim is further undermined by the fact that regarding Log No. 1087474, COPA sustained seventeen of the twenty-one allegations against Defendant Encarnacion and recommended a penalty of separation for each allegation. (*See* FAC, Exhibit B.)

asserting that various City customs and practices involving (1) the use of deadly force during foot pursuits, and (2) training officers on the proper use of force on fleeing individuals, caused Alvarez's death. (*See* FAC at ¶¶157, 165.) However, as the City argued in its prior motion to dismiss (*see* Dkt. 23 at 11-14), it is immune from liability for these policy claims pursuant to the Illinois TIA, specifically 745 ILCS 10/2-201. *See Monson v. City of Danville*, 115 N.E. 3d 81, 2018 IL 122486, ¶ 30 (2018) (municipality immune from "those decisions which require the municipality to balance competing interests and to make a judgment call as to what will best serve each of those interests"); *see also Frieri v. City of Chicago,* 127 F.Supp.3d 992, 996 (N.D. Ill. 2001) (dismissing a claim alleging that the City maintained policies and practices that caused its police officer to batter the plaintiff). Section 2-201 of the TIA absolutely immunizes the City for discretionary policy determinations. *Monson*, 2018 IL 122486, ¶ 29 ("Immunity under section 2-201 is absolute, covering both negligent and willful and wanton conduct.").

When faced with the City's prior Motion to Dismiss, Plaintiff conceded that she does not intend to prosecute these claims and "has *not* brought state law policy claims" because she "agrees that Section 2-201 [of the TIA] immunizes Defendant [City] from acts and omissions in determining policy under Illinois law as to Illinois state law claims." (Dkt. 27 ("Pl.'s Resp. to Def. City's Mot. to Dismiss") at 14-15) (emphasis added).) Thus, because the City is immune from liability for these policy claims, and any *respondeat superior* allegations in these counts are duplicative of Plaintiff's *respondeat superior* claim in Count VIII, this Court should dismiss Counts VI and VII.

## CONCLUSION

As this Court has noted, "at the pleading stage, courts shy away from declaring a winner on one of the elements [of a claim], unless the plaintiff pleads himself out of court." *Liebich v.*

14

*DelGiudice,* No. 20 C 2368, 2022 WL 874610, at *7 (N.D. Ill. Mar. 24, 2022) (Seeger, J.). Here, by incorporating the Consent Decree, IM reports, and CPD G03-02 into her Complaint, Plaintiff has done exactly that. Those documents indisputably demonstrate that the City has not been deliberately indifferent to foot pursuits or to the use of force. As to the investigation and discipline of officer-involved shootings, after Plaintiff's legal conclusions and irrelevant allegations are set aside, Plaintiff has not pleaded sufficient facts to nudge her *Monell* claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Accordingly, Defendant City asks this Court to grant its Motion to Dismiss Plaintiff's *Monell* claims brought in Count I and her state law policy claims under the Wrongful Death and Survival Acts brought in Counts VI and VII, and for any further relief this Court deems just.

Date: April 7, 2023            Respectfully submitted,

                                                       /s/ George J. Yamin Jr.
                                                       GEORGE J. YAMIN JR., Attorney No. 6217483
                                                       *One of the Attorneys for City of Chicago*

James G. Sotos
Jeffrey N. Given
David A. Brueggen
George J. Yamin Jr.
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
gyamin@jsotoslaw.com

## CERTIFICATE OF SERVICE

      I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on April 7, 2023, I electronically filed the foregoing **Defendant City of Chicago's Motion to Dismiss Plaintiff's Policy Claims in her First Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed below.

| *Attorneys for Plaintiff* | *Attorneys for Defendants Evan Solano and Sammy Encarnacion* |
|---|---|
| Steven H. Fine<br>Law Office of Steven H. Fine<br>53 West Jackson Blvd., Suite 1215<br>Chicago, IL 60604<br>(312) 922-0855<br>steve@sfinelaw.com | Ahmed A Kosoko<br>Brian P. Gainer<br>Lisa M. McElroy<br>Nancy Duenez<br>Johnson & Bell, Ltd.<br>33 West Monroe Street, Suite 2700<br>Chicago, IL 60603<br>(312) 372-0770<br>kosokoa@jbltd.com<br>gainerb@jbltd.com<br>mcelroyl@jbltd.com<br>duenezn@jbltd.com |
| Christopher R. Smith<br>Christopher Smith Trial Group, LLC<br>53 W. Jackson, Suite 856<br>Chicago, IL 60604<br>(312) 432-0400<br>chris@crstrialgroup.com | |
| Tania M. Dimitrova<br>Law Offices of Tania Dimitrova, LLC<br>8 S. Michigan Ave, Suite 1300<br>Chicago, IL 60603<br>(312) 488-9529<br>tania@dimitrovalaw.com | |
| James Baranyk<br>james@secondcitylaw.com | |
| Todd S. Pugh<br>Breen & Pugh<br>53 W. Jackson Blvd., Suite 1215<br>Chicago, IL 60604<br>312 (360-1001)<br>tpugh@breenpughlaw.com | |

      /s/ George J. Yamin Jr.
      GEORGE J. YAMIN JR.
      *One of the Attorneys for City of Chicago*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GISELLE HIGUERA, Administrator for the Estate of Anthony Alvarez and as mother of A.A., a minor, | ) ) ) ) | Case No. 22 C 964 |
| Plaintiff, | ) ) | Honorable Judge Seeger |
| v. | ) ) | Magistrate Judge Cole |
| CITY OF CHICAGO and City of Chicago Police Officers EVAN SOLANO, Star No. 12874 and SAMMY ENCARNACION Star No. 11790, | ) ) ) ) ) | JURY DEMAND |
| Defendants. | ) | |

**APPENDIX**

The documents listed below are hyperlinked to the Pacer docket entry through the docket number.

- Consent Decree, *See State of Illinois v. City of Chicago*, Case No.17 C 6260 (N.D. Ill.), Dkt. 703-1.

- Independent Monitor Report 1 (March 1, 2019, through August 31, 2019), *See State of Illinois v. City of Chicago*, Case No.17 C 6260 (N.D. Ill.), Dkt. 798.

- Independent Monitor Report 2 (September 1, 2019, through February 29, 2020), *See State of Illinois v. City of Chicago*, Case No.17 C 6260 (N.D. Ill.), Dkt. 844.

- Independent Monitor Report 3 (March 1, 2020, through December 31, 2020), *See State of Illinois v. City of Chicago*, Case No.17 C 6260 (N.D. Ill.), Dkt. 942.