*Higuera v. City, et al.,* 22 CV 00964

# EXHIBIT **B**

| Chicago Police Department | | General Order  G03-02-01 |
|---|---|---|
| **RESPONSE TO RESISTANCE AND FORCE OPTIONS** | | |

| ISSUE DATE: | 31 December 2020 | EFFECTIVE DATE: | 15 April 2021 |
|---|---|---|---|
| RESCINDS: | 29 February 2020 version | | |
| INDEX CATEGORY: | 03 - Field Operations | | |
| CALEA: | | | |

**I. PURPOSE**

This directive:

A. outlines the Department policy on *response and* force options and the expectations for members when employing *response and force* options.

B. describes the concepts of Force Mitigation and the Department's commitment to de-escalation when responding to all incidents to ensure effective police-public encounters.

C. outlines the various force options and the circumstances in which they are authorized when Department members are met with resistance or threats.

D. satisfies CALEA Law Enforcement Standard Chapter 4.

**II. POLICY**

A. **Sanctity of Human Life.** *The Department's highest priority is the sanctity of human life. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity, regardless of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, immigration status, homeless status, source of income, credit history, criminal record, criminal history, or incarceration status. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.* A member's decision to use force will be made in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force."

B. **De-Escalation.** *Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time, in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force."*

C. **When Force is Authorized.** Department members' use of force must be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by a *person*, under the totality of the circumstances.

D. Sworn members will, whenever possible, identify themselves as police officers prior to taking any police action, unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

E. Members will continually assess situations and determine:

1. if any use of force is necessary.

2. if the seriousness of the situation requires an immediate response or whether the member can employ the Force Mitigation Principles *or other response options.*

3. the *response or* force option based on the totality of the circumstances *and considering individualized factors such as:*

HIGEURA_CITY 13883

a. _the person's age, disability, or physical condition (e.g., known, suspected, or perceived behavioral or mental health condition; intellectual, developmental, psychiatric or physical disability; vision, hearing, or neurological impairment)._

b. _the risk posed by the person._

c. _if the person is restrained, injured, or in crisis._

4. if the level of force employed should be modified based upon the _person's_ actions or other changes in the circumstances. The level of force will be de-escalated immediately as resistance decreases, provided that the member remains in control and as safety permits.

F. Members will modify their force in relation to the amount of continued resistance offered by the _person_.

1. As the _person_ offers less resistance, the member will immediately lower the amount or type of force used.

2. As the _person_ increases resistance, the member may increase the amount or type of force used.

G. Consistent with the Department policy that all uses of force must be objectively reasonable, necessary, and proportional, Department members will refrain from using force against a person who is secured and restrained with handcuffs or other restraining devices (e.g., flexible restraining devices), unless the member:

1. must act to prevent injury to the Department member, the restrained _person_, or another person,

2. must act to prevent escape, or

3. is compelled by other law enforcement objectives.

H. If the Department member is responding to an incident involving persons in need of mental health treatment, the member will act in accordance with the Department directive titled "Responding to Incidents Involving Persons In Need Of Mental Health Treatment."

III. **PRINCIPLES OF FORCE MITIGATION**

During all use of force incidents, when it is safe and feasible to do so, Department members will use the principles of Force Mitigation to ensure effective police-public encounters. The concepts of Force Mitigation include:

A. **Continual Communication**

1. Members will attempt to use verbal control techniques to avoid or minimize confrontations prior to, during, and after the use of physical force.

2. When it is safe and feasible, members will use continual communication, including exercising persuasion, advice, and instruction prior to the use of physical force.

3. Members should attempt to establish and maintain verbal communication in all police-public encounters and to continually evaluate the effectiveness of that communication. Members will:

a. when practical, establish and maintain one-on-one communication where only one member speaks at a time.

b. vary the level of assertiveness of their communication depending on the type of police-public encounter and whether a serious crime has been committed or life or property is at risk.

c. when appropriate, employ trauma-informed communications techniques, including using a respectful tone and acknowledging any confusion or mistrust by the _person_

HIGEURA_CITY 13884

4. When encountering noncompliance to lawful verbal direction, when it is safe and feasible to do so, members will consider:

    a. adjusting their verbal communication or other communication techniques.

    b. allowing a different member to initiate verbal communications.

        NOTE: Members should refrain from giving simultaneous directions to avoid any potential conflicts.

    c. requesting additional personnel to respond or making use of the specialized units and equipment available through a notification to OEMC, as necessary and appropriate.

        EXAMPLE: Members will, when practical, request assistance from specialized *resources, such as* a Crisis Intervention Team (CIT) trained officer *when encountering an individual in crisis, who exhibits symptoms of known, suspected, or perceived behavioral or mental health conditions.*

    d. *whether the noncompliance is due to age, limited English proficiency or other language barriers, a medical condition, disability, behavioral health crisis, or drug or alcohol use.*

        NOTE: Department members should be mindful that some *persons* may be physically or mentally less able to respond to verbal direction or verbal control techniques due to a variety of circumstances, including, but not limited to, the influence of alcohol or drugs, mental health or medical conditions, language barriers, *or vision, hearing, or neurological impairment.*

5. When it is safe and feasible, members will provide a warning prior to the use of physical force.

B. **Tactical Positioning**

1. When it is safe and reasonable to do so, members should make advantageous use of positioning, distance, and cover by isolating and containing a *person*, creating distance between the member and a potential threat, or utilizing barriers or cover. Members will continuously evaluate the member's positioning, the *person's* actions, and available force options.

2. Members should attempt to establish a zone of safety for the security of the responding members and the public. The zone of safety can be established when:

    a. the incident scene has been secured;

    b. the scene can be continually monitored or adjusted to maintain safety;

    c. the *person* does not pose a continuing threat to Department members or the public;

    d. the *person* can be continually monitored; and

    e. the *person* can be contained throughout the incident.

3. Members should provide for a safe and effective route for additional Department members and other resources to approach the incident scene.

C. **Time as a Tactic**

1. When it is safe and reasonable to do so, members should use time as a tactic by slowing down the pace of the incident.

2. In order to use time as a tactic, a zone of safety should be established for the security of responding members and the public.

3. Using time as a tactic may:

    a. permit the de-escalation of the _person's_ emotions and allow the _person_ an opportunity to comply with the lawful verbal direction;

    b. allow for continued communication with the _person_ and the adjustment of the verbal control techniques employed by the members; and

    c. allow for the arrival of additional members, special units and equipment, and other tactical resources.

4. When it is safe and feasible to do so, Department members will allow _persons_ to voluntarily comply with lawful verbal direction (e.g., allowing _for_ the opportunity to submit to an arrest before force is used).

## IV. LEVELS OF RESISTANCE

A. **Cooperative _Person_**: a person who is compliant without the need for physical force, _including individuals lawfully and peacefully exercising their First Amendment rights (e.g., lawful demonstrations)_. The following options are authorized when dealing with a cooperative _person_ :

1. Police Presence

    a. Police presence is established through identification of authority and proximity to the subject. Mere police presence may result in compliant behavior by the _person_.

    b. Police presence alone is the only option authorized for use with _persons_ who are fully cooperative without the need for further intervention.

2. Verbal Response

    a. Verbal response consists of persuasion, advice, instruction, and warning in the form of verbal statements or commands that may result in compliant behavior.

    b. Whenever it is safe and feasible, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force.

B. **Resister:** a person who is uncooperative. Resisters are further subdivided into two categories (1) passive resister; and (2) active resister.

1. **Passive Resister** : a person who fails to comply (non-movement) with verbal or other direction. In addition to the options listed in Item IV-A for Cooperative Persons, the following options are authorized when dealing with a passive resister:

    a. Holding Techniques

    Holding techniques include a firm grip, grabbing an arm, wristlocks, and come-along holds (i.e., escort holds that are not elevated to compliance techniques), as well as any combination of the above.

    b. Compliance Techniques

    Compliance techniques are designed to amplify nonimpact pressure and increase the potential for controlling a _passive resister_.

    (1) The goal of applying joint manipulation and pressure point techniques to pressure sensitive areas of the body is to elicit and maintain established control through non-impact pressure compliance.

    (2) Using a Long Range Acoustic Device (LRAD) to emit high-decibel focused sound waves to cause discomfort. Any use of the LRAD _to emit high-decibel focused sound waves to cause discomfort_ requires authorization from the Superintendent or his or her designee.

**NOTE:**   The LRAD is not considered a use of force when used to deliver verbal messages or warnings at a decibel level not intended to cause discomfort.

c.   Control Instruments

Control instruments are designed to amplify nonimpact pressure in order to increase the potential for controlling a *passive resister*. These instruments are placed mainly on the sensors of the skin covering bone. Control instruments are tools (e.g., baton) applied to joints and pressure sensitive areas of the body with non-impact pressure.

d.   Oleoresin Capsicum (OC) Spray and Capsaicin II Powder Agent Deployment

Oleoresin Capsicum and Capsaicin II powder are highly inflammatory agents that occur naturally in cayenne peppers. The use of OC spray and Capsaicin II powder agent is intended to increase control by disorienting the *passive resister* and interfering with the *passive resister's* ability to resist arrest.

(1)   Oleoresin Capsicum is only authorized to use against the two types of passive resisters described below AND only after the required authorization is received. No other use of oleoresin capsicum is authorized against passive resisters.

(a)   Occupant(s) of a motor vehicle who is passively resisting arrest and only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above.

(b)   Noncompliant groups, crowds, or an individual taking part in a group or crowd (e.g., demonstrations, celebrations), only after obtaining authorization from the Superintendent or his or her designee.

(2)   Capsaicin II powder agent deployment is an authorized force option against passive resisters who are part of noncompliant groups or crowds **only** when used for area saturation and **only** after obtaining authorization from the Superintendent or his or her designee.

**NOTE:**   Only Department-issued Capsaicin II powder agent projectiles and launchers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

(3)   For further guidance and restrictions on the use of OC spray, members will refer to the Department directive titled "Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents."

2.   **Active Resister:** a person who attempts to create distance between himself or herself and the member's reach with the intent to avoid physical control and/or defeat the arrest.

a.   This type of resistance includes, but is not limited to, evasive movement of the arm, flailing arms, and full flight by running.

b.   *Active resistance includes* attempting to avoid apprehension and failing to comply with a sworn member's orders to reveal themselves.

c.   In addition to the options authorized in Items IV-A and IV-B-1 for Cooperative Persons and Passive Resisters, the following options are authorized when dealing with an active resister:

(1)   Stunning

Stunning is diffused-pressure striking or slapping *an active resister* to increase control by disorienting *an active resister* and interfering with his or her ability to resist.

HIGEURA_CITY 13887

(2) Oleoresin Capsicum (OC) Spray

Oleoresin Capsicum is an authorized force option against active resisters. If the active resister is part of a group or crowd, OC Spray is authorized only after obtaining approval from the Superintendent or his or her designee.

(3) Takedown

The act of physically directing an *active resister* to the ground to limit physical resistance, prevent escape, or increase the potential for controlling *an active resister*.

(4) Canines Used by Canine Handlers

A canine under the control of a canine handler is an authorized force option when used consistent with the provisions of the Department directive titled "Canine Use Incidents."

(5) Taser

(a) The Taser is a device used to control and subdue *an active resister* through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions.

(b) Only Department-issued Tasers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

(c) Using the Taser to drive stun an active resister is prohibited.

(d) For further guidance and restrictions on the use of a Taser, members will refer to the Department directive titled "Taser Use Incidents."

C. **Assailant** : a *person* who is using or threatening the use of force against another person or himself/herself which is likely to cause physical injury. Assailants are further subdivided into two categories: (1) a *person* whose actions are aggressively offensive with or without weapons and (2) a *person* whose actions constitute an imminent threat of death or great bodily harm to a Department member or to another person.

1. The person's actions are aggressively offensive with or without weapons. This category may include *an assailant* who is armed with a deadly weapon but whose actions do not constitute an **imminent** threat of death or great bodily harm.

a. In addition to the options authorized in Items IV-A and IV-B for Cooperative *Persons* and Resisters, the following options are authorized when dealing with this type of assailant:

(1) Direct Mechanical

Direct mechanical techniques are forceful, concentrated striking movements such as punching and kicking, or focused pressure strikes and pressures. These techniques can be combined with take-downs or pins against the ground or other objects.

(2) Impact Weapons

Impact weapons are designed to establish control by means of applying mechanical impact to *an assailant* in order to disable elements of his or her musculoskeletal structure.

(a) Members will avoid the use of flashlights, radios, firearms, or any item not specifically designed as an impact weapon, unless reasonably necessary and no other practical options are available.

HIGEURA_CITY 13888

(b)     For further guidance and restrictions on the use of impact weapons, members will refer to the Department directive titled "Baton Use Incidents."

(3)     Impact Munitions

      (a)     Impact munitions are projectiles intended to impact and incapacitate a potentially dangerous *assailant* from a safe distance, thereby reducing resistance and gaining compliance while reducing the probability of serious injury or death.

           i.     Capsaicin II powder agent projectiles fired from a powder agent deployment system is considered an impact munition.

           ii.     The use of Capsaicin II powder agent projectiles as an impact munition requires authorization from the Superintendent or his or her designee.

      (b)     Only Department-issued impact munitions may be used and only after the member has received Department-authorized training in their safe handling and deployment.

2.     The *person's* actions constitute an imminent threat of death or great bodily harm to a Department member or to another person. In addition to the options authorized in Items IV-A, IV-B, and IV-C-1 for Cooperative *Persons*, Resisters, and Assailants, firearms and other deadly force responses are authorized when dealing with this type of assailant.

    a.     For further guidance and restrictions on the use of deadly force as a last resort, members will refer to Department directive titled "De-escalation, Response to Resistence, and Use of Force."

    b.     For further guidance and restrictions on the use of firearms, members will refer to Department directive titled "Firearm Discharge Incidents - Authorized Use and Post-Discharge Administrative Procedures."

    c.     Department members are prohibited from using deadly force against a person who is a threat only to himself, herself, *or property*.

## V.    POST-USE OF FORCE POSITIONING AND MONITORING

A.     Department members engaged in the use of force or application of authorized restraining devices are reminded of the dangers involved with positional asphyxia and will refer to the Department directive titled "Restraining Arrestees" for specific procedures concerning the physical restraint of persons in Department custody.

B.     After gaining control of a *person*, members will:

    1.     avoid sitting, kneeling, or standing on a subject's chest, which may reduce the *person's* ability to breathe.

    2.     position the *person* in a manner to allow free breathing. Whenever feasible, the *person* will not be forced to lie on his or her stomach.

    3.     monitor a *person* until transported to a secure location.

    4.     request and offer medical aid to any injured Department member or *person* consistent with the procedures outlined in the Department directive titled "De-escalation, Response to Resistance, and Use of Force."

(Items identified with *italics/double underline* have been added or revised.)

David O. Brown
Superintendent of Police

T20-120 MWK/TSS

HIGEURA_CITY 13890