**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GISELLE HIGUERA Administrator for the Estate of Anthony Alvarez and as mother of A.A., a minor, | ) | |
| Plaintiff, | ) | Case No. 22-cv-00964 |
| v. | ) | Hon. Steven C. Seeger |
| City of Chicago and City of Chicago Police Officers Evan Solano, Star No. 12784 and Sammy Encarnacion, Star No. 11790, | ) | Hon. Mag. Jeannice W. Appenteng |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO BIFURCATE**

Plaintiff, GISELLE HIGUERA, as administrator of the Estate of Anthony Alvarez, by and through her attorneys, Responds in Opposition to Defendants' Motion to Bifurcate and Stay *Monell* discovery and trial as follows:

## Introduction

Plaintiff brought her case in federal court because Defendant City's policy failure caused Mr. Alvarez's death. Understanding the City's failures relating to foot chases is necessary for a trier of fact to make liability decisions for all Parties. For trial, all parties are necessary, just as all parties were necessary in *Thomas v. Cook County Sherrif's Dep't*, 604 F.3d 293,305 (7th Cir. 2010) and many cases that followed.

In this case, much of the basis for Plaintiff's *Monell* claim has already been established. Plaintiff is well on her way to proving her *Monell* count even without the City's participation. She primarily needs document certification, and live witnesses. Both Defendant Officers and their supervisor testified regarding the complete lack of a meaningful foot chase policy and training. Most *Monell* cases struggle to connect policy and practice to the events in their case;

not so here. In this case, both officers testified that they altered their behavior in dangerous ways, based on their reading of an opaque email bulletin—the only guidance on foot chases they ever received. The City was well aware of the mess its intransigence caused. Creating an actual policy was a repeated promise of then Mayor, Lorri Lighfoot. It never happened.

Pursuant to the Court's February 22, 2024 Order, Plaintiff's *Monell* claim has been streamlined. What remains is a nearly self-contained claim related to the City's deficient foot chase policy. By citing Plaintiff's original discovery requests (propounded on August 8, 2022), Defendants mislead the Court regarding the nature of the remaining *Monell* claim. The Defendants' brief avoids the actual *Monell* claim (and the facts that the Court noted should allow the Plaintiff to proceed). Defendant City even requests that the Court stay their Answer to the Complaint itself. The City is desperate to avoid any exploration of its embarrassing failure to meet the reasonable demands of its officers and citizens for necessary guidance in life or death situations.

Beyond allowing the City to evade scrutiny, bifurcation would be inefficient and would severely prejudice the Plaintiff. In this case, Defendants have testified that they acted according to what they thought policy dictated. A jury may find that Defendants violated Plaintiff's Constitutional rights, but still believe that Defendants' actions did not surmount the high bar of qualified immunity or outright recklessness. That same jury may none-the-less find that the City caused the injury through their policy and practice *and* that the City was reckless (deliberately indifferent to serious risk).

Dividing the trial would be fundamentally unfair to Plaintiff. During trial against the officers, they will testify that they were reasonably trying to act pursuant to deficient City policy. This is not speculation; the officer Defendants have testified accordingly at their depositions. During a trial against only the officers, Plaintiff would not be able to explain how the policy

failures of Defendant City caused the Officers' actions. If the Plaintiff lost at trial against the Officers, the second trial against the City would also suffer from an incomplete and prejudicial picture. Plaintiff's policy claim is ripe now. Delaying its examination until a second trial would attenuate its policy benefit. There is no set of jury instructions that could cure the prejudice to Plaintiff when it is unlikely that the evidence will have the same weight to a second jury—who could decide that they do not agree with the earlier jury's verdict. Courts have decided in similar circumstances that bifurcation does not make sense.

## **Background**

In 2016, the City's lack of any real foot-chase policy was a hot-button issue, with high-profile tragedies becoming a staple of the nightly news. Former Mayor Lightfoot staked her candidacy on correcting this obvious and dangerous problem. Lightfoot spoke about the urgent need for a policy that could not wait for a Consent Decree deadline. The City knew that officers had to improvise, often making bad decisions. Chicago Officers, like Defendants, were confused and frustrated. Civilians were scared and becoming angry.

By 2021, when Defendants chased and killed Anthony Alvarez, what had the City done? If *nothing* is not technically precise; to say that the City had done precious little would be a gross overstatement. Even now, in 2024, there is no evidence of a comprehensive policy or training. In this case, the City has held-up a two page emailed training bulletin as "proof" of its seriousness. There is not one positive thing to say about this opaque document—which did not even carry the force of a general order. There was no guarantee that officers would understand, let alone even read, this insincere inbox filler. In this case, the Defendants testified that they did in fact read the bulletin. Unfortunately, it confused them and led to contradictory interpretations. The Defendants received no guidance on how to interpret the bulletin—or anything that could charitably be called training. The bulletin was not benign. Based on his recollection of the

bulletin, Defendant Solano deviated from what he believed was the safest course of action when it mattered. (Plaintiff's First Amended Complaint Doc., 80 ¶¶ 43-45.) Defendant Encarnacion described the lack of foot chase training in his interview after the shooting. (Plaintiffs' First Amended Complaint Doc. 80, ¶¶ 46-47.) He stated that he never received any real foot pursuit training and that he regarded the CPS training bulletin to constitute suggestions and recommendations. (*Id*.) Encarnacion testified that he interpreted the memo to encourage him to attempt to chase and seize individuals who he believed could be armed. Defendants' direct supervisor, Sgt. Haran, acknowledged that at the time of Anthony's death he was not aware of any foot chase policy. (Doc. 80 ¶ 48.)

Defendant Officers have raised qualified immunity. (Doc. 65, pp. 37.) In this case Defendants pled that "Defendants Solano and Encarnacion could have believed their actions to be lawful, in light of clearly established law and information that they possessed." *Id.* In their fifth Affirmative Defense, with regard to the state law claims, Defendants pled that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id.* at 38.

Wild interpretations and guesses regarding foot chase policy were not limited to this case. (Plaintiff's First Amended Complaint Doc. 80 ¶ 93.) (Officers in a contemporaneous situation testified that they were supposed to seize citizens on the mere suspicion of firearm possession—an unconstitutional conclusion.) By Spring of 2021, Chicago Police officers were disillusioned. The City left them twisting in the wind because concerns over political appearance took priority over clear policy, properly implemented. The City is again trying to Dismiss Plaintiff's *Monell* claim, this time by using the veneer of a motion to bifurcate, because it knows what a jury will know. The City's policy and practice killed Anthony Alvarez.

## **Legal Standard**

Federal Rule of Civil Procedure 42 states, in relevant part, "for convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED. R. CIV. P. 42(b). "When determining whether to bifurcate discovery or trial, the Court "must balance considerations of convenience, economy, expedition, and prejudice, depending on the peculiar facts and circumstances of each case." *Hauskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008). Accordingly, "because bifurcation risks additional delay, it has remained the exception and not the rule*." A.L. Hansen Mfg. Co. v. Bauer Products, Inc.*, 2004 WL 1125911, at *2(N.D. Ill. 2004); *See Real v. Bunn-O-Matic Corp.*, 195 FRD. 618, 620 (N.D. Ill. 2000) ("The piecemeal trial of separate issues in a single lawsuit is not to be the usual course."); *See also Awalt v. Marketti,* 2012WL 1161500, at *10 n.2 (N.D. Ill. 2012) ("The Court has looked at every decision in this District involving bifurcation of *Monell* claims...since the Seventh Circuit decided *Thomas v. Cook County Sheriff's Dep't.* It is clear that the weight of authority holds that bifurcation is now heavily disfavored.") (*internal citations omitted*).

Many courts in this district have recently ruled against bifurcating *Monell* claims. *See Love v. City of Chicago*, 363 F. Supp. 3d 867, 874 (N.D. Ill. 2019); *Rodriguez v. City of Chicago*, 429 F. Supp. 3d 537 (N.D. Ill. 2019); *Hudson v. City of Chi*., 2017 WL 1425594, at *5 (N.D. Ill. Apr. 20, 2017) (denying motion to bifurcate as premature without prejudice to refiling after discovery); *Tate v. City of Chi*., No. 18 CV 07439, 2019 WL 2173802, at *3 (N.D. Ill. May 20, 2019); *Bailey v. City of Chicago*, No. 19-cv-00197 (N.D. Ill. Jan. 10, 2019); *Garcia v. Ramirez,* No. 19-cv-5381 (N.D. Ill. Apr. 5, 2021); *Bouto v. Guevara*, Case No. 19-cv-2441 (N.D. Ill. Feb. 11, 2020); *Loury v. City of Chicago*, No. 16-cv-4452 (N.D. Ill. Mar. 27, 2020); *Arsberry v. Wexford,* No 17-cv-50044 (N.D. Ill. Oct. 22, 2021); *Maysonet v. Guevara*, Case No. 18-cv-

2342 (N.D. Ill. June 11, 2020); *Mendez v. Chicago,* No. 18-cv-5560 (N.D. Ill. Mar. 26, 2020); *Trexler v. Belvidere*, No. 20-cv 50113 (N.D. Ill. Feb. 10, 2021); and *Batchelor v. Chicago,* No 18-cv-8513 (N.D. Ill. Mar. 4, 2021).

## Argument

### I. A Jury Can Hold the City Directly Liable for Plaintiff's Injuries Even if it Finds for Defendant Officers on Liability.

The Plaintiff's Monell claim is important and necessary for jurors to understand the totality of the circumstances as well as the officers' state of mind. A jury could find (1) Plaintiff suffered a constitutional violation; (2) Defendant Officers' actions were protected by qualified immunity (as raised in Defendant Officers' Answer and testimony) or were merely negligent; and (3) the Defendant Officers' actions were caused by the City's deliberate indifference. The Defendant Officers have essentially claimed that they were trying to adhere to the 'training bulletin.' If a jury believes them and blames Anthony Alvarez's death on City failures there can still be a verdict in the Plaintiff's favor, based on her *Monell* claim.

In *Thomas v. Cook County Sherrif's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010), a detainee died in Cook County Jail after he could not persuade Cook County prison staff and medical personnel to treat his severe case of meningitis. *Id.* at 297. Detainees were instructed to request medical care by placing written requests into a slit in a locked box. *Id.* at 298-299. Among his other efforts, the detainee made written requests for help. *Id.* at 298-300 Unfortunately, no one checked the box. The relevant personnel did not even have a key. *Id.* Discovery revealed that the failure to collect medical requests was an endemic practice. *Id.* After trial, a jury found that no individual medical personnel's related misconduct met the high standard required for § 1983 liability. *Id.* at 297-298.The jury, however, held that Cook County's institutional misconduct did meet that burden. The Seventh Circuit held that, "a municipality can be held liable under *Monell*,

even when its officers are not, unless such a finding would create an inconsistent verdict." *Id.* at 305. To determine whether the findings could be inconsistent, the Court must "look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

In *Lewis v. City of Chicago*, No. 04 C 3904, Dkt. No. 98, p. 9-10 (N.D. Ill. April 26, 2005), the court held that even though the City had revised its training materials regarding chokeholds—and even though the City trained new officers on the new policy—a reasonable jury could still find that the City was deliberately indifferent. This was because the City failed to re-train veteran officers on the new policy; a deliberate choice. *Id. Lewis* is instructive for understanding the difference between the two types of cases. The officer defendant in Lewis admitted that he did use a chokehold, but argued that the use was in accord with his training. *Id.*

In this case, Defendants pled that "Defendants Solano and Encarnacion could have believed their actions to be lawful, in light of clearly established law and information that they possessed." (Doc. 65, pp. 37.) In their fifth Affirmative Defense, with regard to the state law claims, Defendants plead that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id.* at 38.

In addition to their pleading, Defendants have asserted facts relating to the absence of training and the impact of the existing policy on their actions. The Officer Defendants are attempting to hide behind the City's policy failures to justify their misconduct. In this case, there is a plausible outcome where a jury could find that Plaintiff did suffer a constitutional violation, but the Defendants did not have the required mental state or were protected by qualified immunity. Plaintiff must present the complete case in one trial in order for a jury to properly assess who should be held liable and to effectively assess the affirmative defenses.

Defendants claim that qualified immunity could protect the officers without requiring a second trial against the City if Plaintiff fails to prove that Defendants did not violate a clearly established right. This scenario is not possible in this case because the right to be free from excessive force is well established. *See Graham v. Connor*, 490 U.S. 386, (1989). Here qualified immunity could be successful if a jury believes that Solano was acting according to a reasonable belief that his training authorized his actions as constitutional (even though they were not), and therefore his action could be deemed negligent and not meet the required recklessness standard. A second trial would be required because a jury could believe that the City was reckless/deliberately indifferent to the risk of constitutional injury for its policy failings. In this scenario—the only possible scenario where qualified immunity can succeed in this case—two trials would be required.

Defendants are correct that *City of Los Angelos v. Heller*, 475 U.S. 796 (1986) requires Plaintiff to prove a constitutional violation to succeed on a *Monell* claim. Defendants, however, are wrong that Plaintiff must establish <u>liability</u> for that wrong against a Defendant Officer to succeed on his *Monell* claim. For example, *see Cage v. City of Chi*., 2010 WL 3613981 (N.D. Ill. 2010) (finding that it would be consistent for a jury to hold the City liable for a policy of not providing exculpatory evidence to the defense despite the individual actors not intending to withhold said evidence); *Rivera v. City of Chi*., 1:12-cv-4428 (returning a jury verdict against the City on various *Monell* theories despite an individual detective not being found liable); *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000) ("Thus when a plaintiff loses his claim against a police officer based on qualified immunity, he can still recover against the municipality if he can prove a constitutional deprivation caused by a municipal policy or custom. In this situation, bifurcation will not avoid a second trial...."); *Awalt*, 2012 WL 1161500, at *12 ("In addition, it is likely that some of the Defendants in this case will assert immunity from

liability—qualified immunity, state-law immunity, etc... This leaves open the possibility that no inconsistent verdict will arise....”); and *Cage*, 2010 WL 3613981, at *2 (“Moreover, some of the individual defendants have asserted a defense of qualified immunity, and if Cage can establish it was the policy of the Chicago Police Department crime lab to withhold exculpatory evidence, a verdict could exist against the municipality but in favor of the individual defendants.”).

Bifurcation would make the first trial unjust, because Plaintiff could not explain the institutional forces that caused Defendants’ actions. For a jury to understand why Defendants killed Anthony Alvarez, the City is a necessary Defendant. It is impossible to know what a “reasonable” officer the Defendants’ situation would have done without evaluating the circumstances and other factors driving their actions. It is necessary for Plaintiff to ask a jury to hold the City directly accountable for its shameful practices, because the City killed Mr. Alvarez as plainly as Defendant Solano. Plaintiff has chosen the proper mechanism to secure the City’s liability. Bifurcation rips the Plaintiff’s story in two, presenting an incomplete picture in both trials. If Plaintiff were to lose, there is no circumstance under which he would not seek a second trial on the *Monell* claim. Plaintiff would also, very likely, appeal the outcome of the first trial as unfair *because* of the prejudicial effect bifurcation had on both discovery and his ability to present evidence at trial.[1]

## II. The Case Cited by Defendants Do Not Support Their Arguments.

In the first section of their argument, Defendants erroneously argue that Plaintiff cannot prevail without a finding of liability against the officer Defendants. In the last paragraph of that section, Defendants cite cases where a second trial against the City was deemed unnecessary after the plaintiffs in those cases prevailed against a defendant officer. Rather than support

[1] Cases like *Thomas* and *Lewis*, do not represent an abstract possibility. Counsel for Plaintiff represented the estates in both cases.

Defendants' arguments, those cases are helpful for understanding why bifurcation in this case is inappropriate in the first place.

For example, *Wrice v. Byrne,* No. 14-C-5934 at Dkt. 626 (N.D. Ill. June 24, 2020) involved unambiguous allegations of torture which occurred in the 1990s. *Wrice v. Byrne*, 488 F. Supp. 3d 646, 652 (N.D. Ill. 2020). Torture requires intent to torture, could never be merely negligent, and could not be immunized. Because of the nature of the claims and defenses, without bifurcation, *Wrice* would have risked an inconsistent verdict. In *Wrice*, the public interest served by attacking ancient practices was severely attenuated. In this case, Plaintiff's policy claim is recent, and Plaintiff has received no information that would indicate that foot chase policy and training has been meaningfully settled. In addition, the policy claim and its related evidence are necessary for a jury to evaluate whether the officers' actions meet the threshold for liability, i.e. whether they acted reasonably *Kuri v. Folino*, 409 F.Supp. 3d 626 (N.D. Ill. 2019) involved allegations of officers coercing witnesses to give false identifications in a shooting investigation, behavior that could never be immunized. *Id.* at 630-643. As explained above, because of the nature of the allegations and defenses, there is no danger of an inconsistent verdict in this case.

The decisions in *Williams v. City of Chicago,* 315 F.Supp. 3d 1060, 1081 (N.D. Ill. 2018) and *Mitchell v. City of Chicago*, No. 18 C 7357 at Dkt. 86 (N.D. Ill. Sept. 18, 2019) are also consistent with the Plaintiff's position. In *Williams,* while the ultimate conclusion that there was no possibility of an inconsistent verdict under the *Williams* facts is debatable, the legal test is not. *Williams* held that if an officer's liability is necessary for finding against the City, bifurcation may be appropriate. *Williams,* at 1081. *Mitchell*, attached by Defendants as Exhibit F, aligns directly with Plaintiff's position. *Mitchell* examined two potential *Monell* claims to determine whether bifurcation would be appropriate. For the first claim, one of evidence

fabrication, the Court held that the act of fabrication would necessarily require officer liability, because the conduct could not be immunized. *Id.* at pp. 1-2. *Mitchell* then examines a second potential claim that the City's filing system prevented the transmission of exculpatory information to criminal defendants. *Id.* The judge indicated that this theory could avoid the pitfalls of the first, but there was one big problem. The plaintiff in *Mitchell* made no such allegation prior to his motion response. *Id.*

The cases cited by Defendants where bifurcation was granted are different from the present case in a fundamental way. In this case the central question is why Anthony Alvarez was shot. Here, like *Thomas* and *Lewis*, the question of "Why?" is foundational for determining liability. In this case, there is no question that Solano shot and killed the Plaintiff. (By contrast, in the cases cited by Defendants, liability hinges on whether the complained conduct occurred in the first place.) The question for the jury will be whether the shooting was reasonable. If a jury believes that a reasonable officer in Solano's position—provided with the same policy and training background—could have believed that he was doing what he was supposed to, or could have believed his actions were merely negligent, Solano could be found not liable. If the jury never-the-less believes that Anthony Alvarez's death at the hands of Solano was a constitutional violation—it could hold the City liable if it finds City practice caused his death. Splitting this case would deprive each jury of evidence necessary to answer the crucial question of "Why?" and would deprive Plaintiff the impact of her evidence.

## III. Defendants' Proposed Stipulation is Missing Teeth.

The City's "stipulation" is deficient. The City admits to nothing. It fails to stipulate to a single fact or piece of evidence. This stipulation would not have the force or impact of an actual judgment as incentive to improve policy. In fact, the stipulation explicitly continues to deny City

culpability. Two key facts are missing: (1) The City is on notice that its policies created a clear danger of causing constitutional violations; and (2) that its policies caused Defendant Officers to act in a dangerous way.

The thrust of the City's argument (as well as the impact of its limited consent to judgment) is that there is only one set of damages due to Plaintiff; and if Plaintiff obtains these damages against the individual officer, she is made whole. Plaintiff makes no claim to double renumeration. However, in this case, as argued above, it is possible that Plaintiff will win damages against the City and not the Defendant Officers. Even if an officer is held liable, there are non-monetary reasons to pursue *Monell*, especially where the policy is so dangerous. *See Cadle v. City of Chicago*, 15 C 4725, 2015 WL 6742070, at *3-4 (N.D. Ill. Nov. 2, 2015).

The principle that plaintiffs control their claims is firmly established. *See, e.g., Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 831 (2002); *Garbie v. Daimler Chrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000). It is equally accepted that a plaintiff is entitled to the moral force of his proof and, thus, may choose to reject a proffered stipulation to some element of his case. *See, e.g., United States v. Williams*, 238 F.3d 871, 875-76 (7th Cir. 2001); *Identiseal Corp. of Wisc. v. Positive Identification Sys.*, 560 F.2d 298, 302 (7th Cir. 1977). As a general matter, plaintiffs have the right to tell their story as they see fit. *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997). Here, the City would prefer to accept liability for individual officers rather than examine the practices that produce consistently tragic outcomes. The evidence is clear that the Defendants believe that they acted in conformity with standard operating procedures and with the sanction of the City. Without his *Monell* claim, Plaintiff's case loses much of its persuasive and moral force. A jury would not even be able to evaluate the evidence that would allow them to determine whether qualified immunity is appropriate.

The final glaring problem with Defendants' proposed stipulation, is that it does not cover the most likely scenario which could create an inconsistent verdict and necessitate a second trial. The stipulation does not anticipate the possibility that a jury could find that Solano merely acted negligently in causing a constitutional injury (without regard to qualified immunity), while the City was reckless.

## IV. Bifurcation Would Require Two Trials, Two Discovery Periods, Waste Resources, and Inconvenience Witnesses.

Because Plaintiff intends to pursue his *Monell* claim, Defendants' proposal would require two separate cases tried consecutively. The City's approach would multiply the proceedings, impose huge costs on the Court and the parties, and inconvenience the witnesses—all while prejudicing Plaintiff. These factors weigh heavily in favor of denying bifurcation. Courts have decided in these circumstances that bifurcation makes little sense. *Cadiz v. Kruger*, 2007 WL 4293976, at *5 (N.D. Ill. Nov. 29, 2007) (discussing the problems with assuming that judicial economy is served by bifurcation); see also *Awalt v. Marketti,* 2014 WL 1161500, at *10 (N.D. Ill. Apr. 9, 2012), at *10 and *Bell v. Chicago,* 2010 WL 432310, at *4 (N.D. Ill. Feb.3, 2010). Splitting this case in two makes no economic sense, when there are almost no circumstances where Plaintiff will not ultimately be able to pursue his *Monell* claim.

## III. Defendants' Discovery Argument Ignores the Courts February 22, 2024 Order.

The Court's ruling on the City's Motion to Dismiss streamlined and refined the scope of Plaintiff's *Monell* claim. The discovery that Defendants cited, was drafted and sent long before the Court's Ruling. What remains will be focused and related solely to Plaintiff's claim regarding Chicago foot chase policy and the related training. It is misleading for Defendants to cite requests relating to a broad claim which has been dismissed, and they would never be expected to answer. Plaintiff has no interest in unnecessary and expensive depositions or

conducting wasteful discovery. Plaintiff's position is clear. At the February 22, 2024 hearing on the Motions to Dismiss, Plaintiff's counsel stated that "bifurcation doesn't make sense and we should go forward on a very limited direct *Monell* discovery path and that's what we should start discussing" Doc. No. 129-2, p. 53. General police misconduct, general police oversight, and general consent decree compliance—potentially voluminous subjects—are no longer at issue.[2] To be completely clear, Plaintiff will limit consent decree discovery to the precise subjects that the Court has allowed to proceed.

### III. The Balance of Prejudice Weighs Against Bifurcation.

Defendants argue that without bifurcation they will be prejudiced at trial. While Defendants have described this generally, they has not identified a factual basis that could lead to prejudice in this case. The argument that *Monell* evidence will prejudice the individual Defendants at trial should be rejected. First, bifurcation primarily impact Defendant City. (If anything, the officers would be prejudiced by a bifurcated trial.) Second, as discussed above, in this case, the Officer Defendants are likely to use Chicago policy and practice as a shield in a bifurcated trial. Third, as explained above, a jury could see the City as the truly culpable party, while finding that the officers were merely negligent in their reliance on City practice.

A Jury knowing the City policy is fair to the Defendant Officers, not unfair, because the jury might find them less culpable. *Houseman*, 171 F.3d at 1121. Because the "claims asserted by Plaintiff are interwoven . . . it would be an unreasonable hardship and completely uneconomical to require proof of virtually the same facts in two separate trials." *Ratliff v. Chicago*, 2012 WL 5845551, at *6 (N.D. Ill. Nov. 19, 2012). *Clipco v. Ignite Design,* 2005 WL

[2] Oddly, Defendants point to Plaintiff's pre-Order attempt to depose a knowledgeable 30(b)(6) on *Monell* subjects as somehow problematic. Plaintiff's notice of deposition was crafted to mirror Defendant City's initial disclosure of exactly such a witness. Plaintiff's notice of deposition sought to depose the witness exactly as Defendant had disclosed them.

2861032, at *3 (N.D. Ill. Oct. 28, 2005) (bifurcation inappropriate when it "would result in unnecessary delay, additional expense, or some other form of prejudice"); *Terry v. Cook County*, 2010 WL 2720754, at *2 (N.D. Ill. July 8, 2010) ("[J]udges in this district have echoed Plaintiff's concerns about delay of the case and possible prejudice to Plaintiff from that delay.").

## CONCLUSION

Defendants have treated their motion as yet another motion to dismiss. The City's request to stay its Answer—an answer which should already be filed—is telling. Plaintiff brought her claim in federal court for the purpose of holding all the responsible parties accountable for Anthony Alvarez's death. Defendants' aggressive attempts to bury Plaintiff's now streamlined and manageable claim is an attempt to prevent Plaintiff from ever examining and proving the depth of the City's complicity. Few *Monell* claims are as strong as Ms. Higuera's, which can be proven with directness and specificity. Rarely is the evidence that proves policymaker complicity so publicly available.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny the Defendant City's Motion to Bifurcate and Stay *Monell* discovery.

Respectfully submitted,

/s/ Christopher R. Smith

Christopher R. Smith
Christopher Smith Trial Group, LLC
53 W. Jackson, Suite 856
Chicago, IL 60602
312.432.0400