**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GISELLE HIGUERA, Administrator for the Estate of Anthony Alvarez and as mother of A.A., a minor,

Plaintiff,

v.

CITY OF CHICAGO, *et al.*,

Defendants.

Case No. 22-cv-964

Hon. Steven C. Seeger

**MEMORANDUM OPINION AND ORDER**

After midnight on a chilly spring night, Evan Solano and Sammy Encarnacion of the Chicago Police Department spotted Anthony Alvarez walking on the streets of Chicago. They wanted to ask him about traffic violations from a few days earlier, including speeding and driving without a license. So they pulled up behind him in their unmarked squad car, and turned on the flashing lights. And then, Alvarez took off.

A foot chase ensued. The officers chased Alvarez through a backyard, down an alley, and along a sidewalk. As Officer Solano turned the corner, he saw Alvarez running away with a gun in his hand. The officer shouted for Alvarez to drop the gun, and pulled out a gun of his own. A few seconds later, Officer Solano fired five shots, taking Alvarez's life.

Giselle Higuera, the mother of Alvarez's minor child, sued both officers and the City. She brought an assortment of claims, such as excessive force and failure to intervene, plus *Monell* claims and claims under state law.

After discovery, the officers moved for summary judgment. For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## Background

This tragic episode began two days before the shooting. On March 29, 2021, Officers Solano and Encarnacion patrolled the streets of Chicago. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 173). During their patrol, they saw a car parked at a gas station, and it took off "at a high rate of speed." *Id.* at ¶ 7; *see also* Encarnacion Dep. Tr., at 97:3-11 (Dckt. No. 156-6).

The officers didn't give chase. They let the car go, but they took down the license plate and ran it through their database. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 6–7 (Dckt. No. 173). The search revealed that the vehicle belonged to Anthony Alvarez. *Id.* And it revealed something else: Alvarez had a suspended license. *Id.*

Two days later, the officers were on patrol in an unmarked police car. *Id*. at ¶¶ 8–9. Solano drove and Encarnacion sat in the passenger seat.

Shortly after midnight, the officers were driving southbound on Laramie Avenue when they spotted Alvarez walking north. *Id*. at ¶¶ 10–11. Alvarez had a bag and a cup in his hands. *Id*. at ¶ 10.

The officers recognized Alvarez. *Id.* at ¶ 11. So they decided to speak to him about the suspended license. *See* Encarnacion Dep. Tr., at 206:4-13 (Dckt. No. 156-6). Solano did a U-turn and headed in Alvarez's direction. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 173).

Alvarez began walking through a gas station parking lot. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 183). The officers pulled into the gas station, got behind Alvarez, and activated their flashing lights.

Alvarez didn't stick around. Instead, he made a break for it. He dropped a few items and jogged away. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 14 (Dckt. No. 173). The camera at the gas station captured his flight. *See* Shell Gas Station Exterior Security Video, Defs.' Ex. L, at 9:42-47 (Dckt. No. 156-12).

Several cameras recorded footage of the events that followed. Each officer wore a bodycam, and they captured the foot race. Solano's camera captured the shooting itself, and Encarnacion's camera recorded the aftermath. *See* Solano Body-Worn Camera, Defs.' Ex. J (Dckt. No. 156-10); Encarnacion Body-Worn Camera, Defs.' Ex. K (Dckt. No. 156-11).

The bodycam footage isn't perfect – after all, the officers were running, so the video jumps up and down in herky-jerky fashion. The record also includes footage from several security cameras in the neighborhood, including a camera at a home right by the shooting.

Alvarez ran through the gas station parking lot and continued down the sidewalk. The officers drove through the parking lot and followed in their car. *See* Security Video at 5220 W. Addison, Defs.' Ex. N, at 1:8-17 (Dckt. No. 156-14). By the look of things, Alvarez seemed to quicken his pace as he ran down the block. *Id.*

At some point along the way, the officers turned on their bodycams. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 18 (Dckt. No. 183). The beginning of the footage shows the officers in the car. About a minute into the footage, the video shows the officers driving through the gas station as they began their pursuit.

As they sped after him, Encarnacion warned Solano that Alvarez was holding his waistband as he ran, consistent with having a gun. *See* Encarnacion Dep. Tr., at 33:5-7 (Dckt. No. 156-6).

After leaving the parking lot and turning the corner, the officers drove a short distance before getting out of the car. They drove for maybe 10 seconds or so, going about a block. *See* Encarnacion Body-Worn Camera, Defs.' Ex. K, at 1:00-10 (Dckt. No. 156-11).

Solano parked in front of a house at 5237 W. Addison Street, and both officers hopped out. Alvarez kept running, darting down a walkway between two houses. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 173). He ran through the backyard and headed toward an alley.

The officers followed Alvarez, ran between the homes, turned the corner, and dashed down the alley. *See* Encarnacion Body-Worn Camera, Defs.' Ex. K, at 1:14-30 (Dckt. No. 156-11). At that point, the footage shows Alvarez running down the alley, off in the distance. He had a head start, and by that point, he was several houses away, so he is hard to see in the bodycam footage. But he's there. *Id.* at 1:30.

Encarnacion had an early lead over Solano, but it didn't last long. After about 20 seconds, Solano passed his partner and took the lead. *See* Solano Body-Worn Camera, Defs.' Ex. J, at 1:35-57 (Dckt. No. 156-10).

The chase continued all the way down the alley. The officers reached the end of the alley, turned right, and ran down a sidewalk along a side street. *See* Solano Body-Worn Camera, Defs.' Ex. J, at 1:57 – 2:12 (Dckt. No. 156-10). Solano chased Alvarez down the block, running for about 15 seconds with Encarnacion lagging behind.

Solano ran down the sidewalk along a fenced-in yard, turned the corner, and reached the front yard of a house on Eddy Street. At that point, he spotted Alvarez only a few steps away. *Id.* at 2:12.

A few cameras captured what happened next, from different perspectives. Solano's bodycam was on, and it recorded the action. But Solano was running, so the footage is less than ideal. Encarnacion had a bodycam, too, but he lagged behind, so his camera didn't record the shooting.

The best footage of the shooting comes from a security camera on the second house on the block. That camera recorded the shooting from an elevated position, from the vantage point of the general direction where Alvarez was running *to*. Unlike the bodycam, the security camera on the house was stationary, so it is easier to see what happened.

The footage from the house camera begins with Alvarez appearing in the upper left of the frame. He turned the corner and entered the front yard. Alvarez lost his footing, and fell to the ground. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 173). He nearly got back on his feet, but he stumbled again, before getting up and heading off. *See* Home Security Video, Defs.' Ex. P, at 4:53-57 (Dckt. No. 156-16). He ran across the front yard of the first home.

Moments after Alvarez had regained his footing, Solano rounded the corner and entered the front yard. *See* Solano Body-Worn Camera, Defs.' Ex. J, at 2:7-12 (Dckt. No. 156-10). He wasn't far behind. By the time Alvarez got back on his feet, Solano had caught up, and was only a few steps away. *See* Home Security Video, Defs.' Ex. P, at 4:53-57 (Dckt. No. 156-16).

Within two seconds of rounding the corner, Solano shouted, "Hey! Drop the gun! Drop the gun!" *See* Solano Body-Worn Camera, Defs.' Ex. J, at 2:11-14. As he yelled, Solano drew his gun, and pointed it at Alvarez. *Id.* at 2:13-14.

Solano testified that he saw a gun in Alvarez's right hand as he closed the distance. *See* Solano Dep. Tr., at 302:9-14 (Dckt. No. 156-7). The gun isn't visible from the bodycam footage

during the chase. But the gun is visible in the home security footage. *See* Home Security Video, Defs.' Ex. P, at 4:57-59. Alvarez ran with a phone in his left hand, and a gun in his right hand.

Alvarez didn't drop the gun. But he didn't point the gun at anyone, either. He wasn't holding it out, and he wasn't brandishing it in any way. Instead, he held the gun low and close, near the front of his waistline. *See* Home Security Video, Defs.' Ex. P, at 4:57 – 5:00; Solano Body-Worn Camera, Defs.' Ex. J, at 2:14-16.

Alvarez continued to run across the front yard. For a quick second, he seemed to turn his head a little, looking back at Solano over his right shoulder. *See* Home Security Video, Defs.' Ex. P, at 4:57 – 5:00. But he didn't turn or twist his body much, if at all. He simply glanced back as he ran forward. *Id.*

He made it only a few more steps.

Alvarez stumbled across the lawn in the direction of a front staircase at the entrance of the second home (with the security camera). He had just gotten up from his fall, and he looked unsteady as he tried to regain his balance and keep running. He seems to have shifted direction a little in an awkward attempt to avoid the staircase. But he didn't turn around to face the officer. *See* Home Security Video, Defs.' Ex. P, at 4:59 – 5:01.

Less than a second after yelling "Drop the gun" a second time, as Alvarez moved to avoid the staircase, Solano pulled the trigger. *See* Solano Body-Worn Camera, Defs.' Ex. J, at 2:11-15.

Solano fired five shots in the span of two seconds. *See* Home Security Video, Defs.' Ex. P, at 4:59 – 5:01; Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 173).

The bullets struck Alvarez, and he immediately fell to the ground. The gun fell from his hand, landing in the grass by the sidewalk at the entrance of the home. *See* Home Security Video, Defs.' Ex. P, at 4:59 – 5:01; Solano Body-Worn Camera, Defs.' Ex. J, at 2:24.

When Solano fired the weapon, Alvarez was a short distance away. The blast from the gun is visible when watching the video in slow motion. *See* Home Security Video, Defs.' Ex. P, at 4:59. At that point, Alvarez was a little more than body length away – maybe six or eight feet. The distance is roughly equal to two rectangular slabs of cement on the nearby sidewalk.

Alvarez gave his last words: "why are you shooting at me?" *See* Solano Body-Worn Camera, Defs.' Ex. J, at 2:11-15. Solano shouted back: "you had a gun!" *Id.*

Solano later testified that he fired shots because he believed that Alvarez was turning around to shoot him. *See* Solano Dep. Tr., at 295:6-20 (Dckt. No. 156-7).

It's hard to describe how fast everything unfolded. It all happened in a split second. Reading this paragraph will take longer than the fateful moments on the front lawn before the shooting.

As the fifth and final shot rang out, Encarnacion rounded the corner onto Eddy Street. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 173). Encarnacion drew his weapon, but at that point, Alvarez had already collapsed on the ground. *See* Encarnacion Body-Worn Camera, Defs.' Ex. K, at 1:53-57. Encarnacion couldn't have stopped the shooting, because the shooting took place right before he arrived on the scene.

The officers located Alvarez's gun, reported the shooting, and requested emergency medical services. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 54 (Dckt. No. 173).

The officers looked confused and bewildered about what to do after the shooting. They didn't exactly spring into action to give Alvarez medical care. Of all things, one of the officers

started to put Alvarez in handcuffs – while he laid on the ground motionless, with the gun out of reach – but the other officer brushed him off.

By the look of things, one of the officers finally attempted to provide some type of medical care a minute and a half after the shooting, or maybe more. The medical care largely consisted of removing Alvarez's pants, and cutting his shirt open. They started giving Alvarez CPR four and a half minutes after the shooting. At that point, it was too late.

Alvarez unfortunately succumbed to his injuries. *Id*. at ¶ 56.

Giselle Higuera, the mother of Alvarez's child, sued on his behalf. She brought excessive force and failure-to-intervene claims against each officer. *See* Second Am. Cplt. (Dckt. No. 80).[1] She brought state-law claims, too, including wrongful death and survival claims against Solano and the City. And she brought indemnification and *respondeat superior* claims against the City under state law. *Id*. at ¶¶ 170–77.

Higuera also brought two *Monell* claims against the City. She alleged that the City lacked a proper foot-chase policy. And she alleged that the City had a policy of failing to discipline and supervise officers.

This Court trimmed the case in a series of orders. At the motion-to-dismiss stage, this Court dismissed the excessive force claim against Encarnacion and her failure-to-intervene claim against Solano. *See* 11/30/22 Order (Dckt. No. 61). Encarnacion didn't apply force because he arrived on the scene after the shooting.

Later, this Court dismissed the *Monell* claim about the failure to train and supervise. *See* 2/22/24 Order (Dckt. No. 124). The Court also granted Defendants' motion to bifurcate

---

[1] Higuera mistakenly titled her second amended complaint as the "First Amended Complaint."

Higuera's *Monell* claim about the foot-chase policy, and stayed discovery on that claim. *See* 6/26/24 Order (Dckt. No. 139).

After discovery, Defendants moved for summary judgment. Solano (again, the officer who fired the shots) moved for summary judgment on the excessive force claim and on the state law claims. Encarnacion moved for summary judgment on the failure-to-intervene claim.[2]

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the non-moving party, giving the non-moving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir.

---

[2] Defendants withdrew the section of their brief arguing for summary judgment on Higuera's claims against Chicago. *See* Defs.' Unopposed Mtn. to Withdraw Section E of Mem. (Dckt. No. 163); 10/23/24 Order (Dckt. No. 168).

2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322.

**Analysis**

This Court will begin with the excessive force claim under the Fourth Amendment, before turning to the state-law claims. The failure-to-intervene claims will come last.

## I. Excessive Force Claim

The first issue involves the excessive force claim against Solano under the Fourth Amendment. Solano invokes qualified immunity.

Qualified immunity "protects government officers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *See Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine gives officers "breathing room to make reasonable but mistaken judgments about open legal questions," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (cleaned up).

When an officer raises qualified immunity, "the burden shifts to the plaintiff to show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *See Neita v. City of Chicago*, 148 F.4th 916, 930 (7th Cir. 2025) (quoting *al-Kidd*, 563 U.S. at 735); *see also Weinmann*, 787 F.3d at 450 ("In essence, [an officer] enjoys a kind of double deference: 'the substantive constitutional standard protects [his] reasonable factual mistakes' and 'qualified immunity protects [him] from liability where [he] reasonably misjudge[d] the legal standard.'") (citation omitted).

A plaintiff must satisfy both prongs to survive summary judgment. "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Weinmann*, 787 F.3d at 447 (quoting *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). That is, a defendant is entitled to summary judgment based on qualified immunity unless a reasonable jury could find a constitutional violation, *and* unless the violation involves a clearly established right.

The burden shifts to the plaintiff to overcome the defense of qualified immunity. But the standard doesn't change when it comes to the *facts*. When a defendant moves for summary judgment based on qualified immunity, normal rules apply when it comes to the record. A district court must continue to construe the facts in a light favorable to the plaintiff as the non-moving party.

**A. Constitutional Violation**

The first question is whether a reasonable jury could find that Solano used excessive force.

Deadly force is a seizure, so the Fourth Amendment comes into play. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "A claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment." *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (cleaned up).

"The touchstone of the Fourth Amendment is reasonableness, as measured in objective terms." *Id.* (cleaned up). The analysis focuses on "whether the force deployed was justified from 'the perspective of a reasonable officer on the scene.'" *Id.* (citation omitted).

An objective inquiry does not involve plumbing through an officer's thoughts to search for their "underlying intent or motivation." *See Graham v. Connor*, 490 U.S. 386, 397 (1989). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively

reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Sometimes deadly force is reasonable, not excessive. The use of deadly force is reasonable if, under the totality of the circumstances, the officer "'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *See Mendez v. City of Chicago*, 160 F.4th 888, 891 (7th Cir. 2025) (quoting *Garner*, 471 U.S. at 11).

The inquiry depends on the facts "as then known to the officer." *See Barnes*, 605 U.S. at 80. Courts consider the use of force "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *See Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (citation omitted); *see also Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021) ("[W]e must be careful not to allow the benefit of hindsight to cause us to discount the reality that officers must make quick decisions as to how much force, if any, to employ.").

After all, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *See Graham*, 490 U.S. at 396–97.

Courts must "remain mindful that the opportunity to debate the merits of various law enforcement responses 'in the peace of a judge's chambers' is a privilege unavailable to most officers in real time." *Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022) (quoting *Graham*, 490 U.S. at 397); *see also Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) ("Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information.").

"What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002).

Evaluating the reasonableness of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *See Garner*, 471 U.S. at 11–12.

"[A] suspect disobeying commands to stop or drop a weapon is a factor that reasonably supports an officer's belief that the suspect presents an imminent threat." *Est. of Eason by Eason v. Lanier*, 2021 WL 4459469, at *9 (N.D. Ill. 2021) (citations omitted).

Solano argues that using deadly force was reasonable because Alvarez posed an immediate threat of serious physical harm to Solano and Encarnacion. *See* Mem. in Supp. of Defs.' Mtn. for Summ. J., at 7–13 (Dckt. No. 157).

The parties offer sharply different versions of what happened in the front yard.

As Solano tells it, he saw Alvarez with a gun in his right hand, and told him to drop it. *Id.* at 12. At that point, Alvarez allegedly "extended his gun away from his body . . . while simultaneously opening his left shoulder and left hip so as to rotate his body in Solano's direction." *Id.* Solano contends that Alvarez "began to turn towards" Solano with the gun, so Solano fired his weapon out of fear that "he was about to die." *Id.*

Solano is the only living witness, so if no other evidence existed, Solano would get summary judgment. "When an officer who used deadly force is the only possible witness, a decedent's estate is unlikely to succeed unless physical evidence contradicts the officer's account. So we have said in multiple decisions. . . . Disbelief of the only witness is not proof

that the opposite of the witness's statements is true; disbelief would mean that the record is empty, and on an empty record the plaintiff loses, because the plaintiff has the burdens of production and persuasion." *See Est. of Logan v. City of South Bend*, 50 F.4th 614, 615 (7th Cir. 2022).

But Higuera points to the video, and that footage tells a story of its own. *See King v. Hendricks County Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) ("To ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts.").

As Higuera sees things, Alvarez didn't turn toward Solano at all. *See* Pl.'s Resp. to Mtn. for Summ. J., at 21 (Dckt. No. 171). According to Higuera, Alvarez "did not show the weapon, point the weapon, or even turn with the weapon," so he posed no immediate threat. *See* Pl.'s Statement of Additional Facts, at ¶ 30 (Dckt. No. 172).

The parties disagree about the material facts. Factual disputes can get a little tricky when the issue involves qualified immunity.

The important thing to remember is that qualified immunity does not change *how* to view the record. The summary judgment standard is the summary judgment standard. The plaintiff has the burden to overcome qualified immunity, but when a defendant moves for summary judgment, a district court must view the record in a light favorable to the plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.") (citation omitted; brackets in original).

The Seventh Circuit recently offered guidance about how district courts should proceed when a motion for summary judgment involves qualified immunity, and the record includes disputed questions of material fact. *See Villalobos v. Picicco*, 168 F.4th 1057, 1063–64 (7th Cir. 2026) ("Where material facts are disputed, the district court has three options.").

One option is to construe the facts in favor of the plaintiff as the non-moving party, and then grant the motion for summary judgment based on qualified immunity. *Id.* at 1064 ("First, it can still grant the motion for summary judgment on qualified immunity grounds, so long as it construes all facts in the plaintiff's favor.").

"If it finds that the plaintiff's factual allegations do not add up to a constitutional violation, it should enter judgment on prong one. Or it can find that the relevant law was not clearly established at the time of the incident, granting the motion on prong two." *Id.*

In other words, maybe a defendant is entitled to qualified immunity, even if the plaintiff's version of the facts is correct. Maybe the defendant didn't violate the Constitution, even if the plaintiff is right about the facts. Or maybe the law was not clearly established, so the plaintiff cannot overcome qualified immunity even if the plaintiff's story is true.

A second possibility is that the district court can deny the defendant's motion for summary judgment. *Id.* ("Second, the district court can deny the motion for summary judgment and reject the qualified immunity defense as a matter of law.").

A plaintiff might have enough evidence to support a finding of a constitutional violation by a reasonable jury. And the evidence might support a finding of a violation of a clearly established right. In that situation, a district court should deny the motion for summary judgment, and let the jury sort out what happened.

A third option is similar to the second option. A district court could deny the motion for summary judgment about qualified immunity, and revisit the issue of immunity after the jury decides questions of fact. *Id.* ("In this scenario, the district court temporarily rejects the qualified immunity defense, but the defendants can renew it after a jury settles the relevant disputes of fact at trial.").

Needless to say, all three options assume that there is a *genuine* issue of *material* fact. So, a district court could resolve a motion for summary judgment about qualified immunity on other grounds, too. A court could decide that the disagreement about the facts isn't real, or doesn't matter.

This Court must construe the facts in a light favorable to Higuera as the non-movant. Here, that approach means interpreting the video evidence in Higuera's favor.

As Higuera sees things, Alvarez ran away from the officer without pointing his weapon or threatening the officer. In fact, Higuera contends that Alvarez didn't even turn toward the officer. He simply ran away.

That interpretation of the record is fair game. Based on the video evidence, a reasonable jury could reach the conclusion that Alvarez simply ran away.

True, there is other evidence in the record. After all, Solano testified that Alvarez turned toward him. Even so, it is possible to watch the video and conclude that Solano's recollection isn't consistent with what happened. A reasonable jury could watch the video and reach the conclusion that Alvarez didn't turn toward the officer. So, for purposes of summary judgment, this Court must consider whether Solano is entitled to summary judgment if Alvarez didn't turn in the officer's direction.

Frankly, a closer question (which this Court doesn't have to answer) is whether a reasonable jury could find that Alvarez *did* turn toward the officer. Solano testified that Alvarez turned, but that interpretation seems in tension with the video.

Courts sometimes disregard testimony when it is inconsistent with what they can see for themselves. But the video must support only one possible interpretation, and leave room for only one outcome. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations. A conclusive video allows a court to know what happened and decide the legal consequences, but a video that is ambiguous or not wholly clear can be relied on only for those facts that can be established with confidence and beyond reasonable question." *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (cleaned up).

"[W]hen the parties tell conflicting stories and video evidence 'blatantly contradict[s]' one party's allegations, we do not adopt that party's version of the facts at summary judgment." *Compton v. Toler*, 2026 WL 1622820, at *1 (7th Cir. 2026) (citation omitted; brackets in original); *see also Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts."); *Smith*, 10 F.4th at 730 ("When video 'firmly settles a factual issue,' we will not 'indulge stories clearly contradicted by the footage' because there is no genuine factual dispute.") (citation omitted); *Raddant v. Douglas County*, 170 F.4th 583, 591 (7th Cir. 2026) ("We have noted time and again that it is the 'rare case where video evidence leaves no room for interpretation by a fact finder.'") (citation omitted).

Video evidence has no special status compared to other forms of evidence. *See Mendez v. City of Chicago*, 160 F.4th 888, 892 (7th Cir. 2025) ("Do not misinterpret what we are saying: video evidence enjoys no special status in law by virtue of being video evidence. It is not infallible."). So, if a video leaves room for interpretation, then courts interpret the video in favor of the non-moving party.

Alvarez was running after getting up from a fall, and he was unsteady on his feet. He wasn't going in a straight line. Maybe, just maybe, a reasonable jury could side with Solano and decide that Alvarez was turning.

Even then, the ultimate question is not whether Solano was *right*, meaning that Alvarez really did turn toward the officer. The question is whether a reasonable officer could have *believed* that Alvarez turned toward him. After all, the Fourth Amendment is about *reasonableness*. An officer doesn't have to be *right* – an officer has to be *reasonable*. *See City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015); *Weinmann*, 787 F.3d at 448.

In any event, there is no need to decide whether a reasonable jury could watch the video and find that Alvarez *did* turn toward the officer (or more precisely, whether a reasonable officer could have *believed* that Alvarez turned toward him). After all, Higuera didn't move for summary judgment as the plaintiff. If Higuera had moved for summary judgment, this Court would have viewed the facts in Solano's favor. And then, this Court would have considered whether a reasonable jury could conclude that Alvarez turned toward the officer.

Instead, Solano moved for summary judgment, so this Court must interpret the evidence in Higuera's favor as the non-movant. That is, the question is whether a reasonable jury could conclude that Alvarez *didn't* turn in the officer's direction. After watching the video countless

times, in real speed and in slow-motion, this Court has little trouble concluding that a reasonable jury could conclude that Alvarez *didn't* turn toward the officer.

The question, then, is whether a reasonable jury could find that Solano used excessive force by shooting Alvarez when he was running away *without* turning toward the officer.

In excessive force cases, courts draw different lines when officers confront individuals with firearms. The reasonableness of using deadly force depends in large part on what the person was doing with the gun.

The easiest cases involve pointing a gun. If a suspect raises a gun and *points* it at a police officer, there is no question that the officer has probable cause to use deadly force. *See Weinmann*, 787 F.3d at 449–50 ("[I]f Jerome had the gun raised to his shoulder and pointed at [Officer] McClone, then McClone would have been justified in using deadly force and hence entitled to qualified immunity."); *see also Est. of Escobedo v. Martin*, 702 F.3d 388, 410–11 (7th Cir. 2012); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002).

But officers need not wait until a gun is directly pointed at them to take decisive action. *See Conley-Eaglebear v. Miller*, 2017 WL 7116973, at *2 (7th Cir. 2017). An officer also has probable cause to use deadly force against a person "fleeing the police, carrying a gun, and *turning* toward [the officer] with gun in hand." *Id.* (emphasis added).

The officer doesn't need certainty that the item is a gun. For instance, the Seventh Circuit affirmed summary judgment on qualified immunity grounds when, during a foot chase, an officer shot a suspect after seeing his "right hand swing in the officer's direction" with "*something* in his hand." *See Mendez*, 160 F.4th at 892 (emphasis added).

Police officers can use deadly force if a suspect *reaches* for a weapon, too. *See Helman v. Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014) ("Helman is left, then, with an argument under

§ 1983 that the officers violated his Fourth Amendment rights in shooting him when he was reaching for his firearm. That claim, however, cannot survive summary judgment because such a response is objectively reasonable.").

On the opposite end of the spectrum, the mere possession of a firearm, without more, is not enough to justify the use of deadly force. "[S]omeone does not pose 'an immediate threat of serious harm' solely because he is armed." *See Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020); *see also Weinmann*, 787 F.3d at 448.

After all, the Second Amendment protects the right to bear arms. It is hard to see how the police could have a legitimate basis for shooting someone for exercising a constitutional right.

Running away with a firearm is a closer call. The answer is context-specific, and turns on the unique facts at hand. Fleeing with a weapon, in and of itself, might not justify an inference that the person is dangerous and poses a threat to others.[3] But it depends on an assortment of factors, such as who the person is, what the person did, where the person came from, where the person is going, and so on.

To sum it up, *pointing* a gun is different than *turning* with a gun, which is different than *possessing* a gun. Police officers can use deadly force when an individual points a gun, or turns in a manner suggesting an imminent threat. But the mere possession of a firearm, without more, isn't enough to justify the use of deadly force.

[3] One district court in this circuit commented that, under Seventh Circuit case law, the police may not shoot an armed suspect who is fleeing. *See Czerpak v. Krueger*, 2023 WL 5822507, at *3 (E.D. Wis. 2023) ("The Seventh Circuit has explained that deadly force *may not* be used on a non-violent suspect, even if he is fleeing.") (emphasis in original). But that court cited only one case, and it might overread its holding. The Seventh Circuit merely offered dicta, without supporting citation of its own, and without delving into the issue. *See Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("We permit deadly force to be used against violent fleeing felons in part because they have forfeited the right to a less intrusive seizure by their actions. Fleeing felons who have not resorted to violence are accorded less intrusive seizures.").

On this record, viewed in a light favorable to Higuera as the non-moving party, a reasonable jury could conclude that Officer Solano used excessive force.

For starters, the reason for the foot chase looms large. The officers weren't chasing Alvarez because he had committed a violent offense, or was about to commit a violent offense. Alvarez hadn't fired a weapon, or threatened anyone with a gun. There is no evidence that he was about to hurt anyone, either. He didn't threaten public safety with the firearm.

Instead, Solano wanted to talk with Alvarez about a traffic violation. Solano and Encarnacion had witnessed Alvarez pull out of a gas station, traveling at a high speed without a license. That's it.

If you had to make a list of infractions that pose a threat to others, speeding out of a parking lot and driving without a license wouldn't be at the top of the list. They would appear above stealing a pack of gum. But it's fair to say that they would be somewhere near the bottom.

They're not nothing, but they're not the crimes of the century, either. Most driving violations are misdemeanors, not felonies. And for good reason. Speeding and driving without a license are not as serious as many other violations that traditionally justify the use of deadly force.

What's more, the alleged infractions didn't take place on the day of the shooting. The officers saw Alvarez driving too fast *two days earlier*.

Alvarez wasn't threatening anyone when he was walking down the street on the day of the shooting. And he certainly wasn't threatening anyone *as an unlicensed driver* when he wasn't even driving. Even if a driving violation is potentially dangerous, it's hard to commit a driving violation while walking.

Alvarez didn't do anything threatening with the gun when he was walking down the street. The officers didn't have any other basis to believe that he had committed a crime, or was about to commit a crime, or was up to no good, or anything along those lines.

The officers didn't even know that he possessed a gun until they noticed how he was running. Alvarez held his waistband while running, which was consistent with having a gun. *See* Encarnacion Dep. Tr., at 33:5-7 (Dckt. No. 156-6).

The brief interaction between Solano and Alvarez in the front yard did not pose an obvious threat, either. When Solano turned the corner and entered the front yard, Alvarez was running away. Alvarez wasn't facing the officer. His arm wasn't up or out. He wasn't making any physical movements that posed a clear threat.

Alvarez wasn't running in a crowd, either. The chase took place at midnight, on a quiet, deserted street. Alvarez wasn't posing a danger to people around him because no one was around.

True, Alvarez did not drop the gun after Solano directed him to do so. But almost no time passed between the directive and the shooting. Solano shot Alvarez almost immediately after yelling "Drop the gun!" So, a reasonable jury could conclude that Alvarez didn't ignore the command. He didn't drop the gun because he didn't have *time* to drop the gun.

That said, a few facts cut in the other direction.

Most importantly, the video leaves some room for interpretation. Alvarez had just stumbled and gotten up on his feet. His flight was unsteady as he regained his footing and scampered off. He ran in a direction that was something short of a straight line, too.

The officer was running, and he may have perceived Alvarez's movements differently in real time. Basically, a running person had to evaluate the movements of a running person, and

he had to make a split-second decision. In the heat of the moment, maybe the officer interpreted the somewhat-circuitous manner of running as a movement in his direction.

The lighting wasn't perfect. The chase happened around midnight. The officer may not have had a perfect view of Alvarez's movements.

Solano had sprinted for about a minute, too, and the combination of fatigue, adrenaline, and a racing heart might have affected his perception.

Alvarez was fleeing the officers, too. Flight matters. A factfinder can consider if the person was "actively resisting arrest or attempting to evade arrest by flight." *See Graham*, 490 U.S. at 396.

Alvarez wasn't under arrest, but the officers did want to perform a *Terry* stop and ask him about his driving. A factfinder could consider whether Alvarez was "interfering or attempting to interfere with the officer's duties" by running away. *See Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021); *see also Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).

The physical proximity could make a difference as well. During the chase down the alley, Alvarez was off in the distance. But by the time that Solano reached the end of the house and turned the corner, Alvarez was right there, a short distance away (maybe 15 feet or so).

A nearby person with a gun poses a greater danger than a faraway person with a gun. And the close proximity could have caught Solano off guard. The element of surprise could have added to the perception of danger.

What's more, Solano shouted for Alvarez to drop the weapon. And Alvarez didn't drop the weapon. A finder of fact can consider the fact that a fleeing person ignores demands when deciding if that person poses a threat. *See Est. of Eason by Eason v. Lanier*, 2021 WL 4459469, at *9 (N.D. Ill. 2021).

Even so, at this stage, the question is not whether a reasonable officer could have believed that Alvarez posed a threat. After all, Solano moved for summary judgment, not Higuera.

The question is whether a reasonable jury could decide that Alvarez did *not* pose a threat. On this record, a reasonable jury could reach that conclusion.

In sum, a reasonable jury could decide that Solano used excessive force by shooting Alvarez when he did not pose a "threat of serious physical harm" to the officers or the community. *See Mendez*, 160 F.4th at 891.

### B. Clearly Established Law

The next question is whether, construing the evidence in a light most favorable to Higuera, Solano violated a clearly established right by shooting Alvarez.

A plaintiff can show that a right is clearly established "*either* by identifying a closely analogous case that established a right to be free from the type of force the police officers used on him, *or* by showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *See Manery v. Lee*, 124 F.4th 1073, 1080 (7th Cir. 2025) (citation omitted) (emphasis added).

If the plaintiff chooses the first path, the case law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). "Existing precedent must have placed the statutory or constitutional question beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Pointing to abstract legal principles doesn't cut it. A plaintiff must point to "specific cases, not general legal principles." *Villalobos*, 168 F.4th at 1063. The "contours" of a rule must be "so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the

situation he confronted.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *See Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (cleaned up). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (cleaned up).

"Police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Manery*, 124 F.4th at 1080 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79.

That said, a plaintiff does not need to find "a case directly on point." *See al-Kidd*, 563 U.S. at 741. "Though specificity is important, it does not require a case presenting the exact same facts." *Taylor v. Milford*, 10 F.4th 800, 807 (7th Cir. 2021). Police officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Defining the proper level of specificity is easier said than done. It isn't hard to say that district courts must define the clearly established law with the appropriate level of specificity. But it's harder to know where that boundary is. Lots of cases say that district courts shouldn't be too general. Not a lot of cases tell district courts how to decide the proper level of generality.

By way of analogy, it is easy to say that a cake should come out of the oven when it's done baking. It's harder to know when, exactly, that is. Rules of thumb exist for that reason. Like "Try the toothpick test," or "Look for the cake to pull away from the sides of the pan."

If there are rules of thumb for defining the right level of specificity in qualified immunity, they are in short supply. In a twist of irony, the rule about defining the clearly established law with the proper level of specificity is *itself* too general to be much good.

This case illustrates the conundrum. How should the Court define the right at issue? That is, what is the proper level of generality?

Is the right question whether, under clearly established law, the police can shoot an armed, fleeing person? Or whether the police can shoot an armed, fleeing person *at midnight*? Or whether the police can shoot an armed, fleeing person at midnight *who is unexpectedly close to the officer*? Or whether the police can shoot an armed, fleeing person at midnight who is unexpectedly close to the officer *and who shifts direction while running*? Or whether the police can shoot an armed, fleeing person at midnight who is unexpectedly close to the officer and who shifts direction while running and *does not immediately drop a gun when commanded to do so*? Or whether the police can shoot an armed, fleeing person at midnight who is unexpectedly close to the officer and who shifts direction while running and does not immediately drop a gun when commanded to do so, *even if the police have no reason to think the person has committed or will commit a violent crime*? Or something else?

As the Court sees it, the facts must be viewed in the light most favorable to Higuera, and some of the extra layers of specificity are not exactly favorable.

Whatever the right level of generality is, the outcome is the same. Solano did not violate a clearly established right.

For the sake of argument, this Court will frame the right in a light favorable to Higuera: whether the use of deadly force violates clearly established law when a suspect (1) flees (2) with a gun, but (3) with no other indication of threatening or violent behavior.

Higuera has the burden of identifying closely analogous cases. *See Villalobos*, 168 F.4th at 1062 ("Importantly, the plaintiff bears the burden of proving the law is clearly established – not the defendant."). Even with this Court's generous framing, Higuera does not carry that burden.

Higuera relies heavily on the Seventh Circuit's decision in *Weinmann*. *See Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015). In that case, an officer shot a suicidal person "passively sitting in a chair with [a] gun across his lap." *Id.* at 451. The person was "neither resisting arrest nor threatening anyone save himself." *Id.* at 451. The Seventh Circuit held that the officer used excessive force.

*Weinmann* is meaningfully different than the case at hand. Alvarez wasn't passively sitting in a chair with a gun in his lap. The gun was in his hand, and he was actively fleeing from the police. He was moving unpredictably, too. Solano acted moments after seeing Alvarez's gun under the pressure of a high-speed foot chase. *Weinmann* could not have put Solano on notice that his conduct was unlawful.[4]

Higuera cited no other case law, so this Court could end its analysis there and grant summary judgment for the police officer. *See, e.g.*, *Thompson v. Village of Monee*, 110 F. Supp. 3d 826, 852 (N.D. Ill. 2015) (St. Eve, J.) ("Accordingly, [the plaintiff] – upon whom the burden squarely rests – fails to defeat Defendants' qualified immunity defense because he has not

[4] The notion that any police officer is reading Seventh Circuit case law is fanciful. *See, e.g.*, Joanna C. Schwartz, *Qualified Immunity's Boldest Lie* 88 U. Chi. L. Rev. 605, 610 (2021) ("[T]he Supreme Court's qualified immunity doctrine does not accurately reflect how officers are educated about court opinions or the role these opinions play in officers' decisionmaking.").

identified sufficiently analogous case law clearly establishing the constitutional right he accuses the officers of violating.").

For good measure, this Court conducted its own search for clearly established case law. That review confirms that Solano did not violate a clearly established right.

Taking a step back, the Supreme Court's decision in *Garner* is the trunk from which all branches of case law in this area sprout. *See Tennessee v. Garner*, 471 U.S. 1 (1985). At the core of that trunk is the simple proposition that officers cannot shoot *unarmed* fleeing suspects.

"A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11; *see also Jones v. Kuschell*, 2021 WL 5563715, at *4 (7th Cir. 2021) (citing *Garner*, 471 U.S. at 8–9). More precisely, deadly force "may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3.

The Supreme Court elaborated on the standards for excessive force in *Graham*. But once again, the Supreme Court painted with a broad brush.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *See Graham*, 490 U.S. at 396 (citation omitted). In the end, the test is reasonableness, so "its proper application requires careful attention to the facts and circumstances of each particular case." *Id.*

The Supreme Court laid down rules about excessive force in *Garner* and *Graham*, but did so "at only a general level." *See White v. Pauly*, 580 U.S. 73, 79 (2017). "*Garner* and *Graham*

do not by themselves create clearly established law outside 'an obvious case.'" *Id.* at 80; *see also Plumhoff*, 572 U.S. at 779 (emphasizing that *Garner* and *Graham* are "cast at a high level of generality").

A plaintiff cannot overcome an assertion of qualified immunity by pointing to *Garner* and *Graham*. That's no better than pointing to the prohibition on excessive force.

That said, if it is clearly established that officers cannot shoot *unarmed* fleeing suspects, one wonders if the constitutionally protected act of carrying a gun – without any threatening movements – suddenly gives the police a green light to pull the trigger. Also, the touchstone of the analysis is whether the person posed a significant threat of death or serious physical injury. It seems important that Alvarez did not engage in any threatening or violent behavior, except for fleeing from the police with a gun in hand.

Other cases shed some light, but they aren't on all fours, either.

In *Rios v. City of Chicago*, 523 F. Supp. 3d 1020, 1024 (N.D. Ill. 2021), a district court declined to grant qualified immunity to a police officer who shot and killed an armed, fleeing suspect. But it did so because there was a genuine dispute of fact about whether the officer could have believed that the suspect had a weapon. It wasn't clear that the suspect was armed.

If the officer had no basis to think the suspect had a gun, then he could not credibly believe that he was in imminent danger. *Id.* at 1029 ("[A] jury could find that [the officer] knew only that [the suspect] was running with something that he did not want to show to police, without any particular reason to believe it was a weapon other than his own intuition. If that is the jury's finding, then [the officer] is not entitled to qualified immunity because he had no reason to believe that [the suspect] was a threat to him or the community, so he was not entitled to use deadly force to stop him from fleeing."). And if the officer shot an *unarmed* fleeing

person, that would obviously violate *Garner*. *See Garner*, 471 U.S. at 1. So, the case turned on this factual dispute, and that was enough to send it to a jury.

Here, it is uncontested that Alvarez had a gun and that Solano had reason to *believe* he had a gun. While still in their patrol car, Encarnacion warned Solano that Alvarez was holding his waistband, consistent with him having a weapon. Solano also testified that he saw the gun after rounding the corner. He also yelled "Drop the gun!" twice as soon as he saw Alvarez a few steps in front of him.

The difference between shooting an *armed* fleeing suspect and an unarmed fleeing suspect is too material to make *Rios* "closely analogous." *See Smith v. Finkley*, 10 F.4th 725, 745 (7th Cir. 2021) ("Whether the suspect is holding or touching a weapon when shot is [] of great consequence in these cases.").

In *Ellis v. Wynalda*, 999 F.2d 243 (7th Cir. 1993), the Seventh Circuit reversed a district court's grant of summary judgment on qualified immunity grounds when a police officer shot an unarmed burglary suspect. The individual threw a lightweight mesh bag at the officer and then tried to run away. *Id.* at 245. As the suspect fled, the officer shot him in the back. *Id.*

The Seventh Circuit was "unable to conclude" that the officer's perceptions "justif[ied] the grant of qualified immunity." *Id.* at 246. The officer "had no particular reason to believe that [the suspect] was armed." *Id.* at 247. And throwing a four- or five-pound bag, while "risky and startling," is "not the equivalent of menacing an officer with a weapon." *Id.*

This case is different. Again, Solano had reason to believe that Alvarez had a gun. Solano had a reasonable basis to believe that he could be staring down the barrel of a gun at any moment. A gun can inflict a lot more damage than a mesh bag.

Yet another case, *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), included some language on the topic. It suggests that qualified immunity would not apply where an "escape attempt did not involve menacing a police officer or civilian with a weapon." *Id.* at 233.

But that language was dicta, not a holding. The case involved an unarmed person in a car getting shot by officers, after one officer jumped in front of the car to block it. *Id.* at 232. Dicta isn't clearly established law. *See, e.g.*, *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) ("Clearly established law comes from holdings, not dicta.").

Even then, that principle hovers at a high level of generality. It is not clear what "menacing" means. It could mean brandishing a gun, or pointing a gun, or running away with a gun. This imprecise language can't create a clearly established right.

Other cases favorable to Higuera are also factually distinct. In *Gant v. Hartman*, 924 F.3d 445 (7th Cir. 2019), the Seventh Circuit stated that "it is unreasonable to use deadly force against a suspect who is not resisting arrest and who is genuinely attempting to surrender." *Id.* at 451. But Alvarez *was* resisting arrest, not surrendering.

In *Holmes v. Hernandez*, 560 F. Supp. 3d 1177 (N.D. Ill. 2021), a district court concluded that a "fleeing, unarmed man is not a danger to officers or bystanders." *Id.* at 1196. But Alvarez was armed.

If anything, Seventh Circuit case law on deadly force doesn't provide a clear-cut answer, or cuts the other way.

In *Conley-Eaglebear v. Miller*, 2017 WL 7116973 (7th Cir. 2017), an officer shot a fleeing individual after seeing him "draw a gun and begin to point it in his direction." *Id.* at *2. The Seventh Circuit held that the officer acted reasonably. The officer "did not need to wait for [the person] to face him or point the gun directly at him before acting to protect himself and the

community." *Id.*; *see also Helman v. Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014) (holding that it is "objectively reasonable" for an officer to shoot a person who "was reaching for his firearm"); *Reynolds v. Shelton*, 2024 WL 4524123, at *1 (7th Cir. 2024) (concluding that deadly force was reasonable when a suspect "did not 'point' the gun at them," but "reached for [a] gun in her waistband").

The most similar case from the Seventh Circuit might be *Mendez v. City of Chicago*, 160 F.4th 888 (7th Cir. 2025). In that case, officers responded to a call about a gunshot. They arrived at a home, and Mendez ran away.

A foot chase ensued. One officer warned the other officer that Mendez had something in his waistband. Mendez "fell while running, got up, and looked back at the officers. As he did so, his right arm swung toward them with some sort of object in his right hand." *Id.* at 890; *see also id.* ("Mendez got back up and looked back over his right shoulder. As he turned, his right hand and arm swung in the officers' direction."). An officer yelled "I'll shoot you," and then immediately shot him. *Id.*

The Seventh Circuit held that the use of force was reasonable, without getting into whether the officer violated clearly established law. That case shares some similarities with the case at hand.

Both cases involved a foot chase of an armed suspect. Both cases involved a suspect who stumbled, with awkward movements. Both cases involved a warning or a command, without time to respond. Both cases involved a fast-moving, unpredictable environment where anything could happen in the flick of a wrist.

But *Mendez* isn't squarely on point, either. Those officers responded to a call about a gunshot, which isn't the case here. And the suspect in *Mendez* had something in his hand and

swung it in the officers' direction. Here, Alvarez was flailing and stumbling around, with something in each hand. But he didn't swing his arm toward the officers, either.

In *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988), the Seventh Circuit held that an officer acted reasonably when he shot a fleeing suspect in the back. The individual fled an armed bank robbery with a bag of money, and ignored commands to stop. *Id.* at 1272, 1276.

In *Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018), the Seventh Circuit ruled that an officer acted reasonably when he shot an individual in the back while that individual was crawling by the officer during a robbery. The individual was unarmed, but the officer reasonably believed that he was armed. The unpredictable atmosphere meant that the officer acted reasonably. "[F]or all a reasonable officer could have known [he] could have turned and produced a gun in a flash . . . ." *Id.* at 952; *see also Pam v. City of Evansville*, 154 F.4th 523, 533 (7th Cir. 2025) ("[T]he confluence of dangerous circumstances, in conjunction with [the suspect's] furtive movements and the dim lighting, presented the 'tense, uncertain, and rapidly evolving' situation where 'split second judgments' are a must, and the law allows for reasonable errors.") (citation omitted).

Other courts have addressed whether clearly established law forbids an officer from shooting an armed, fleeing suspect, and have come up empty.

The most similar district court case might be *Estate of Eason by Eason v. Lanier*, 2021 WL 4459469 (N.D. Ill. 2021). There, an armed individual fled, slipped and tumbled, picked his gun back up, continued to run, and did not turn around or point his gun at the officers, but still got shot. The court granted qualified immunity based on its finding that the officer did not violate clearly established law.

Once again, the case is not exactly on point. That person ignored repeated orders to drop his weapon, and his gun was "swaying in various directions," including in the officers' direction. *Id.* at *9. Even so, the case shares a lot in common with the case at hand.

Other courts have offered dicta that undercuts Higuera's position. Consider, for the second time, the decision in *Rios v. City of Chicago*, 523 F. Supp. 3d 1020, 1024 (N.D. Ill. 2021). Again, that court denied qualified immunity because there was a question of fact about whether the individual was armed. In the alternative, the plaintiff argued that even if the officer "knew that [the person] had a gun, he was not justified in shooting [the person] if [he] was not doing anything threatening with it." *Id.* at 1030.

The district court cast doubt on that conclusion. "Seventh Circuit cases recognize that an officer in a fluid, fast-developing, and chaotic situation that presents a threat of violence to the officer or the public may take decisive action to protect himself and the public, without the need to wait until a gun is actually pointed at him." *Id.*

There is a hodgepodge of case law in this area, and none of the cases recognize a clearly established right that favors Higuera. *See, e.g.*, *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) ("[O]fficers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety"); *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 984 (7th Cir. 2021) (granting qualified immunity where an off-duty correctional officer saw an armed scuffle break out in the street, and then shot one of the participants); *Maravilla v. United States*, 867 F. Supp. 1363, 1374 (N.D. Ind. 1994), *aff'd*, 60 F.3d 1230 (7th Cir. 1995) (finding deadly force reasonable where agents entered a room with an armed individual shooting out the window); *Klein v. Ryan*, 847 F.2d 368, 373 (7th Cir. 1988) (finding that deadly force was reasonable where an unarmed

individual fled a burglary in a car); *Tilson v. City of Elkhart*, 96 F. App'x 413, 415 (7th Cir. 2004) (holding that unleashing a K-9 was reasonable when a drunk driver fled police on foot and ignored orders to stop); *Jackson v. City of Madison*, 176 F.4th 1005, 1012 (7th Cir. 2026) (finding it reasonable for a SWAT team to shoot an armed, barricaded individual with soft bullets).

The long and the short of it is simple. Higuera did not point this Court to clearly established law prohibiting Solano from shooting Alvarez. And after rolling up its sleeves, this Court hasn't located any such case law, either.

Higuera has another option. The Seventh Circuit noted that "in some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *See Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000); *see also Manery*, 124 F.4th at 1080. A constitutional violation is obvious when the "defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *See Reed*, 906 F.3d at 547.

That's a high standard, and on this record, Higuera can't meet it. Solano faced a fluid, dynamic, fast-paced environment. He chased an armed suspect in the dead of night. And when he turned the corner, Alvarez was only a few feet away, and was moving in uncertain and unpredictable ways.

At best, Solano had a split second to think. A reasonable officer could conclude that he was in danger, so he had the ability to protect himself. *But see Est. of Smith by Haynes v. City of Milwaukee*, 410 F. Supp. 3d 1066, 1075–76 (E.D. Wis. 2019).

On this record, a finding of obviousness would run afoul of repeated admonitions about qualified immunity. The doctrine gives officers "breathing room to make reasonable but

mistaken judgments about open legal questions," and "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

Courts can't view the evidence with the "20/20 vision of hindsight," and for good reason. *See Plumhoff*, 572 U.S. at 775. Police officers must make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *See Graham*, 490 U.S. at 396–97.

That's exactly the type of situation that Solano faced. He turned the corner in the dead of night, and spotted Alvarez nearby, moving erratically and holding a gun. Solano may have made a mistake, but it wasn't "plainly incompetent," either. *See al-Kidd*, 563 U.S. at 743.

There is a third route that is less traveled. "In the absence of binding precedent specifically adjudicating the right at issue, the right may still be clearly established based on a 'consensus of cases of persuasive authority' from other jurisdictions." *See Ullery v. Bradley*, 949 F.3d 1282, 1294 (10th Cir. 2020) (quoting *al-Kidd*, 563 U.S. at 742); *see also Werner v. Wall*, 836 F.3d 751, 763 n.28 (7th Cir. 2016); *Ruff v. Han*, 2024 WL 4346609, at *6 (N.D. Ill. 2024); *Kopulos v. Pisaneschi*, 2025 WL 2239337, at *3 (N.D. Ill. 2025).

Higuera did not cite analogous cases from other circuits. But this Court performed its own search.

A number of circuits have held that it is clearly established law that an officer cannot shoot a fleeing suspect who is armed. *See, e.g.*, *Ruffin v. Davis*, 174 F.4th 414, 420 (4th Cir. 2026) (finding it "clearly established . . . that an officer would violate the Fourth Amendment by using deadly force against an armed suspect who runs from an officer . . . but doesn't raise his weapon or make any other threatening movements"); *Keith v. Griffiths*, 2025 WL 1604493, at *5 (6th Cir. 2025) (finding that an officer violated "clearly established right to be free from deadly force" where armed individual fled, but "did not turn and point a gun at [the officer]"); *Cole Est.*

*of Richards v. Hutchins*, 959 F.3d 1127, 1133 (8th Cir. 2020) (finding "the law was clearly established" that "use of deadly force . . . was objectively unreasonable" where an armed individual fled towards his porch "with his gun pointed either toward the ground or the sky"); *Edmond v. Lockwood*, 2023 WL 2423340, at *1 (9th Cir. 2023) (finding it "clearly established that police officers may not use deadly force on an individual who has not acted threateningly at any time during or prior to the encounter, even if they believe the individual has a firearm . . . even where the suspect is fleeing on foot").[5]

Two's "company" and three's a "crowd" – but it's unclear what rises to the level of a "consensus." *See Jimerson v. Lewis*, 94 F.4th 423, 429 (5th Cir. 2024) ("We have not previously identified the level of out-of-circuit consensus necessary to put the relevant question 'beyond debate' and to constitute clearly established law.") (quoting *Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019)).

Perhaps the string cite of cases creates a consensus. But at this time, without the benefit of briefing and without Seventh Circuit guidance, this Court doesn't go there.

From an Emperor-has-no-clothes perspective, it is unrealistic to think that any officer could have such a firm command of case law that he could know the right answer to a constitutional question in a split second, especially after coming face-to-face with someone with a gun. Especially *out of circuit* case law. That's faster than Westlaw. Even almighty AI can't figure out answers that fast.

[5] There is more debate where an order to drop a weapon has gone unheeded. *See, e.g.*, *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) (finding it reasonable to use deadly force on an individual who ran past the officer and "never actually pointed the sawed-off shotgun at anyone" because "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force"). But as explained, construing the facts in the light most favorable to Higuera, Alvarez arguably did not have enough time to comply with the command to drop the gun before the officer shot him.

The Supreme Court allows courts to consider a "consensus of cases" outside their jurisdiction as a proxy for what a reasonable officer should know. The idea is that, if plenty of courts say the same thing, then an officer has "fair and clear warning" about what the Constitution requires. *See United States v. Lanier*, 520 U.S. 259, 271 (1997). Even so, at some point, looking at case law outside of the circuit injects artificiality into an exercise that should reflect what happens in the real world, from a boots-on-the-ground perspective.

Solano may have made a mistake, but qualified immunity "provides 'ample room for mistaken judgments.'" *See Carmichael v. Village of Palatine*, 605 F.3d 451, 459 (7th Cir. 2010); *see also Smith v. Finkley*, 10 F.4th 725, 749 (7th Cir. 2021) ("Qualified immunity permits officers to make mistakes as to what is legally allowed."). Because Solano did not violate clearly established law, he gets the protection of the doctrine.

The Court grants summary judgment on the excessive force claim on qualified immunity grounds.

## II. State-Law Claims

Higuera also brought state-law claims of survival and wrongful death against Solano. *See* Second Am. Cplt., at ¶¶ 138–52 (Dckt. No. 80).

"The same rule applies to wrongful death claims under Illinois law as to Fourth Amendment excessive force claims: when an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *See Horton v. City of Chicago*, 2018 WL 4699790, at *12 (N.D. Ill. 2018) (Dow, J.) (cleaned up) (quoting *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002)). In other words, if the officer's actions were reasonable, no wrongful death claim can go forward.

The standards are the same, so Fourth Amendment claims and wrongful death claims tend to "stand or fall together." *See Williams v. Village of Maywood*, 2016 WL 4765707, at *4 (N.D. Ill. 2016) (Lee, J.) (citing *Muhammed*, 316 F.3d at 683). But here, they meet different fates because different immunity standards apply.

The qualified immunity doctrine applies to federal claims, but not to state-law claims. *See Horton*, 2018 WL 4699790, at *14 (explaining that "qualified immunity from a Section 1983 claim does not provide a shield against state law claims") (cleaned up). Instead, the Illinois Tort Immunity Act supplies the state-law equivalent. That statute generally protects officials "from liability for actions 'committed in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.'" *Id.* at *13 (citing 745 ILCS 10/2-202).

Whether an officer's actions were "willful and wanton" turns on whether the use of force was reasonable. *Id.* That question is the same as the first prong of the federal qualified immunity test. But state immunity doctrine does not require a showing that the right at issue was "clearly established."

As explained above, there is a genuine dispute of material fact as to whether Solano used excessive force. So the state-law claims against Solano survive.

## III. Failure-to-Intervene Claim

Higuera also brought a failure-to-intervene claim against Encarnacion, alleging that he failed to stop Solano's use of excessive force. *See* Second Am. Cplt., at ¶¶ 132–34 (Dckt. No. 80).

"'An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been

unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.'" *See Pryor v. Corrigan*, 2021 WL 1192481, at *19 (N.D. Ill. 2021) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Higuera does not argue that Encarnacion could have predicted that Solano would shoot Alvarez earlier in the pursuit, and for good reason. The record provides no basis for such a conclusion.

Instead, Higuera argues that Encarnacion could have stopped Solano from pursuing Alvarez in the first place. *See* Pl.'s Resp. to Mtn. for Summ. J., at 23–24 (Dckt. No. 171). As this Court has previously held, chasing Alvarez was not itself a Fourth Amendment violation. *See* 11/30/22 Order (Dckt. No. 61). So, there was no alleged constitutional violation for Encarnacion to prevent before the shooting itself.

No reasonable jury could find that Encarnacion had a realistic opportunity to stop Solano from shooting Alvarez. Encarnacion was on a different street than Solano when the shooting began, and the entire incident unfolded within seconds. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 173). It's hard enough to stop a shooting that begins and ends in a flash. It is impossible when the officer is not even there.

The Court grants the motion for summary judgment on the failure-to-intervene claim against Encarnacion.

*　　*　　*

The outcome of this motion turns on the intricacies of the qualified immunity doctrine. But it is important to keep the big picture in mind, too, from a real-world perspective.

This case is about yet another life lost on the streets of Chicago – a life that arguably should not have been taken. The family of Alvarez has suffered an unspeakable tragedy, causing undeniable pain that will continue for years to come. It is impossible to watch the videos without coming away with a deep sense of sadness.

The opinion is limited to the application of qualified immunity law. Nothing in this opinion calls into question the gravity of the loss. And nothing in this opinion suggests that anyone deserved to get hurt, or that the officer did the right thing by firing his weapon. Any reader can draw their own conclusions about whether the situation could have been handled differently.

**Conclusion**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on the excessive force claim under the Fourth Amendment against Officer Solano, and on the failure-to-intervene claim against Officer Encarnacion. The Court denies the motion for summary judgment on the state-law claims against Solano.

Date: September 30, 2026

Steven C. Seeger
United States District Judge